JONATHAN HAYDEN (Bar No. 104520)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104
Telephone: (415) 772-6000
Facsimile: (415) 772-6268
jonathan.hayden@hellerehrman.com

CHAD R. FULLER (Bar No. 190830)
BRITTANY L. S. LITTLE (Bar. No. 239681)
HELLER EHRMAN LLP
4350 La Jolla Village Drive, 7th Floor
San Diego, CA 92122
Telephone: (858) 450-8400
Facsimile: (858) 450-8499
chad.fuller@hellerehrman.com
brittany.little@hellerehrman.com

Attorneys for Defendant
WASHINGTON MUTUAL BANK

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VINCENT BOVA, on behalf of himself, and on behalf of all persons similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>WASHINGTON MUTUAL BANK and Does 1 to 10,<br><br>    Defendants. | Case No.: 07 CV 2410 WQH JMA<br><br>**DEFENDANT WASHINGTON MUTUAL'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS OR IN THE ALTERNATIVE MOTION TO STAY**<br><br>**Date:  June 9, 2008**<br>**Time:  11:00 a.m.**<br>**Judge:  William Q. Hayes** |

Heller
Ehrman LLP

DEFENDANT WASHINGTON MUTUAL'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS OR IN THE ALTERNATIVE MOTION TO STAY

CASE NO: 07 CV 241 WQH JMA

1       Pursuant to Federal Rule of Evidence 201, Washington Mutual Bank ("WaMu")

2   hereby requests this Court to take judicial notice of the following documents;

3       1.    A true and correct copy of the First Amended Complaint filed in Los Angeles

4   Superior Court Case No. BC356051 entitled *Creese v. Washington Mutual Bank* on October

5   21, 2004 without exhibits is attached as Exhibit A.

6       2.    A true and correct copy of the Memorandum of Points and Authorities in

7   Support of Plaintiffs' Motion to Certify a Class Action filed in Los Angeles Superior Court

8   Case No. BC323376 on April 14, 2006 without exhibits is attached as Exhibit B.

9       3.    A true and correct copy of Washington Mutual's Memorandum of Points and

10  Authorities in Opposition to Plaintiffs' Motion to Certify a Class Action filed in Los

11  Angeles Superior Court Case No. BC323376 on May 22, 2006 without exhibits is attached

12  as Exhibit C.

13      4.    A true and correct copy of Plaintiffs' Reply Brief in Support of Plaintiffs'

14  Motion to Certify a Class Action filed in Los Angeles Superior Court Case No. BC323376

15  on or about June 12, 2006 without exhibits is attached as Exhibit D.

16      5.    A true and correct copy of Washington Mutual's Supplemental Brief Re

17  Predominance and Due Process Issues filed in Los Angeles Superior Court Case No.

18  BC323376 on July 3, 2006 without exhibits is attached as Exhibit E.

19      6.    A true and correct copy of Plaintiffs' Response to Washington Mutual's

20  Supplemental Brief Re Predominance and Due Process Issues filed in Los Angeles Superior

21  Court Case No. BC323376 on or about July 5, 2006 without exhibits is attached as Exhibit

22  F.

23      7.    A true and correct copy of the Notice of Minute Order Denying Class

24  Certification from Los Angeles Superior Court Case No. BC323376 on July 24, 2006

25  without exhibits is attached as Exhibit G.

26      8.    A true and correct copy of Appellant's Opening Brief filed in Court of

27  Appeal, Second District, Division 2, California Case No. B193931 on or about May 22,

28  2007 without exhibits is attached as Exhibit H.

Heller
Ehrman LLP

2

9.     A true and correct copy of Respondent's Opposition Brief filed in Court of Appeal, Second District, Division 2, California Case No. B193931 on August 20, 2007 without exhibits is attached as Exhibit I.

10.     A true and correct copy of Appellant's Reply Brief filed in Court of Appeal, Second District, Division 2, California Case No. B193931 on or about October 9, 2007 without exhibits is attached as Exhibit J.

11.     A true and correct copy of the Court of Appeal decision filed in Court of Appeal, Second District, Division 2, California Case No. B193931 entitled *Creese v. Washington Mutual Bank* and decided on March 12, 2008 without exhibits is attached as Exhibit K.

Under Rule 201(b), a court may take judicial notice of a fact "not subject to reasonably dispute in that it is . . . (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Pursuant to this rule, a court may take judicial notice of legal decisions by California courts, "[b]ecause these decisions are matters of public record." *Kent v. DaimlerChrysler Corp.*, 200 F. Supp. 2d 1208, 1219 (N.D. Cal. 2002), citing *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (district court may take judicial notice of opinions of other courts, though not for truth of facts recited therein).

Dated:  May 5, 2008            HELLER EHRMAN LLP


/s/ /Chad R. Fuller
Jonathan Hayden
Chad R. Fuller
Brittany Little
Attorneys for Defendant
WASHINGTON MUTUAL BANK

Heller
Ehrman LLP

3

# EXHIBIT A

Marc Primo, Esq. (SBN 216796)
Initiative Legal Group LLP
1875 Century Park East, Suite 1800
Los Angeles, California 90067
Telephone: (310) 556-5637
Facsimile: (310) 861-9051

Attorneys for Plaintiffs

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| KIMBLYN JOHNSON CREESE, an individual, PHYLLIS PARKER, an individual, and on behalf of other members of the general public similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> WASHINGTON MUTUAL BANK, a Washington corporation; WASHINGTON MUTUAL MORTGAGE SECURITIES, INC., a Delaware corporation; WASHINGTON MUTUAL BROKERAGE HOLDINGS, INC., a California corporation, WASHINGTON MUTUAL COMMUNITY DEVELOPMENT, INC., a California Corporation, and DOES 1 through 10, inclusive, <br><br> Defendants. | **Case Number: BC356051** <br><br> **FIRST AMENDED COMPLAINT** <br><br> CLASS ACTION & ENFORCEMENT UNDER THE PRIVATE ATTORNEYS GENERAL ACT, <u>CALIFORNIA LABOR CODE</u> § 2699 *ET SEQ.* <br><br> AMENDED BY RIGHT UNDER <u>CALIFORNIA LABOR CODE</u> § 2699.3(a)(2)(C) <br><br> [Assigned for all purposes to the Hon. Judge Green, Dept. 13] <br><br> (1) Violation of <u>California Labor Code</u> §§ 510 and 1198; <br> (2) Willful Violation of <u>California Labor Code</u> § 226(a) <br> (3) Violation of <u>California Labor Code</u> §§ 201 and 202 <br> (4) Conversion and Theft of Labor <br> (5) Violation of <u>California Business & Professions Code</u> § 17200 *et seq.*; and <br> (6) Violation of <u>California Labor Code</u> § 226.7 <br> (7) Violation of <u>California Labor Code</u> § 204 (Failure to Pay Wages Timely) <br><br> **Jury Trial Demanded** <br><br> Action Filed:  October 21, 2004 |

FIRST AMENDED COMPLAINT

Plaintiffs, individually and on behalf of all other members of the public similarly situated, alleges as follows:

## JURISDICTION AND VENUE

1)    This class action is brought pursuant to <u>California Code of Civil Procedure</u> § 382.  The monetary damages and restitution sought by Plaintiffs exceed the minimal jurisdiction limits of the Superior Court and will be established according to proof at trial.  The amount in controversy for each class representative, including claims for compensatory damages and pro rata share of attorney fees, is less than $75,000.

2)    This Court has jurisdiction over this action pursuant to the California Constitution, Article VI, § 10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other courts."  The statutes under which this action is brought do not specify any other basis for jurisdiction.

3)    This Court has jurisdiction over all Defendants because, upon information and belief, each party is either a citizen of California, has sufficient minimum contacts in California, or otherwise intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

4)    Venue is proper in this Court because, upon information and belief, one or more of the named Defendants reside, transact business, or have offices in this county and the acts and omissions alleged herein took place in this county.

## THE PARTIES

5)    Plaintiff Kimblyn Creese ("Plaintiff" or "Plaintiffs") is a United States citizen and resident of Los Angeles in the State of California.

6)    Plaintiff Phyllis Parker ("Plaintiff" or "Plaintiffs") is a United States citizen and resident of Los Angeles in the State of California.

7)    Defendant Washington Mutual Bank ("WMB" or "Defendants"), was and is, upon information and belief, a Washington corporation doing business within the State of California, and at all times hereinafter mentioned, is an employer whose employees are engaged in interstate

- 1 -

FIRST AMENDED COMPLAINT

1  commerce throughout this county, the State of California, and the various states of the United

2  States of America.

3      8)    Defendant Washington Mutual Mortgage Securities, Inc. ("WMMS" or "Defendants"),

4  was and is, upon information and belief, a Delaware corporation doing business within the state of

5  California, and at all times hereinafter mentioned, is an employer whose employees are engaged in

6  interstate commerce throughout this county, the state of California, and the various states of the

7  United States of America.

8      9)    Defendant Washington Mutual Brokerage Holdings, Inc. ("WMBH" or "Defendants"),

9  was and is, upon information and belief, a California corporation doing business within the state of

10  California, and at all times hereinafter mentioned, is an employer whose employees are engaged in

11  interstate commerce throughout this county, the state of California, and the various states of the

12  United States of America.

13      10)    Defendant Washington Mutual Community Development, Inc. ("WMCD" or

14  "Defendants"), was and is, upon information and belief, a California corporation doing business

15  within the state of California, and at all times hereinafter mentioned, is an employer whose

16  employees are engaged in interstate commerce throughout this county, the state of California, and

17  the various states of the United States of America.

18      11)    WMB, WMMS, WMBH and WMCD will hereafter be collectively referred to as

19  "Defendants."

20      12)    Plaintiffs are informed and believe and thereon allege that each of said Defendants are

21  in some manner intentionally, negligently, or otherwise responsible for the acts, occurrences and

22  transactions alleged herein.

23      13)    Plaintiffs are unaware of the true names or capacities of the Defendants sued herein

24  under the fictitious names DOES 1-10, but pray for leave to amend and serve such fictitiously

25  named Defendants pursuant to California Code of Civil Procedure § 474, once their names and

26  capacities become known.

27      14)    Plaintiffs are informed and believe, and thereon allege, that Does 1-10 are the partners,

28  owners, shareholders or managers of Defendants, and were acting on behalf of Defendants.

- 2 -

FIRST AMENDED COMPLAINT

1    15)    Plaintiffs are informed and believe, and thereon allege, that each and all of the acts and

2    omissions alleged herein were performed by, or are attributable to, all Defendants, each acting as

3    the agent for the other, with legal authority to act on the other's behalf. The acts of Defendants

4    were in accordance with, and represent the official policy of Defendants.

5    16)    At all times herein mentioned, Defendants, and each of them, ratified each and

6    every act or omission complained of herein. At all times herein mentioned, the Defendants, and

7    each of them, aided and abetted the acts and omissions of each and all the other. Defendants in

8    proximately causing the damages herein alleged.

9                              **CLASS ACTION ALLEGATIONS**

10    17)    Plaintiff brings this action on his or her own behalf, as well as, each and all other

11    persons similarly situated, and thus, seeks class certification under California Code of Civil

12    Procedure § 382.

13    18)    All claims alleged herein arise under California law for which Plaintiffs seek relief

14    authorized under California law.

15    19)    The proposed class is comprised of, and defined as:

16               All current and former Loan Underwriters employed by Defendants at their

17               business locations within the state of California, who failed to receive premium

18               overtime wages, and meal and rest periods, from four years prior to the filing of

19               this complaint to final judgment.

20    20)    There is a well defined community of interest in the litigation and the class is easily

21    ascertainable:

22               a.    Numerosity: The members of the class, and each subclass, if any, are so

23    numerous that joinder of all members would be unfeasible and not practicable. The membership

24    of the entire class is unknown to Plaintiffs at this time, however, the class is estimated to be

25    greater than 600 individuals, and the identity of such membership is readily ascertainable by

26    inspection of Defendant's employment records.

27               b.    Typicality: Plaintiffs are qualified to, and will, fairly and adequately protect

28    the interests of each class member, with whom they have a well defined community of interest and

- 3 -

FIRST AMENDED COMPLAINT

1  typicality of claims, as demonstrated above. Plaintiffs acknowledge the obligation to make known

2  to the Court any relationship, conflicts or differences with any class member. Plaintiffs' attorneys

3  and the proposed class counsel are versed in the rules governing class action discovery,

4  certification, and settlement. Plaintiffs have incurred, and during the pendency of this action, will

5  continue to incur, costs and attorneys' fees, that have been, are, and will be necessarily expended

6  for, the prosecution of this action for the substantial benefit of each class member

7          c.      Adequacy: Plaintiffs are qualified to, and will, fairly and adequately protect

8  the interests of each class member, with whom they have a well-defined community of interest and

9  typicality of claims, as demonstrated above. Plaintiffs acknowledge that they have an obligation

10  to make known to the Court any relationship, conflicts or differences with any class member.

11  Plaintiffs' attorneys and the proposed class counsel are versed in the rules governing class action

12  discovery, certification, and settlement. Plaintiffs have incurred, and during the pendency of this

13  action, will continue to incur, costs and attorney's fees, that have been, are, and will be necessarily

14  expended for the prosecution of this action for the substantial benefit of each class member.

15          d.      Superiority: The nature of this action makes the use of class action

16  adjudication superior to other methods. A class action will achieve economies of time, effort, and

17  expense as compared to separate lawsuits, and avoid inconsistent outcomes, because the same

18  issues can be adjudicated in the same manner for the entire class.

19          e.      Public Policy Consideration: Employers of the state violate employment

20  laws every day. Current employees are often afraid to assert their rights out of fear of direct or

21  indirect retaliation. Former employees are fearful of bringing actions because they believe their

22  former employers can damage their future endeavors through negative references and other means.

23  Class actions provide the class members who are not named in the complaint with a type of

24  anonymity that allows for the vindication of their rights.

25      21)     There are common questions of law and fact as to the class, and each subclass, if any,

26  that predominate over questions affecting only individual members, including, but not limited to:

27

28

- 4 -

FIRST AMENDED COMPLAINT

a.    Whether Defendants required the Plaintiffs and the other class members to work over eight hours per day and/or forty hours per week, and failed to pay premium overtime compensation to the Plaintiff and the other class members;

b.    Whether Defendants properly complied with wage reporting as required by the California Labor Code.

c.    Whether Defendants' failure to pay wages, without abatement or reduction, in accordance with the California Labor Code, was willful;

d.    Whether Defendants improperly retained, converted, appropriated or deprived the Plaintiffs and the other class members of the use of monies- or sums to which the class was legally entitled;

e.    Whether Defendants engaged in unfair business practices in violation of Business & Professions Code § 17200, et seq.;

f.    Whether Defendants' conduct was willful or reckless;

g.    Whether the Defendants failed to provide meal and rest periods to the Plaintiffs and other members of the class.

h.    The effect upon and the extent of injuries suffered by the class and the appropriate amount of compensation; and

i.    The appropriate amount of monetary penalties resulting from Defendants' violations of California law.

## FACTUAL ALLEGATIONS

22)    At all times set forth, Defendants employed Plaintiffs and other persons in the capacity of Loan Underwriter.

23)    Defendants employed Plaintiff Kimblyn Johnson Creese as a Loan Underwriter from approximately November 18, 2002, to approximately November 21, 2003, at the Montebello Loan Fulfillment Center.

24)    Defendants employed Plaintiff Phyllis Parker as a Loan Underwriter from approximately July 12, 1999 to approximately June 17, 2002, at the Chatsworth Loan Fulfillment

FIRST AMENDED COMPLAINT

1  Center, and from approximately June 18, 2002 to December 3, 2003 at the Montebello Loan
2  Fulfillment Center.

3      25)    Defendants continue to employ Loan Underwriters within California.

4      26)    Plaintiffs are informed and believes and thereon alleges that at all times herein
5  mentioned, Defendants were advised by skilled lawyers and other professionals, employees and
6  advisors knowledgeable about California labor and wage law and employment and personnel
7  practices.

8      27)    Defendants knew or should have known that Plaintiffs and other members of the class
9  were not receiving proper wages, because, among other things, Defendants' agents, officers and
10  employees witnessed Plaintiffs and other members of the class performing non- exempt duties,
11  and working in excess of eight hours per day and/or forty hours per week.

12      28)    Plaintiffs are informed and believes and thereon alleges that at all times herein
13  mentioned, Defendants knew that it had a duty to compensate Plaintiffs and other members of the
14  class, and that Defendants had the financial ability to pay such compensation, but willfully,
15  knowingly and intentionally failed to do so, and falsely represented to Plaintiffs and other
16  members of the class that they were properly denied wages, all in order to increase Defendants'
17  profits.

18      29)    At all times herein set forth, California Labor Code § 2699 et seq., The Labor Code
19  Private Attorneys General Act ("PAGA") was applicable to Plaintiff's employment by
20  Defendants.

21      30)    PAGA provides that for any provision of law under the Labor Code that provides for a
22  civil penalty to be assessed and collected by the Labor and Workforce Development Agency
23  ("LWDA") for violation of the Labor Code, may, as an alternative, be recovered through a civil
24  action brought by an aggrieved employee on behalf of himself and other current or former
25  employees pursuant to procedures outlined in California Labor Code § 2699.3.

26      31)    Pursuant to PAGA, a civil action may be brought by an aggrieved employee, who is
27  any person that was employed by the alleged violator and against whom one or more of the
28  alleged violations was committed.

- 6 -

FIRST AMENDED COMPLAINT

32) Plaintiffs were employed by the Defendants and the alleged violations were committed against them during her time of their employment and they are therefore, aggrieved employees.

33) Pursuant to <u>California Labor Code</u> §§ 2699.3 and 2699.5, aggrieved employees, such as Plaintiffs, may as a matter of right amend an existing complaint to add a cause of action arising under <u>California Labor Code</u> § 2699 only after the following requirements have been met:

    a. The aggrieved employee shall give written notice ("Notice") by certified mail to the LWDA and the employer of the specific provisions of the <u>Labor Code</u> alleged to have been violated, including the facts and theories to support the alleged violation;

    b. The LWDA shall notify the employer and the aggrieved employee by certified mail that it does not intent to investigate the alleged violation within 30 days of the postmark date of the Notice. Upon receipt of the Notice, or, if no Notice is provided within 33 days of the Notice, the aggrieved employee may amend an existing complaint within 60 days of receiving the Notice that the LWDA does not intend to investigate the alleged violation, to add a cause of action pursuant to <u>California Labor Code</u> § 2699 to recover civil penalties in addition to any other penalties that the employee may be entitled to.

34) Plaintiffs have provided written notice by certified mail to the LWDA (<u>see</u> Exhibit A, attached hereto) and have provided a copy of the letter to Defendants of the specific provisions of the <u>Labor Code</u> alleged to have been violated, including the facts and theories to support the alleged violations.

35) The LWDA notified Defendants and Plaintiffs by certified mail on November 1, 2006, that it did not intend to investigate the alleged violations. <u>See</u> Exhibit B, attached hereto.

36) Plaintiffs have satisfied the requirements of PAGA and may amend their existing complaint to recover civil penalties, in addition to other remedies, for violations of <u>California Labor Code</u> §§ 201, 202, 203, 204, 226, 226.7, 510, 512 and 1198.

- 7 -

FIRST AMENDED COMPLAINT

## FIRST CAUSE OF ACTION

### Violation of California Labor Code §§ 510 and 1198

### (Against all Defendants)

37)    Plaintiffs incorporate by reference and realleges as if filly stated herein the material allegations set out in this Complaint.

38)    The Defendants' conduct described in this Complaint violates the provisions of California Labor Code § 1198, which provides that it is unlawful to employ persons for longer than the hours set by the Industrial Welfare Commission ("IWC").

39)    At all times herein set forth, the IWC Wage Order applicable to Plaintiffs employment by Defendants provides that all non-exempt employees working for more than eight hours in a day or more than forty hours in a workweek are entitled to payment at the rate of time and one-half for all hours worked in excess of eight hours in a day or more than forty hours in a workweek, and an employee who works more than twelve hours in a day is entitled to overtime compensation at a rate of two times his or her regular rate of pay.

40)    California Labor Code § 510 has codified the right to overtime compensation at one and one-half the regular rate for hours worked in excess of eight hours in a day or forty hours in a week or for the first eight hours worked on the seventh day of work, and to overtime compensation at twice the regular hourly rate for hours worked in excess of twelve hours in a day or in excess of eight hours in a day on the seventh day of work.  Defendants have failed and continue to fail to pay Plaintiffs and other class members overtime earned and due.

41)    At all times herein set forth, the IWC Wage Order applicable to Plaintiffs' employment by Defendants provides that in order to satisfy the requirements of the administrative exemption from overtime wages, the administrative work must be directly related to the management policies or general business operations of the employer, or the employer's customers, as distinguished from mere production work.

42)    At all times herein set forth, the IWC Wage Order applicable to Plaintiffs' employment by Defendants provides that in order to satisfy the requirements of the administrative exemption,

- 8 -

FIRST AMENDED COMPLAINT

1   the administrative employee must have the power an authority to exercise independent choice, free

2   from immediate direction or supervision and with respect to matters of significance.

3       43)    At all times herein set forth, the IWC Wage Order applicable to Plaintiffs'

4   employment by Defendants provides that applying knowledge and skill to techniques, procedures,

5   and specific standards, is not, an exercise of discretion within the meaning of the applicable IWC

6   Wage Order.

7       44)    During the relevant time period, the Plaintiffs and the other members of the class

8   engaged in basic tasks related to the day-to-day production work of the Defendants' business,

9   consisting of requesting documentation, reviewing, documentation, assessing credit worthiness

10  and signing loans according to established guidelines, and referring files, along with assessments

11  to managers for approval.

12      45)    During the relevant time period, the Plaintiffs and other members of the class did not

13  engage in any activities related to the administrative operations of the Defendants' business, such

14  as personnel administration, labor relations, research, planning, or assisting a management official

15  in carrying out the executive or administrative functions 'of that official.

16      46)    During the relevant time period, the Plaintiffs and, other members of the class applied

17  knowledge and skill in following prescribed procedures, determining which procedures to follow,

18  and determining whether specific standards have been met with regards to prospective loan

19  applications.

20      47)    During the relevant time period, Plaintiffs and other members of the class did not have

21  the authority to exercise discretion, free, from immediate direction and supervision, and with

22  respect to matters of significance concerning prospective loan applications.

23      48)    At all, times herein set forth; Plaintiffs and other members of the class failed to satisfy

24  the requirements of the administrative exemption from premium overtime wages.

25      49)    During the relevant time period, the Plaintiffs and other members of the class consistently

26  worked in excess of eight hours in a day, or more than forty hours in a workweek, for which no

27  additional overtime compensation, was paid by Defendants.

28

- 9 -

FIRST AMENDED COMPLAINT

50)   Defendants' failure to pay Plaintiffs and other class members the unpaid balance of overtime compensation, as required by California state law, violates the provisions of <u>California Labor Code</u> § 510 and 1198 and is therefore unlawful.

51)   Pursuant to <u>California Labor Code</u> § 1194, Plaintiff and other class members are entitled to recover their unpaid overtime compensation as well as interest, costs, and attorneys' fees.

52)   Pursuant to <u>California Labor Code</u> § 2699(f) and (g), Plaintiff and other class members are entitled to recover civil penalties in the amount of $100 for each aggrieved employee per pay period for the initial violation and $200 for each aggrieved employee per pay period for each subsequent violation, plus costs and attorneys' fees for violations of <u>California Labor Code</u> §§ 510 and 1198.

## SECOND CAUSE OF ACTION

### Willful Violation of <u>California Labor Code</u> § 226(a)

### (Against all Defendants)

53)   Plaintiffs incorporate by reference and realleges as if fully stated herein the material allegations set out in this Complaint.

54)   At all times herein set forth, <u>California Labor Code</u> § 218 authorizes employees to sue directly for any wages or penalty due under the Labor Code."

55)   Defendants, and each of them, have either recklessly or intentionally failed to make, keep and preserve true, accurate, and complete records of, among other things, the actual number of hours worked each workday and each workweek by Plaintiffs and the other class members.

56)   Plaintiffs are entitled to recover from Defendants the greater of their actual damages caused by Defendants' failure to comply with <u>California Labor Code</u> § 226(a) or an aggregate penalty not exceeding four thousand dollars and an award of costs and reasonable attorneys' fees pursuant to <u>California Labor Code</u> § 226(e).

57)   Therefore, Plaintiffs and other class members are entitled to recover from Defendants the statutory penalty for each day they were not paid at their regular rate of pay up to a thirty days maximum pursuant to <u>California Labor Code</u> § 203.

- 10 -
FIRST AMENDED COMPLAINT

1    58)    Pursuant to California Labor Code §§ 2699(f) and 226.3, Plaintiff and the other

2    members of the class are entitled to recover from Defendants the greater of their actual damages

3    caused by Defendant's failure to comply with California Labor Code § 226(a) or an aggregate

4    penalty not exceeding $4,000.00, and an award of costs and reasonable attorneys' fees.

5    **FOURTH CAUSE OF ACTION**

6    **Conversion and Theft of Labor**

7    **(Against all Defendants)**

8    59)    Plaintiffs incorporate by reference and realleges as if fully stated herein the

9    8 material allegations set out in this Complaint.

10    60)    Pursuant to statute, including but not limited to California Labor Code § 216, 225, and

11    226.6 and California Penal Code §§ 484 and 532, it is a criminal violation of law to fail to pay

12    wages on the next payday after they are earned.

13    61)    At the time Defendants refused to pay the wages due to Plaintiffs and other members of

14    the class, as alleged herein, Plaintiff and other members of the class owned and had the right to

15    posses the withheld wages. Defendants wilfully and without legal justification interfered with

16    Plaintiffs' right to own and possess earned wages. The exact amount of those wages is capable of

17    being made certain from a review of either the information of Plaintiffs or other class members, or

18    from the records of Defendants.

19    62)    In refusing to pay wages to the Plaintiffs and other class members, Defendants

20    unlawfully and intentionally took and converted the property of Plaintiffs and other class members

21    to their own use. At the time the conversion took place, Plaintiffs and other class members were

22    entitled to immediate possession of the amounts of wages payable. This conversion was

23    oppressive, malicious, and fraudulent. This conversion was concealed by the Defendants from the

24    Plaintiff and other class members.

25    63)    The amount of wages converted by Defendants from Plaintiffs and each class member

26    is easily ascertainable through Defendants' records that employers are required by law to keep.

27    64)    Plaintiffs and other class members have been injured by this conversion and are

28    entitled to all monies converted by Defendants with interest thereon pursuant to California Civil

- 11 -

FIRST AMENDED COMPLAINT

1   Code § 3336, any and all profits whether direct or indirect, the Defendants acquired by their

2   conversion, and punitive or exemplary damages pursuant to California Civil Code § 3294.

3   **FIFTH CAUSE OF ACTION**

4   **Violation of California Business & Professions Code §17200, et seq.**

5   **(Against all Defendants)**

6       65)   Plaintiffs incorporate by reference and realleges as if fully stated herein the material

7   allegations set out in. this Complaint.

8       66)   Plaintiffs, and on behalf of the general public, and all class members, bring this action.

9       67)   The conduct alleged of Defendant alleged in this complaint has been, and continues to

10  be, unfair, unlawful, and harmful to the Plaintiff, the other members of the class, the general

11  public. Plaintiff seeks to enforce important rights affecting the public interest within the meaning

12  of Code of Civil Procedure § 1021.5.

13      68)   Defendants' failure to pay overtime wages in violation of California law, constitutes an

14  unlawful business act and practice in violation of California Business & Professions Code §

15  17200, et seq.

16      69)   Pursuant to California Business & Professions Code § 17200, et seq., Plaintiff and all

17  class members are entitled to restitution of the wages withheld and retained by Defendants during

18  a period that commences four years prior to the filing of this complaint, a permanent injunction

19  requiring Defendants to pay all outstanding wages due to class members, an award of attorneys'

20  fees pursuant to California Code of Civil Procedure § 1021.5 and other applicable law, and costs.

21  **SIXTH CAUSE OF ACTION**

22  **Violation of California Labor Code §226.7(a)**

23  **(Against all Defendants)**

24      70)   Plaintiffs incorporate by reference and realleges as if fully stated herein the material

25  allegations set out in this Complaint.

26      71)   At all times herein set forth, California Labor Code § 218 authorizes employees to sue

27  directly for any wages or penalty due to them under the California Labor Code.

28

- 12 -

FIRST AMENDED COMPLAINT

72)    At all times herein set forth, the IWC Wage Order and California Labor Code § 226.7 were applicable to Plaintiffs' employment by Defendants.

73)    The applicable IWC Wage Order and California Labor Code § 226.7(a) provide that employees cannot be required to work in excess of four hours without receiving a ten minute rest period, nor can be required to work in excess of five hours without receiving a meal period of not less than thirty minutes.

74)    Defendants required the Plaintiffs and other members of the class to work in excess of four hours without providing a ten minute rest period.

75)    Defendants required the Plaintiffs and other members of the class to work an additional four hours without providing a second ten minute rest period.

76)    Defendants required the Plaintiffs and other members of the class to work for periods longer than five hours without a meal period of not less than thirty minutes.

77)    Defendants required Plaintiffs and other members of the class to work during meal and rest periods and failed to compensate Plaintiff and members of the class for work performed during meal and rest periods.

78)    Defendants' conduct violates applicable orders of the California Industrial Wage Commission, therefore violating California Labor Code 226.7(a).

79)    Plaintiffs and other members of the class are entitled to recover from Defendants additional compensation for each work day that bona fide meal and rest periods were not provided.

80)    Pursuant to California Labor Code § 2699(f) and (g), Plaintiff and other class members are entitled to recover civil penalties in the amount of $100 for each aggrieved employee per pay period for the initial violation and $200 for each aggrieved employee per pay period for each subsequent violation, plus costs and attorneys' fees for violations of California Labor Code §226.7.

- 13 -

FIRST AMENDED COMPLAINT

## SEVENTH CAUSE OF ACTION

### Violation of California Labor Code § 204

### (Against All Defendants)

81)    Plaintiffs incorporate by reference and realleges as if fully stated herein the material allegations set out in this Complaint.

82)    At all times herein set forth, California Labor Code § 218 authorizes employees to sue directly for any wages or penalty due to them under the Labor Code.

83)    At all times herein set forth, California Labor Code § 204 provides that all wages earned by any person in any employment between the first and the fifteenth days, inclusive, of any calendar month, other than those wages due upon termination of an employee, are due and payable between the sixteenth and the twenty-sixth day of the month during which the labor was performed.

84)    At all times herein set forth, California Labor Code § 204 provides that all wages earned by any person in any employment between the sixteenth and the last day, inclusive, of any calendar month, other than those wages due upon termination of an employee, are due and payable between the first and the tenth day of the following month.

85)    At all times herein set forth, California Labor Code § 204 provides that all wages earned for labor in excess of the normal work period shall be paid no later than the payday for the next regular payroll period.

86)    During the relevant time period, Defendants failed to pay the wages owed to Plaintiffs and other members of the class within the time frame set forth in California Labor Code § 204 when Defendants failed to compensate Plaintiff and other members of the class for missed meal and rest breaks.

87)    Plaintiffs and other members of the class are entitled to recover all unpaid wages, and such general and special damages as may be appropriate, as well as interest on all due and unpaid wages pursuant to California Labor Code § 218.6, accrued from the date that the wages were due and payable at the rate of interest specified in California Civil Code § 3289(b), costs of suit incurred, and for such other relief as this Court may deem appropriate.

- 14 -

FIRST AMENDED COMPLAINT

88)    Pursuant to <u>California Labor Code</u> § 2699(f) and (g), Plaintiffs and other class members are entitled to recover civil penalties in the amount of $100 for each aggrieved employee per pay period for the initial violation and $200 for each aggrieved employee per pay period for each subsequent violation, plus costs and attorneys' fees for violations of <u>California Labor Code</u> § 204.

## REQUEST FOR JURY TRIAL

Plaintiffs request a trial by jury.

## PRAYER FOR RELIEF

Plaintiffs, and on behalf of all others similarly situated, prays for relief and judgment against Defendants, jointly and severally, as follows:

### Class Certification

1.    That this action be certified as a class action;

2.    Plaintiffs are to be appointed as the representatives of the class;

3.    That counsel for Plaintiffs is to be appointed as class counsel.

### As to the First Cause of Action

4.    For general unpaid wages at overtime wage rates, and such general and special damages as may be appropriate;

5.    For pre-judgment interest on any unpaid overtime compensation from the date such amounts were due;

6.    For reasonable attorneys' fees and for costs of suit incurred herein pursuant to <u>California Labor Code</u> § 1194(a);

7.    For such other and further relief as the Court may deem appropriate; and

8.    For all civil penalties and reasonable attorneys' fees and costs of suit incurred herein pursuant to <u>California Labor Code</u> § 2699(f)(g).

### As to the Second Cause of Action

9.    For all actual, consequential, and incidental losses and damages, according to proof;

10.    For statutory penalties pursuant to <u>California Labor Code</u> § 226(e);

- 15 -

FIRST AMENDED COMPLAINT

11.    For reasonable costs and attorneys' fees pursuant to <u>California Labor Code</u> § 226(e);

12.    For such other and further relief as the Court may deem appropriate; and

13.    For all civil penalties and reasonable attorneys' fees and costs of suit incurred herein pursuant to <u>California Labor Code</u> §§ 2699(f)(g) and 226.3.

<u>As to the Third Cause of Action</u>

14.    For statutory penalties pursuant to <u>California Labor Code</u> § 203 for Plaintiffs and all other class members who have left Defendants' employ;

15.    For reasonable attorney's fees;

16.    For costs of suit incurred herein;

17.    For such other and further relief as the Court may deem appropriate; and

18.    For all civil penalties and reasonable attorneys' fees and costs of suit incurred herein pursuant to <u>California Labor Code</u> § 2699(f)(g).

<u>As to the Fourth Cause of Action</u>

19.    For all monies converted by Defendant that Plaintiffs and other members of the class are entitled to recover under <u>California Civil Code</u> § 3336;

20.    For pre-judgment interest on all monies converted by Defendants from the day such amounts were due that Plaintiffs and other members of the class are entitle1e1 to recover under <u>California Civil Code</u> § 3287;

21.    For any and all profits whether direct or indirect, the Defendant acquired by their conversion;

22.    For punitive and exemplary damages pursuant to <u>California Civil Code</u> § 3294;

23.    For reasonable attorneys' fees that Plaintiffs and other members of the class are entitled to under <u>California Code of Civil Procedure</u> § 1021.5;

24.    For costs of suit incurred herein; and

25.    For such other and further relief as the Court may deem appropriate.

- 16 -

FIRST AMENDED COMPLAINT

<u>As to the Fifth Cause of Action</u>

26.     For all actual, consequential, and incidental losses and damages, according to proof;

27.     For restitution of overtime to all class members and pre-judgment interest from the day such amounts were due;

28.     For the appointment of a receiver to receive, manage, and distribute any and all funds disgorged from the Defendants determined to have been wrongfully acquired by the Defendants as a result of violations of <u>California Business & Professions Code</u> § 17200 *et seq.*

29.     For a permanent injunction ordering Defendants to pay required overtime rates for overtime hours worked to all employees in the job positions described in this Complaint;

30.     For reasonable attorneys' fees that Plaintiffs and other members of the class are entitled to recover under <u>California Code of Civil Procedure</u> § 1021.5;

31.     For costs of suit incurred herein; and

32.     For such other and further relief as the Court may deem appropriate.

<u>As to the Sixth Cause of Action</u>

33.     For all actual, consequential, and incidental losses and damages, according to proof;

34.     For statutory penalties pursuant to <u>California Labor Code</u> § 226.7(b); For reasonable attorney's fees;

35.     For costs of suit incurred herein;

36.     For such other and further relief as the Court may deem appropriate; and

37.     For all civil penalties and reasonable attorneys' fees and costs of suit incurred herein pursuant to <u>California Labor Code</u> § 2699(f)(g).

<u>As to the Seventh Cause of Action</u>

1.      For unpaid wages, and such general and special damages as may be appropriate;

2.      For interest on all due and unpaid wages, accrued from the date that the wages were due and payable, at the rate of interest specified in <u>California Civil Code</u> § 3289(b), pursuant to <u>California Labor Code</u> § 218.6; and

- 17 -

32    For all civil penalties and reasonable attorneys' fees and costs of suit incurred herein pursuant to <u>California Labor Code</u> § 2699(f)(g).

Dated: December 26, 2006

Respectfully submitted,
Initiative Legal Group LLP

By: _____
Mark Yablonovich, Esq.
Marc Primo, Esq.
Shawn Westrick, Esq.
Attorneys for Plaintiffs

- 18 -

**EXHIBIT B**



Conformed Cop

1  Mark Yablonovich, Esq. (SBN 186670)
   Marc Primo, Esq. (SBN 216796)
2  Shawn Westrick, Esq. (SBN 235313)
   Initiative Legal Group LLP
3  1875 Century Park East, Suite 1800
   Los Angeles, California 90067
4  Telephone: (310) 556-5637
5  Facsimile: (310) 861-9051

6

   Attorneys for Plaintiffs and Class Members
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA
9
               FOR THE COUNTY OF LOS ANGELES
10

11  KIMBLYN JOHNSON CREESE, an              Case Number: BC323376
12  individual, PHYLLIS PARKER, an
    individual, and on behalf of other members    CLASS ACTION
13  of the general public similarly situated,
14              Plaintiffs,                   [Assigned to the Honorable Terry A.
                                             Green]
15           vs.
                                             **MEMORANDUM OF POINTS AND**
16  WASHINGTON MUTUAL BANK, a               **AUTHORITIES IN SUPPORT OF**
    Washington corporation; WASHINGTON      **PLAINTIFFS' MOTION TO**
17  MUTUAL MORTGAGE SECURITIES,            **CERTIFY A CLASS ACTION**
    INC., a Delaware corporation;
18  WASHINGTON MUTUAL BROKERAGE            Date:      June 26, 2006
19  HOLDINGS, INC., a California            Time:      9:00 a.m.
    corporation, WASHINGTON MUTUAL         Place:     Department 14
20  COMMUNITY DEVELOPMENT, INC., a
    California Corporation, and DOES 1       Action Filed: October 21, 2004
21  through 10, inclusive,
22              Defendants.
23

24

25

26

27

28                                                            20

## TABLE OF CONTENTS

PAGE

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... -1-

II.  STATEMENT OF FACTS ........................................................................................ -2-

   A.   Background ....................................................................................................... -2-

      1.   The Parties .............................................................................................. -2-

      2.   Procedural History ................................................................................. -2-

   B.   Claims Brought In This Lawsuit ...................................................................... -2-

      1.   The Putative Class Was Misclassified as Exempt From Overtime
         Laws And Is Owed Overtime Pay ......................................................... -2-

      2.   The Putative Class Was Not Timely Paid And Is Due "Waiting
         Time" Penalties ...................................................................................... -2-

      3.   The Underwriters' Wage Statements Were Not Accurate and
         Complete ................................................................................................. -3-

      4.   The Underwriters' Were Regularly Denied Their Meal And Rest
         Breaks ..................................................................................................... -3-

      5.   Defendant's Failure To Pay Overtime Wages Or To Provide
         Accurate Wage Statements And Meal And Rest Breaks Violates
         California's Unfair Competition Law ..................................................... -3-

III. PROPOSED CLASS DEFINITIONS ...................................................................... -3-

IV.  CLASS CERTIFICATION IS APPROPRIATE BECAUSE UNDERWRITERS
WORKED ACCORDING TO COMMON PROCEDURES IN THE PRODUCTION
OF LOANS AND WERE NOT CALLED UPON TO APPLY DISCRETION AND
INDEPENDENT JUDGMENT ....................................................................................... -4-

   A.   Legal Standard For Class Certification ............................................................ -4-

      1.   The Merits Of Plaintiffs' Claims Are Not To Be Considered ............. -4-

      2.   Judicial Policy Favors Class Certification ........................................... -4-

      3.   Damages May Vary Among Class Members .......................................... -4-

4.    Requirements For Class Certification ............................................. -5-

B.    The Class Of Underwriters Is Ascertainable And Numerous ......................... -5-

C.    Common Questions of Law And Fact Predominate ....................................... -6-

   1.    Common Questions Of Law And Fact Predominate In Determining

         That the Underwriters Were Not Properly Subject To The

         "Administrative" Exemption.............................................................. -6-

      a.    The Underwriters Do Not Fall Within The Administrative

            Exemption Because Their Work Is "Production" As Defined

            By The Case Law................................................................... -8-

      b.    The Underwriters Do Not Fall Within the Administrative

            Exemption Because Their Work Does Not Require The

            Application Of "Discretion And Independent Judgment"......... -12-

   2.    Defendant's Failure To Pay Overtime Wages And The Resulting

         Waiting Time Penalties Raises Common Legal And Factual Issues. -17-

   3.    Defendant's Failure To Provide Accurate And Complete Wage

         Statements Raises Common Legal And Factual Issues .................... -17-

   4.    Defendant's Denial Of Meal And Rest Breaks Is Also A Classwide

         Issue.............................................................................................. -18-

   5.    Defendant's Failure To Pay Overtime Wages In Violation Of

         California's Unfair Competition Law Raises Common Legal And

         Factual Issues ................................................................................. -18-

D.    Plaintiffs' Claims Are Typical Of Class Members Claims........................... -19-

E.    Plaintiffs And Counsel Will More Than Adequately Represent the Class... -19-

F.    Class Certification Has Substantial Benefits And Is The Superior Method

      For Ensuring A Fair And Efficient Resolution ............................................ -20-

V.    CONCLUSION ..................................................................................... -21-

1

## **TABLE OF AUTHORITIES**

2

PAGE

3

### **STATE CASES**

4
Bell v. Farmers Insurance Exchange, 87 Cal. App. 4th 805 (2001) ..................... -7-, -8-, -9-

5
Bell v. Farmers Insurance Exchange, 115 Cal. App. 4th 715 (2004) ....................... -7-, -10-

6
Carabini v. Superior Court, 26 Cal. App. 4th 239 (1994) .................................................... -4-

7
Chern v. Bank of America, 15 Cal. 3d 866 (1976) ........................................................... -19-

8
Classen v. Weller, 145 Cal. App. 3d 27 (1983) ............................................................... -19-

9
Cortez v. Purolator Air Filtration Products Co., 23 Cal. 4th 163 (2000) ....................... -19-

10
Daar v. Yellow Cab Company, 67 Cal. 2d 695 (1967) ....................................................... -5-

11
Employment Development Dept. v. Superior Court, 30 Cal. 3d 256 (1981) ..................... -4-

12
Ghory v. Al-Lahham, 209 Cal. App. 3d 1487 (1989) ...................................................... -17-

13
Hudgins v. Neiman Marcus Group, Inc., (1995) 34 Cal .App. 4th 1109 ......................... -19-

14
Keating v. Superior Court, 31 Cal. 3d 584 (1982) .......................................................... -20-

15
La Sala v. American Savings & Loan Assn., 5 Cal. 3d 864 (1971) ................................. -20-

16
McGhee v. Bank of America, (1976) 60 Cal. App. 3d 442 ............................................. -19-

17
Miller v. Woods, 148 Cal. App. 3d 862 (1983) ............................................................... -20-

18
Nordquist v. McGraw-Hill Broadcasting Comp., Inc.

19
      32 Cal. App. 4th 555 (1995) .............................................. -7-, -8-, -14-, -15-

20
Reyes v. Board of Supervisors of San Diego, 196 Cal. App. 3d 1263 (1987) ................... -5-

21
Rich v. Schwab, (1984) 162 Cal. App. 3d 739 ................................................................... -5-

22
Richmond v. Dart Industries, Inc., 29 Cal. 3d 462 (1981) ................................... -4-, -5-, -20-

23
Sav-On Drug Stores, Inc. v. Superior Court, 34 Cal. 4th 319 (2004) ................... -4-, -5-, -6-

24
Vasquez v. Superior Court, 4 Cal. 3d 800 (1971) ................................................... -4-, -5-

25

### **SUPREME COURT CASES**

26
Corning Glass Works v. Brennan, 417 U.S. 188 (1974) .................................................... -8-

27
Southland Corp. v. Keating, 465 U.S. 1 (1984) ..................................................... -18-, -21-

28

23

1

## FEDERAL CASES

2

Dalheim v. KDFW-TV, 918 F. 2d 1220 (5th Cir. 1990)................................. -8-

3

Reich v. American International Adjustment Co, Inc.

4

     902 F. Supp. 321 (D. Conn 1994) ...................................................... -9-

5

Reich v. Chicago Title Insurance Co., 853 F. Supp. 1325 (D. Kan. 1994) ....................... -8-

6

Stewart v. Abraham, 275 F. 3d 220 (3rd Cir. 2001)................................. -6-

7

## CALIFORNIA LABOR CODE

8

California Business and Professions Code § 17200 ................................. -1-, -3-, -19-

9

California Labor Code § 201 ................................................... -3-

10

California Labor Code § 202 ................................................... -3-

11

California Labor Code § 203 ............................................... -2-, -17-

12

California Labor Code § 226 .......................................... -3-, -17-, -18-

13

California Labor Code § 226.7 ................................................. -3-

14

California Labor Code § 382 ................................................... -1-

15

California Labor Code § 510 ................................................... -2-

16

California Labor Code § 512(a) ............................................... -3-

17

California Labor Code § 1174 ................................................. -5-

18

California Labor Code § 1175 ................................................. -5-

19

California Labor Code § 1198 ................................................. -2-

20

21

22

23

24

25

26

27

28

**24**

TABLE OF AUTHORITIES

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Pursuant to <u>Code of Civil Procedure</u> § 382, Plaintiffs respectfully seek an Order of this Court certifying a class action on behalf of Washington Mutual's current and former underwriters employed at any time during the four years prior to the filing of Plaintiffs' complaint through the resolution of this litigation.

The class of approximately 600 underwriters worked within the chain of production for Washington Mutual's core business offering: *the making of loans to prospective and current home owners.* The underwriters worked in "loan fulfillment centers" that were dedicated exclusively to the production of loans. Prospective loans passed in assembly line fashion from originators, or sales people, to underwriters to processors, all working side-by-side, and according to Washington Mutual's strict guidelines, including enforced production goals. Nevertheless, these underwriters were misclassified as so called "administrative" employees exempt from the state's overtime laws. As a result of this policy Defendant violated meal and rest break regulations.

Moreover, while Plaintiffs and the putative class nominally made loan "decisions," their range of options was sufficiently circumscribed that they lacked the requisite discretion and independent judgment to support a valid administrative exemption from California's wage and hour protections. Subject to uniform guidelines, training, and discipline for failure to meet production quotas, underwriters essentially held borrowers' financial qualifications up against the detailed standards established by their employer.

Accordingly, Plaintiffs and the putative class, having regularly worked well in excess of forty hour weeks, are entitled to back overtime pay; penalties following from the failure to timely be paid overtime; penalties resulting from the failure to provide complete and accurate wage statements as required by law; compensation for being denied meal and rest breaks; and restitution provided for by <u>Business and Professions Code</u> § 17200. Because Defendant's comprehensive, class-wide policies directly caused the underwriters' work to consist predominantly of the production of loans, which did not require the

25

MEMORANDUM OF POINTS AND AUTHORITIES

1  application of discretion and independent judgment, the class is properly certified, as

2  common issues of law and fact predominate.

3  **II.    STATEMENT OF FACTS**

4  **A.    Background**

5      **1.    The Parties**

6      Washington Mutual Bank ("Washington Mutual" or "Defendant") operates a

7  mortgage lending business throughout the State of California.  Washington Mutual's

8  mortgage lending business is in the business of making loans to current and prospective

9  home owners.

10     Plaintiffs are former Washington Mutual underwriters.  As underwriters, Plaintiffs

11 and putative Class Members were at the core of Washington Mutual's mortgage lending

12 business: making loans to mortgage lending customers.  The underwriters were classified

13 as "administrative" employees and thus exempt from various state wage and hour laws,

14 such as those requiring the payment of overtime pay and the obligation to provide meal

15 and rest breaks.

16     **2.    Procedural History**

17     Plaintiffs Kimblyn Johnson and Phyllis Parker initiated this action in October of

18 2004.  See Declaration of Marc Primo, dated April 14, 2006 ("Primo Decl."), filed

19 concurrently herewith, at ¶ 1.  Defendant answered on April 1, 2005.  Id.  The parties

20 agreed that Plaintiffs' Motion for Class Certification would be heard on June 26, 2006.  Id.

21 **B.    Claims Brought In This Lawsuit**

22     **1.    The Putative Class Was Misclassified As Exempt From Overtime Laws**

23         **And Is Owed Overtime Pay**

24     Because the underwriters were misclassified as exempt "administrative" employees,

25 they did not receive overtime pay to which they were entitled, pursuant to California Labor

26 Code §§ 510 and 1198.  Defendant therefore owes back overtime pay to Plaintiffs and to

27 the putative Class Members.

28     **2.    The Putative Class was Not Timely Paid and is Due "Waiting Time"**

**Penalties**

Because Defendant failed to pay overtime wages to which Plaintiffs were entitled, they and the putative Class Members failed to receive all monies due them upon termination, as required by <u>California Labor Code</u> §§ 201 and 202. Defendant therefore owes its former underwriters "waiting time" penalties pursuant to <u>Labor Code</u> § 203.

**3.    The Underwriters' Wage Statements Were Not Accurate And Complete**

Wage statements that Defendant provided its underwriters did not contain all information required by <u>California Labor Code</u> § 226, including the actual hours worked, and provided inaccurate hourly rates of pay. Accordingly, Plaintiffs and the putative Class Members are entitled to statutory penalties, pursuant to <u>Labor Code</u> § 226.

**4.    The Underwriters Were Regularly Denied Their Meal And Rest Breaks**

California Industrial Welfare Commission Wage Orders and <u>California Labor Code</u> §§ 226.7(a) and 512(a) require that employees receive a rest break every four hours, and a meal break every five hours. As a matter of course, the underwriters were denied their meal and rest breaks as Defendant considered the putative Class Members to be exempt from the relevant laws and regulations. Plaintiffs and the putative Class Members did not regularly receive these breaks, nor were they paid an additional hour of pay in lieu of missing these breaks as required by the <u>Labor Code</u> .

**5.    Defendant's Failure To Pay Overtime Wages, Or To Provide Accurate Wage Statements Or Meal And Rest Breaks Violates California's Unfair Competition Law**

The wage practices described above violate <u>California Business and Professions Code</u> § 17200 *et seq.*

**III.    PROPOSED CLASS DEFINITIONS**

Plaintiff seeks certification of the following Class:

All current and former employees of Defendant who were employed as underwriters and classified as exempt from overtime by Defendant at their mortgage lending business

1   locations in the state of California within four (4) years of the

2   filing of this complaint through the resolution of this lawsuit.

3   **IV.    CLASS CERTIFICATION IS APPROPRIATE BECAUSE**

4   **UNDERWRITERS WORKED ACCORDING TO COMMON PROCEDURES IN**

5   **THE PRODUCTION OF LOANS AND WERE NOT CALLED UPON TO APPLY**

6   **DISCRETION AND INDEPENDENT JUDGMENT**

7   **A.    Legal Standard For Class Certification**

8       **1.    The Merits Of Plaintiff's Claims Are Not To Be Considered**

9       A motion to certify a class action is not a trial on the merits, nor does it function as

10  a motion for summary judgment. See Carabini v. Superior Court, 26 Cal. App. 4th 239,

11  245 (1994)  Moreover, any doubts as to the appropriateness of class treatment must be

12  resolved in favor of certification, subject to later modification.  See Richmond v. Dart

13  Industries, Inc., 29 Cal. 3d 462, 473-75 (1981).

14      **2.    Judicial Policy Favors Class Certification**

15      California courts favor the use of class actions in appropriate instances, and will

16  resolve any doubts in favor of certifying a class.  See Vasquez v. Superior Court, 4 Cal. 3d

17  800, 807-08 (1971).  Class actions for employees who have been misclassified are

18  specifically favored by California courts.  See, generally, Sav-on Drug Stores, Inc. v.

19  Superior Court (Rocher), 34 Cal. 4th 319 (2004).

20      **3.    Damages May Vary Among Class Members**

21      The amount of damages may vary among class members and does bear upon the

22  question of certification.  Individualized proof of damages is not a bar to class certification.

23  See Vasquez, supra, at 815; and see Employment Development Dept. v. Superior Court 30

24  Cal. 3d 256, 266 (1981) ("[C]lass action is not inappropriate simply because each member

25  of the class may at some point be required to make an individual showing as to his or her

26  eligibility for recovery or as to the amount of his or her damages…[A] court can devise

27  remedial provisions which channel the individual determinations that need to be made

28  through existing administrative forums.").

28

**4.  Requirements For Class Certification**

The two primary requirements necessary to maintain a California class action are: (1) an ascertainable class, and, (2) a well-defined community of interest in the questions of law and fact. See <u>Daar v. Yellow Cab Company</u>, 67 Cal. 2d 695, 704 (1967).  Courts generally evaluate these requirements by considering the: (1) numerousity of class members; (2) typicality of claims; (3) adequacy of representation by counsel and class representative; and (4) the superiority and predominance of common questions of law and fact. See <u>Vasquez v. Superior Court</u>, supra, 4 Cal.3d at 820.

This burden is not an onerous one – Plaintiff need only show that a class action would be the most efficient means of resolving class members' claims. See <u>Sav-On</u>, <u>supra</u>, 34 Cal. 4th at 330.

**B.    The Class of Underwriters Is Ascertainable And Numerous**

The proposed class must be ascertainable and sufficiently numerous so that joinder of its members is impracticable. See <u>Richmond v. Dart Industries</u>, <u>supra</u>, 29 Cal. 3d at 470.  Plaintiff need not allege the exact number and identity of the Class Members, but must only establish that joinder is impracticable through some reasonable estimate of the number of potential Class Members, and that there exists sufficient means to identify them at the remedial stage. See <u>Reyes v. Board of Supervisors of San Diego County</u>, <u>supra</u>, 196 Cal. App. 3d at 1274-75.

Here, both requirements are easily met.  The individual members of the class are identifiable from Defendant's business and personnel records, because an employer is required to maintain its employment records for a minimum of three years. See <u>California Labor Code</u> §§ 1174-75.  Additionally, Defendant has estimated that "the purported class may well exceed 600 current and former employees."[1]

While there is no minimum class size, under federal class action case law, which

---

[1]    Response of Defendant Washington Bank FKA Washington Mutual Bank, FA to Plaintiffs Kimblyn Johnson Creese and Phyllis Parker's Special Interrogatories (Set Three), attached as Exhibit A to the Declaration of Shawn Westrick, dated April 14, 2006 ("Westrick Decl."), filed concurrently herewith.

1  California courts regularly consult, the "numerousity" requirement is generally met if the
2  total number of plaintiffs exceeds 40. See Stewart v. Abraham, 275 F. 3d 220, 226-27 (3rd
3  Cir. 2001). With Defendant having identified a class of 600 or more underwriters, the
4  numerousity threshold is many times exceeded, implying that joinder of all affected
5  underwriters would be impracticable without class treatment. At the same time, the class
6  is far from so numerous as to be unmanageable.

7  **C.    Common Questions Of Law And Fact Predominate**

8       In assessing whether common issues predominate over individual ones, Plaintiffs'
9  theory does not depend on Class Members having identical claims, nor does the law of
10 class certification require such. The relevant comparison lies between the costs and
11 benefits of adjudicating Plaintiffs' claims in a class action and the costs and benefits of
12 proceeding by numerous separate actions. See Sav-On, supra, 34 Cal.4th at 338; 339,
13 n.10.

14      **1.  Common Questions Of Law And Fact Predominate In Determining That**
15      **The Underwriters Were Not Properly Subject To The "Administrative"**
16      **Exemption**

17      In this instance, Washington Mutual has classified Plaintiffs and the putative class
18 as "exempt" from certain wage law protections because they work in an "administrative"
19 capacity.[2] The common legal and factual question is simply whether underwriters did in
20 fact work in an administrative capacity, and were thereby legally exempt from being paid
21 for overtime and the right to meal and rest breaks. While not every underwriter performed
22 identical work, they did all work under a common structure that strictly defined the
23 procedures they were to follow in the production of loans, Defendant's core product.

24      Defendant's policies and procedures, applicable to all underwriters, strictly limited
25 the underwriters' discretion and independent judgment. However, under California law, a
26 properly exempt "administrative" employee is one who:

27

28 [2]   See Transcript of Deposition of Peggy Ohlaver ("Ohlaver Depo."), lodged concurrently
   herewith, at 67:15-20.

                                    - 6 -
                    MEMORANDUM OF POINTS AND AUTHORITIES

Customarily and regularly exercises discretion and independent judgment in the performance of 'intellectual' work which, in the context of an administrative function, is office or non-manual work directly related to management policies or the general business operations of the employer or the employer's customers. Nordquist v. McGraw-Hill Broadcasting Company, Inc., 32 Cal. App. 4th 555, 563 (1995) quoting 2 Division of Labor Standards Enforcement, Operations and Procedures Manual ("DLSE Manual") § 10.62.

Courts apply a two-part test to determine whether employees are properly subject to the administrative exemption. First, there is an inquiry as to whether the employees classified as exempt administrators are primarily engaged in the "'performance of office or non-manual work *directly related to management policies or general business operations*'" of the employer. Bell v. Farmers Insurance Exchange, 87 Cal. App. 4th 805, 821 (2001) ("Bell I"), quoting 29 C.F.R. part 541.2 (italics added by court). This is the foundation of the so-called "administrative/production worker dichotomy." Bell v. Farmers Insurance Exchange, 115 Cal. App. 4th 715, 737-38 (2004) ("Bell II"[3]). If it is determined that a worker classified as "administrative" is in fact "in the sphere of rank and file production workers," then the inquiry ends. Bell I, 87 Cal. App. 4th 828-29. The exemption is improper. Production employees – "those whose primary duty is producing" the employer's basic product – are categorically not eligible for the administrative exemption. Id. at 821.

If, however, employees classified by the administrative exemption have as their primary duty "administering the business affairs of the enterprise," id., then a second-level inquiry is still required to validate the administrative exemption. This second-level inquiry

---

[3]    The various Bell courts use different designations of Bell I, Bell II, and so forth, as they take up the matter's entire appellate history. Thus the designations used herein do not comport with those courts' references: the "Bell II" referenced at 115 Cal. App. 4th at 728 is "Bell I" herein. Each is internally consistent, however, and no citations rely on the inconsistent definitions.

1  asks whether or not the employees are engaged in work that primarily "requires exercise of
2  discretion and independent judgment." Id. at 828.

3      "The employer bears the burden of proving the employee is exempt." Nordquist, 32
4  Cal. App. 4th at 562; see also Corning Glass Works v. Brennan, 417 U.S. 188, 196-197
5  (1974).

6      "Exemptions are narrowly construed against the employer and their application is
7  limited to those employees plainly and unmistakably within their terms." Nordquist, 32
8  Cal. App. 4th at 562; see also Dalheim v. KDFW-TV, 918 F. 2d 1220 1224 (5th Cir. 1990).

9      However, far from proving its underwriters are properly designated according to the
10  narrow administrative exemption, Defendant has thus far provided an abundance of
11  evidence, chiefly through deposition testimony of Persons Most Knowledgeable,
12  confirming that underwriters work according to a strict set of guidelines, and do work that
13  is at the very core of Washington Mutual's mortgage lending business: making loans.
14  Further, while there is no need to reach the question of whether or not the underwriters are
15  called upon to exercise discretion and independent judgment, because they do not perform
16  administrative work in the first place, it turns out that Washington Mutual's proposed
17  administrative exemption fails the second prong of the inquiry, as well.

18      a.      **The Underwriters Do Not Fall Within The Administrative**
19              **Exemption Because Their Work Is "Production" As Defined By**
20              **The Case Law**

21      In determining on which side of the "administrative/production worker dichotomy"
22  a group of employees falls, California courts will draw a distinction "between those
23  employees whose primary duty is administering the business affairs of the enterprise [and]
24  those whose primary duty is producing the commodity or commodities, whether goods or
25  services,[4] that the enterprise exists to produce and market." Bell I, 87 Cal. App. 4th at

26

27  _____
    [4]    While "production" is more typically associated with the manufacturing of tangible
28  objects, it is uncontroversial that production work, within the meaning of the case law considering
    the administrative exemption, can include either goods or services. Thus a loan is as amenable to

1   821-22. The inquiry begins by asking: *What is "'the nature of the employer's*
2   *business.'"?* Id.

3          The case law tends to yield straightforward answers to this question. For instance,
4   in the automobile damage appraisal business, those who did the actual appraisals "did not
5   administer the business." Id., citing Reich v. American International Adjustment Co, Inc.,
6   902 F. Supp. 321, 325 (D. Conn 1994). Rather, the damage appraisers worked directly
7   within the company's core function, or, alternatively, "the nature of the employer's
8   business": appraising automobile damage. Id. As such, the appraisers were regarded as
9   production workers, and were therefore not eligible for the administrative exemption. Id.
10  Similarly, Reich v. Chicago Title Insurance Co., 853 F. Supp. 1325 (D. Kan. 1994)
11  "examined the duties of the plaintiff escrow closers 'to determine whether they carry out
12  Chicago Title's day-to-day operations . . . or whether they administer the business affairs .
13  . . [of the company]." Bell I, 87 Cal. App. 4th at 823. The court concluded that "'Chicago
14  Title is in the escrow closing business, and its . . . status as a title insurer does not alter the
15  fact that escrow closings are a very real product . . .'" Id., quoting Chicago Title, 853 F.
16  Supp. at 1330. The escrow agents who performed the escrow closings were thus engaged
17  in production, not administration, and were thus not eligible for the administrative
18  exemption.

19         In all three instances – Bell I (insurance adjusters), American International
20  (automobile damage appraisers), and Chicago Title (escrow closers), employees working
21  to produce the employer's core product or service were found to fall "squarely on the
22  production side of the administrative/production worker dichotomy." Bell I, 87 Cal. App.
23  4th 826. So, too, with underwriters. A similar inquiry reveals that Washington Mutual
24  underwriters also fall on the production side of the dichotomy. Washington Mutual is in
25  the business of producing loans, and the underwriters carry out that production, a
26  conclusion amply supported by the available evidence.

27

28  being characterized as resulting from "production" as are durable goods coming off an assembly
    line.

1    Over the course of numerous Person Most Knowledgeable depositions, Defendant's
2  designees testified extensively as to both the "nature" of Washington Mutual's mortgage
3  lending business and the job duties of Washington Mutual's underwriters.  As a
4  foundational matter, Sandie Randall, a Washington Mutual Area Underwriting Manager
5  who supervises underwriters, described the "business" of the home loans group as being
6  "[t]o provide financing to individuals who are looking for home loans."[5]   As to the role of
7  underwriters in producing home loans, Ms. Randall stated as follows:  "Underwriting is a
8  very important part of home loans."  (Randall Depo. at 95:12-13).[6]  See Bell II, 115 Cal.
9  App. 4th at 732 ("The work here falls '"squarely on the production side of the line"'
10  [citation omitted]; it places plaintiff in the broad category of rank and file workers carrying
11  out the service that is an important component of [that] the [Defendant's]business
12  organization exists to provide.")[7]

13    Indeed, Washington Mutual's *administrative* functions are not even located in
14  California, where the loan production occurs, but rather at the company's corporate
15  headquarters, in Seattle:

16    **Q: Do you know what functions are based out of Seattle?**

17    A:  The typical corporate functions, which I would assume include
18    accounting and, you know **all the administrative functions** that go with a large
19    company.

20

21

22

_____

23  [5]    See Transcript of Deposition of Sandie Randall ("Randall Depo."), lodged concurrently
herewith, at 59:23-24.
24  [6]    Another Area Underwriter Manager, Stephen Riley, was asked the same question – *are the
Underwriters an important part of Washington Mutual's mortgage lending business?* – and
25  responded as follows: "Yes.  It's absolutely vital."  Transcript of Deposition of Stephen Thomas
Riley ("Riley Depo."), lodged concurrently herewith, at 39:16-19.  See also Transcript of
26  Deposition of Glenn Dekow ("Dekow Depo."), lodged concurrently herewith, at 96:25-97:1-2.
("**Q: Would you say that underwriting is an important function of Washington Mutual?**  A.
27  Absolutely.")
[7]    See, e.g., "Performance Management Process" sheets, attached as Ex. D to Westrick
28  Decl., in which Underwriters' tasks are expressly referred to as "production."

1  Deposition Transcript of Tom Fletcher[8] ("Fletcher Depo.), lodged concurrently herewith,

2  at 69:6-11. Nor do underwriters determine what kind of products Washington Mutual will

3  sell, or at what interest rate loans will be made; those, too, are matters of administrative

4  policy set in Seattle, Washington.[9]

5      The admission that underwriting is production work is even made by Washington

6  Mutual executives themselves when they describe the nature of the work.[10]: So, too, do

7  Plaintiffs' and the putative Class Members see themselves as being engaged in the

8  production of loans, not administration. For instance, underwriters worked in cubicles,

9  forming something of a loan production assembly line, next to workers whose non-exempt

10  status is uncontested. "My fellow underwriters and I put together the loans, working in the

11  loan fulfillment center side by side with boarders, processors, and closers."[11]

12      Underwriters have production quotas and keep a tracking log of their production of

13  loans.[12] For underwriters who do well, bonuses are "based on productivity."[13] For those

14  _____

15  [8]    Tom Fletcher is an Area Underwriting Manager for Washington Mutual.
   [9]    See Fletcher Depo. at 179:16-180:3; 180:5-9.

16  [10]    See, e.g., Dekow Depo. at 86:25-88:3. Throughout Mr. Dekow's deposition testimony, he
   regularly uses the language of "production" and loans as "products" when referring to the overall

17  loan and underwriting process:

18  •    "I oversaw production in the office, which consisted of the loan delivery . . . I also
     oversaw the loan processors, the loan closing, the post-closing, and the

19     underwriting."

20  •    "[Tony Meola] was vice president in charge of retail and wholesale [loan]
     production."

21  •    "[T]he product that we do may be slightly different than you would get in a large
     retail fulfillment center . . ."

22  Dekow Depo. at 12:10-15; 15:9-13; 29:18-21.
   [11]    Declaration of Phyllis Parker, dated April 7, 2006 ("Parker Decl."), attached as Exhibit 1 to

23  Plaintiff's Appendix of Declarations in Support of Plaintiffs' Motion for Class Certification
   ("Appendix of Plfs' Declarations"), filed concurrently herewith, at ¶5. And see Declaration of

24  Kimberly Johnson Creese, dated April 10, 2006 ("Johnson Creese Decl."), Ex. 2 to Appendix of
   Plfs' Declarations at ¶5; Declaration of Jo Ann Gullo, dated April 12, 2006 ("Gullo Decl."), Ex. 3

25  at ¶5; Declaration of Vijay Kumar, dated April 12, 2006 ("Kumar Decl."), Ex. 4 at ¶5; Declaration
   of Vickie Moore, dated April 5, 2006 ("Moore Decl."), Ex. 5 at ¶5; Declaration of Cathy Lashon,

26  dated April 4, 2006 ("Lashon Decl."), Ex. 6 at ¶4; Declaration of Beverly Solis, dated April 10,
   2006 ("Solis Decl."), Ex. 7 at ¶4.

27  [12]    See Randall Depo. at 151:3-10; 154:1-6; see also Parker Decl. at ¶4; Creese Decl. at ¶4;

28  Gullo Decl. at ¶4; Kumar Decl at ¶4; Moore Decl. at ¶4; Lashon Decl. at ¶5; Solis Decl. at ¶5;
   Wick Decl. at ¶4; Minassian Decl. at ¶4; Wallen Decl. at ¶4.

1   who do not, the relevant measure is the same – production.  Underwriters are disciplined

2   for falling below production quotas.[14]  For extremely poor performers, where termination

3   is a possibility, production is the dominant factor:[15]

4   Q.   **And would people – do underwriters need to be counseled a**

5        **certain number of times before getting a notice of concern?**

6   A.   I think that would depend on how close their productivity was; in

7        other words, how close to the number are you?  If – if this month you

8        are at 95 [percent of production quota] and last month you were at 80,

9        and then you jumped to 100, and then you jumped back down, you

10       know, it – it's a just a matter of if you can never get off a 65 percent

11       or 70 percent, you know, you might be counseled right away.

12  Indeed, the testimony of those Washington Mutual personnel who supervise the

13  underwriters is replete with references to production goals and standards.[16]

14       Thus, all evidence points to the underwriters being non-exempt production – not

15  exempt administrative – workers.

16  b.   **The Underwriters Do Not Fall Within The Administrative**

17       **Exemption Because Their Work Does Not Require The**

18       **Application Of "Discretion And Independent Judgment"**

19       Even if the above analysis of the production-side of underwriting did not decisively

20  settle the question, the fact that underwriters also are not called upon to exercise discretion

21  and independent judgment is a separate, independent ground on which to disallow

22  Defendant's claimed administrative exemption.

23       Underwriters also do not exercise sufficient discretion and independent judgment to

24  qualify for the administrative exemption.  As noted in the declarations of Class Members

---

[13]  Randall Depo. at 150:11-14.
[14]  See Randall Depo. at 182:25-183:3.
[15]  See Randall Depo. at 182:25-183:3.
[16]  However, even an employee who is at 95 percent of the quota can be disciplined.  Randall Depo. at 184:7-16.  See also, e.g., Fletcher Depo. at 140:22-143:3 (discussing productivity standards and goals).

1  and Defendant's witnesses, underwriters performed their job using "skill, knowledge and

2  experience." By contrast, the requirement that an employee exercise independent

3  judgment and discretion involves

4          the comparison and evaluation of possible courses of conduct,

5          and acting or making a decision after considering various

6          possibilities ... . The most frequent cause of misapplication of

7          the term 'discretion and independent judgment' is the failure to

8          distinguishes it from **the use of skills and knowledge**. An

9          employee who merely applies his or her knowledge in

10         following prescribed procedures or in determining which

11         procedures to follow, or who determines whether specified

12         standards are met ... is not exercising discretion and judgment

13         of the impendent sort associated with administrative work.

14  Nordquist, 32 Cal. App. 4th at 564, citing the DLSE Manual § 10.63 (emphasis added).

15         This misunderstanding is vividly demonstrated by the Washington Mutual

16  personnel who have participated in misclassifying the Underwriters. One Underwriting

17  Manager concluded that "underwriters are having to use their experience, **their skills,**

18  **their knowledge** to determine the qualifications of that borrower."[17] Another

19  Underwriting Manager answered in nearly identical terms when asked on what

20  underwriters rely when called upon to make a decision:

21         Could be a combination of skill, **experience**. I think we

22         always draw from our past experiences and knowledge as to,

23         you know, what is a good loan, what isn't a good loan. So,

24         yes, they do draw from their past experiences, **knowledge,**

25         **skill level**, training.

26  Randall Depo. at 142:24-143:3 (emphasis added).

27

28

---

[17]     Fletcher Depo. at 156:17-18 (emphasis added).

- 13 -

1    Like the Washington Mutual deponents, Plaintiffs and the putative Class Members

2  testify to a system that does not rely upon discretion and independent judgment:

3          In putting together the loans, the underwriters and I would

4          begin with the corporate guidelines and policies and

5          procedures.  We had specific and narrow parameters within

6          which we could make exceptions from these guidelines.  In

7          making such exceptions, we relied on our **skill knowledge and**

8          **experience**.

9  Parker Decl. at ¶7.[18] <u>Compare</u> <u>with</u> <u>Nordquist</u>, 32 Cal. App. 4th at 569 (Misclassified

10 employees "relied primarily on their intelligence and the skills derived from many years of

11 experience in the field and not imagination or sheer talent.").

12        Plaintiffs further echo the words of their supervisors, with regard to the expectations

13 their Washington Mutual supervisors had for the underwriters:

14         We also relied on industry standards as well as the accepted

15         conventions within Washington Mutual which we were taught

16         over time.  We were provided with a great deal of training,

17         correction and feedback so that we learned the right way to put

18         together a loan.  When there was a grey area or a problem, we

19         would speak with our manager.  In light of all the above

20         factors, **it would be obvious whether it was appropriate to**

21         **approve, decline, or [make a] counter [offer]**.

22 Parker Decl. at ¶7 (emphasis added).[19] <u>Compare</u> <u>with</u> <u>Nordquist</u>, 32 Cal. App. 4th at 566-

23 67 ("Many of their decisions were obvious" – referring to employees misclassified as

24 exempt because, *inter alia*, they did not exercise discretion and independent judgment).

25 _____

[18]    <u>And</u> <u>see</u> Creese Decl. at ¶7; Gullo Decl. at ¶8; Kumar Decl at ¶7; Moore Decl. at ¶7;
26 Lashon Decl. at ¶7; Solis Decl. at ¶9; Declaration of Cynthia Wick, dated April 12, 2006 ("Wick
   Decl."), Appendix of Plfs' Declarations, Ex. 8 at ¶6; Declaration of Nancy Minassian, dated April
27 13, 2006 ("Minassian Decl."), Appendix of Plfs' Declarations, Ex. 9 at ¶7; Declaration of
   Adrienne Wallen, dated April 12, 2006 ("Wallen Decl."), Appendix of Plfs' Declarations, Ex. 10
28 at ¶7.

1        In practice, the actual work of underwriters is as standardized as it is by Washington

2 Mutual's design. *All* underwriters are required to follow two extensively detailed manuals:

3 (1) the nearly three-hundred page "Conventional Underwriting Guidelines,"[20] which sets a

4 common basis for underwriters' reference to standardized Washington Mutual policies

5 pertaining to its underwriters, and, (2) "Conventional Underwriting Procedures,"[21] which

6 describes the execution of those policies. Stephen Riley, a Washington Mutual

7 Underwriting Manager, described the "Conventional Underwriting Guidelines" as being

8 "where an underwriter can research what the -- what Washington Mutual's policy is

9 surrounding that subject."[22] There are no specific educational requirements for

10 Underwriters.[23] Underwriters are not required to have any sort of professional license.[24]

11 See Nordquist, 32 Cal. App. 4th at 572 (noting that improperly exempt employee "had no

12 advanced degree or even a high school education"). Underwriters do not supervise any

13 subordinate employees.[25] See id. (noting that improperly exempt employee had no

14 supervisory responsibilities).

15        Underwriters are evaluated in terms of whether or not their decisions on loans "fit

16 the current guidelines"[26] and meet goals – *production* goals. Underwriters are encouraged

17 to approve as many loans as possible.[27] Yet an underwriter cannot deny a loan or make a

18 counteroffer without getting the approval of a manager.[28] Underwriters must use the

19 "Conventional Underwriting Guidelines" to determine whether a loan falls within an

20

21

22

---

[19]    See also Creese Decl. at ¶7; Gullo Decl. at ¶7; Kumar Decl at ¶7; Moore Decl. at ¶4;
Lashon Decl. at ¶8; Solis Decl. at ¶9; Wick Decl. at ¶6; Minassian Decl. at ¶7; Wallen Decl. at ¶7.
[20]    Attached as Exhibit B to Westrick Decl.
[21]    Attached as Exhibit C to Westrick Decl.
[22]    Riley Depo. at 40:20-22.
[23]    Riley Depo. at 53:1-54:4.
[24]    Riley Depo. at 54:18-22.
[25]    Riley Depo. at 55:2-6.
[26]    Randall Depo. at 19:5-11.
[27]    Fletcher Depo. at 156:1-7.
[28]    Fletcher Depo. at 157:6-9.

1   acceptable limit for Defendant.[29]  Just as Plaintiffs' and the putative Class Members state,

2   underwriters must speak to a manager if the approval of a loan falls into a "gray" area.[30]

3       Underwriters are also subject to extensive, standardized training and feedback.[31]

4   And when they are evaluated, the extent to which the Underwriters have absorbed and

5   followed Defendant's prescribed production policies is first among the criteria cited by

6   those who directly supervise the underwriters:

7       **Q.    Okay. What would you say makes somebody a good**

8       **underwriter.**

9       A.    . . . But certainly an understanding of . . . Washington

10      Mutual's products, prices, guidelines, policies.  Washington

11      Mutual as – as mortgage originator, . . .

12          . . . .

13      So that's got to be the – the first – that's got to be one of the

14      first areas that – that I've described as a strong underwriting, is

15      simply know our policies, how policies are documented, where

16      they go for them – for identifying gaps in their own

17      knowledge.

18  Riley Depo. at 59:13-60:14.

19      An underwriter who fails to consistently reach production quotas can be

20  disciplined.[32]  An underwriter needs permission to leave early or come in late, and without

21  such permission, an employee may be disciplined.[33]  The forms of discipline far more

22  resemble those assessed to hourly workers than administrators who have considerable

23  autonomy.[34]

---

24  [29]  Fletcher Depo. at 78:15-19; 160:19-160:25; Dekow Depo. 49:14-20.
25  [30]  Dekow Depo. at 54:19-55:11.
    [31]  Fletcher Depo. at 157:16-18, 158:13-159-160:14; Dekow Depo. at 50:25-51:4; 53:20-25.
26  [32]  Fletcher Depo. at 132:12-14; and see extended discussion regarding production quotas,
27  supra.
    [33]  Fletcher Depo. at 149:11-150:7.
28  [34]  See, e.g., "Performance Improvement Notice," attached as Exhibit E to Westrick Decl., in
    which Plaintiff Kimblyn Johnson Creese is informed "[Y]ou left the office at approx. 4:00,

- 16 -
MEMORANDUM OF POINTS AND AUTHORITIES

Accordingly, because the putative class neither performed administrative work nor did they exercise sufficient independent judgment and discretion, there exists a common question of law and fact that makes a class action the appropriate treatment of this matter.

On a final note, the declarations submitted by Plaintiffs and the putative Class Members *all* testify to work weeks well in excess of forty hours. See Parker Decl. at ¶ 11 (55-60 hours); Johnson Creese Decl. at ¶11 (55 hours); Gullo Decl. at ¶12 (50 hours); Kumar Decl. at ¶ 11(50-60 hours); Moore Decl. at ¶ 10 (60 hours); Lashon Decl. at ¶13 (55-60 hours); Solis Decl. at ¶14 (55-60 hours); Wick Decl. at ¶10 (50 or more hours). Thus, if the class was improperly classified as exempt from overtime, there can be no question that damages exist.

## 2. Defendant's Failure To Pay Overtime Wages And The Resulting Waiting Time Penalties Raises Common Legal And Factual Issues

California Labor Code § 203 provides that all former employees may recover up to 30 days wages as a waiting penalty for a defendant's failure to pay all compensation, such as overtime, due upon termination. Once the class proves entitlement to the underlying wage claims, waiting time penalties are assessed on a class basis. See Ghory v. Al-Lahham 209 Cal. App. 3d 1487, 1492 (1989) ("if [an employee] is entitled to overtime compensation, he is entitled to penalty wages as well").

## 3. Defendant's Failure To Provide Accurate And Complete Wage Statements Raises Common Legal And Factual Issues

Certification is proper for wage statement violations on two separate and independent grounds. First, Labor Code § 226(a)(2) is violated because the statute requires that employees must be told the actual amount of hours worked unless an employee's "compensation is solely based on a salary and who is exempt from payment of overtime … ." Defendant routinely admitted in depositions that the putative class received

without any notification to management. . . . You returned to work 2 hours later. . . . You must notify management directly when you need to leave the office for an unexpected time."

- 17 -
MEMORANDUM OF POINTS AND AUTHORITIES

bonuses, and thus the putative class was not paid "solely" on salary, but rather a salary *plus* bonus.   Under § 226(a)(2) then, the putative class must be informed as to the total hours actually worked.  This is a certifiable issue regardless of the Court's determination on the misclassification issue.  See also Primo Decl. at ¶11.

Second, Defendant is in violation of <u>Labor Code</u> § 226(a)(9).  Section 226(a)(9) is violated because employers must accurately report "all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee."  Defendant routinely issued wage statements that noted an employee's hourly rate.  For example, Plaintiff Phyllis Parker was repeatedly told she earned an hourly rate of $28.831519.[35]  Defendant thus continuously issued a patently inaccurate hourly rate.  Plaintiff Phyllis Parker did not earn $28.831519 per hour.  Plaintiffs and the putative class were paid a salary.  The putative class was never paid an hourly rate.  Thus, all wage statements issued by Defendant are in error and in violation § 226(a)(9).  This is also grounds for certifying this cause of action regardless of the Court's determination on the misclassification issue.  See also Primo Decl. at ¶11.

**4.  Defendant's Denial Of Meal And Rest Breaks Is Also A Class-Wide Issue**

Plaintiffs and Class Members all testify to being denied meal and rest breaks.  See Parker Decl. at ¶¶ 9-10;  Creese Decl. at ¶¶9-10; Gullo Decl. at ¶¶9-10; Kumar Decl at ¶¶9-10; Moore Decl. at ¶9; Lashon Decl. at ¶¶10-12; Solis Decl. at ¶¶11-13; Wick Decl. at ¶¶8-9; Minassian Decl. at ¶¶9-10; Wallen Decl. at ¶¶9-10.

Defendant's violation of <u>California Labor Code</u> § 226.7 plainly spanned across the entire putative class of underwriters, as the erroneous assumption that they were exempt would never have given rise to any diligence about enforcing the meal and rest break requirement.  Accordingly, this issue, too, is appropriate for certification.

**5.  Defendant's Violation Of California's Wage Laws Is Also A Violation Of California's Unfair Competition Law**

---

[35]     See Westrick Decl., Exhibit F.

MEMORANDUM OF POINTS AND AUTHORITIES

1    Violations of California's labor laws are actionable under <u>California Business and</u>

2  <u>Professions Code</u> § 17200 *et seq.*, the state's Unfair Competition Law. <u>See Hudgins v.</u>

3  <u>Neiman Marcus Group, Inc.</u> 34 Cal. App. 4th 1109 (1995). If the underlying overtime

4  claims are proven, the class may be entitled to additional remedies, pursuant to § 17200,

5  such as injunctive relief and restitution. <u>See Cortez v. Purolator Air Filtration Products</u>

6  <u>Co.</u>, 23 Cal. 4th 163 (2000).

7  **D.    Plaintiff's Claims Are Typical Of Class Member Claims**

8    Typicality requires that class representatives be members of the class they seek to

9  represent. <u>See Chern v. Bank of America</u>, 15 Cal. 3d 866, 874 (1976). Plaintiffs' claims

10  must arise from the same event, practice or course of conduct that gives rise to the claims

11  of the other class members and be based on the same legal theories. <u>Classen v. Weller</u>,

12  145 Cal. App. 3d 27, 46-47 (1983).

13    Here, Plaintiffs' claims arise from Defendant's standardized policies and practices,

14  which necessitate that underwriters will perform "production" work. Further, those same

15  policies and practices so circumscribe Plaintiffs' decisions to prevent the application of

16  discretion and independent judgment that is required to qualify for the administrative

17  exemption. Members of the putative class are subject to all the same systematic rules and

18  constraints, giving rise to the same claims as Plaintiffs, who are themselves properly

19  members of the class.

20  **E.    Plaintiff And Counsel Will More Than Adequately Represent The Class**

21    Adequacy of representation is satisfied where the Plaintiffs are represented by

22  qualified counsel and Plaintiffs' interests are not antagonistic to those of the class. <u>See</u>

23  <u>McGhee v. Bank of America</u>, 60 Cal. App. 3d 442, 450 (1976). The named Plaintiffs'

24  interests in this litigation are co-extensive with the interests of the class. The Plaintiffs and

25  the class have been damaged in the same manner by Defendant's improper election of the

26  administrative exemption, and seek the same relief. Ms. Creese and Ms. Parker have

27  agreed to serve as class representatives and have retained experienced counsel. <u>See</u> Creese

28  Decl at ¶ 12; Parker Decl. at ¶ 12; <u>and see</u>, <u>generally</u>, Primo Decl. Both class

1    representatives have devoted much time to this litigation and are prepared to continue to do

2    so.  This demonstrates their commitment to achieving the best possible result for the

3    benefit of the class and thus meets the adequacy requirement.

4        Plaintiffs' counsel is qualified to handle this litigation on a class-wide basis because

5    they are experienced in both employment law and class actions.  See Primo Decl. at ¶ 2.

6    Class counsel meets the legal requirement of being "qualified, experienced and generally

7    able to conduct the proposed litigation."  Miller v. Woods 148 Cal. App. 3d 862, 874

8    (1983).

9    **F.    Class Certification Has Substantial Benefits And Is The Superior Method For**

10          **Ensuring A Fair And Efficient Resolution**

11       The express judicial policy of the State of California favors the maintenance of

12   appropriate class actions.  Richmond v. Dart Industries, supra, at 473; La Sala v. American

13   Savings & Loan Assn. 5 Cal. 3d 864 (1971).  The California Supreme Court has

14   encouraged the use of class actions as an important device to vindicate rights asserted by

15   large groups of people.  Keating v. Superior Court, 31 Cal. 3d 584, 609 (1982), appeal

16   dism'd in part, rev'd in part on other grounds sub nom., Southland Corp. v. Keating, 465

17   U.S. 1 (1984).

18       A class action in this matter would allow the hundreds of current and former

19   underwriters to resolve their claims in one forum and at one time, thereby providing much

20   greater access to the judicial system, furthering the legislature's goal of enforcing

21   California's wage and hour laws, eliminating repetitive litigation, and reducing the risk of

22   inconsistent judgments.  Class-wide adjudication is therefore the superior method for

23   handling this dispute.

24   \\\

25   \\\

26   \\\

27

28
                                                            **44**

V.    **CONCLUSION**

Plaintiffs and the putative Class Members have satisfied all the requirements for class certification.  Plaintiff respectfully request that this Court certify the class described herein, appoint Plaintiff as the class representative, and appoint Plaintiff's attorneys as class counsel.

Dated: April 14, 2006

Respectfully submitted,
Initiative Legal Group LLP

By: _____
Mark Yablonovich
Marc Primo
Shawn Westrick

1

## PROOF OF SERVICE

2 STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

I am employed in the County of Los Angeles.  I declare that I am over the age of eighteen (18) and not a party to this action.  My business address is: Initiative Legal Group LLP, 1875 Century Park East, Suite 1800, Los Angeles, California 90067.

4

5

On April 14, 2006, I served the within document(s) described below as:

6

7 **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

8

Andrew R. Livingston, Esq.
9      Jonathan Hayden, Esq.
Heller, Ehrman LLP
10     333 Bush Street
San Francisco, California 94104
11     *Facsimile: 415-772-6268*

12
**(X)**      **FACSIMILE**:  I caused the above-referenced document(s) to be transmitted to the above-named person at the telephone numbers above.
13

14 ( )      **MAIL**:  I deposited such envelope in the mail at Los Angeles, California.  The envelopes were mailed with postage thereon fully prepaid.

15 ( )      **PERSONAL**:  I caused such envelope to be delivered by hand to Jonathan Hayden through the service of You Got Served, LLC and Matthew Yu through the service of P.D. Rabitt.

16 ( )      **OVERNIGHT COURIER**:  I caused the above-referenced document(s) to be delivered to an overnight courier service (Federal Express), for delivery to the above addressee(s).

17
**(X)**      **(STATE)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.
18

19 ( )      **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

20

**EXECUTED** this document on April 14, 2006, at Los Angeles, California.

21

22

23                                        _Armen Boyajian_

24

25

26

27

28

**46**

- 1 -

# EXHIBIT C

1  JONATHAN P. HAYDEN (State Bar No. 104520)
   ANDREW R. LIVINGSTON (State Bar No. 148646)
2  TRACY S. TODD (State Bar No. 172884)
   MICHELLE A. ROJAS (State Bar No. 215365)
3  HELLER EHRMAN LLP
   333 Bush Street
4  San Francisco, CA 94104-2878
   Telephone: (415) 772-6000
5  Facsimile: (415) 772-6268
   Jonathan.Hayden@hellerehrman.com
6  Andrew.Livingston@hellerehrman.com

7  Attorneys for Defendant
   WASHINGTON MUTUAL BANK
8  FKA WASHINGTON MUTUAL BANK, FA

ORIGINAL FILED
By E. Torres

MAY 2 2 2006

LOS ANGELES
SUPERIOR COURT

9              SUPERIOR COURT OF CALIFORNIA

10                COUNTY OF LOS ANGELES

11

12  KIMBLYN JOHNSON CREESE, an individual,      Case No.: BC323376
    PHYLLIS PARKER, an individual, and on
13  behalf of other members of the general public   [Assigned to Hon. Terry A. Green, Dept. 14]
    similarly situated,
14                                                 **CLASS ACTION**

                                                   **WASHINGTON MUTUAL'S**
15                             Plaintiffs,          **MEMORANDUM OF POINTS AND**
                                                   **AUTHORITIES IN OPPOSITION TO**
16       vs.                                        **PLAINTIFFS' MOTION FOR CLASS**
                                                   **CERTIFICATION**
17  WASHINGTON MUTUAL BANK, a
    Washington corporation; WASHINGTON           Date:  June 26, 2006
18  MUTUAL MORTGAGE SECURITIES, INC.,            Time: 8:30 A.M.
    a Delaware corporation; WASHINGTON
19  MUTUAL BROKERAGE HOLDINGS, INC., a           Action Filed:  October 27, 2004
    California corporation, WASHINGTON           Trial Date:     October 30, 2006
20  MUTUAL COMMUNITY DEVELOPMENT,
    INC., a California corporation, and DOES 1
21  through 10, inclusive,

22                             Defendants.

23

24

25

26

27

Heller
Ehrman LLP   28

# TABLE OF CONTENTS

|   |   | **Page** |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | RELEVANT FACTUAL BACKGROUND | 2 |
| | A. Washington Mutual Bank's Home Loans Group | 2 |
| | B. Issuing a Home Loan at Washington Mutual Bank | 2 |
| | C. Underwriters at Washington Mutual | 3 |
| |    1. The Underwriting Function | 3 |
| |    2. Performing the Underwriter's Job | 4 |
| |    3. Scope of Authority | 5 |
| |    4. The Organization of Underwriters in California | 6 |
| |    5. Variations in the Underwriting Job at Washington Mutual | 7 |
| | D. Plaintiffs' Employment with Washington Mutual | 10 |
| | E. Declarations and Depositions of Former Washington Mutual Employees | 11 |
| III. | PLAINTIFFS HAVE THE BURDEN OF PROOF FOR CLASS CERTIFICATION | 13 |
| IV. | PLAINTIFFS FAIL TO MEET THEIR BURDEN TO PROVE A COMMUNITY OF INTEREST EXISTS AMONG THE PROPOSED CLASS. | 15 |
| | A. Plaintiffs' Theory of Recovery | 15 |
| | B. Plaintiffs Cannot Show Common Issues of Fact Predominate. | 16 |
| |    1. Underwriters' Exercise of Discretion And Independent Judgment Is Not Susceptible To Common Proof. | 16 |
| |       a. The Deposition Testimony of Plaintiffs' Declarants Belies Commonality of The Underwriters' Claims. | 17 |
| |       b. The "Common" Evidence Proffered By Plaintiffs Is Not Determinative of Underwriters' Claims. | 18 |
| |       c. The Key Evidence Is *Not* Common to the Class. | 20 |

Heller
Ehrman LLP

i

2.   Washington Mutual Bank's Underwriters Were Employed
     in an Administrative Capacity.................................................................. 22

C.   Plaintiffs' Claims Are Not Typical of the Purported Class.......................... 24

D.   Class Treatment Is Not the "Superior" Means of Resolving This
     Dispute. ................................................................................................. 25

V.   CONCLUSION .......................................................................................... 25

Heller
Ehrman LLP

# TABLE OF AUTHORITIES

**Page**

**CASES**

*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.,*
191 Cal. App. 3d 1341 (1987) ................................................................. 16

*Bell v. Farmers Ins. Exch,*
87 Cal.App.4th 805 (2001) ..................................................................... 23

*Blue Chip Stamps v. Superior Court,*
18 Cal. 3d 381 (1976) ............................................................................ 25

*Bothell v. Phase Metrics, Inc.,*
299 F.3d 1120 (9th Cir. 2002) ............................................................... 16

*Brooks v. Southern Bell Tel. & Tel. Co.,*
133 F.R.D. 54 (S.D. Fla. 1990) ............................................................. 15

*Broussard v. Meineke Discount Muffler Shops,*
155 F.3d 331 (4th Cir. 1998) ............................................................ 14-15

*Brown v. Regents of the Univ. of California,*
151 Cal. App. 3d 982 (1984) ................................................................. 14

*City of San Jose v. Superior Court,*
12 Cal. 3d 447 (1974) ............................................................................ 14

*Dalheim v. KDFW-TV,*
706 F.Supp. 493 (N.D. Tex. 1988) ........................................................ 15

*Edwards v. Audubon Ins. Group,*
2004 U.S. Dist. Lexis 27562 (S.D. Miss.) ........................................ 20, 22

*General Tel. Co. of the Southwest v. Falcon,*
457 U.S. 147 (1982) .............................................................................. 14

*Hamwi v. CitiNational-Buckeye Inv. Co.,*
72 Cal. App. 3d 462 (1977) ................................................................... 14

*Havey v. Homebound Mortgage, Inc,*
2005 U.S. Dist. Lexis 27036 (D.Vt.) ................................................. 20-21, 22

*Haywood v. North Amer. Van Lines, Inc.,*
121 F.3d 1066 (1997) ............................................................................ 18

*Hogan v. Allstate Ins.,*
361 F.3d 621 (11th Cir. 2004) ............................................................... 22

*Lockheed Martin Corp. v. Superior Court,*
29 Cal. 4th 1096 (2003) .................................................................... 14, 16

*McAllister v. Transamerica Occidental Life Ins. Co.,*
325 F.3d 997 (2003) .............................................................................. 18

*Nordquist v. McGraw Hill Broadcasting Co.,*
32 Cal.App.4th 555 (1995) ............................................................... 15, 20

*Reese v. Wal-Mart Stores, Inc.,*
73 Cal. App. 4th 1225 (1999) ................................................................ 25

*Sav-On Drug Stores, Inc., v. Superior Court,*
34 Cal. 4th 319 (2004) ................................................................... 13-14, 16

Heller
Ehrman LLP

WASHINGTON MUTUAL'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION: CASE NO. BC323376

*Sprague v. General Motors Corp.,*
    133 F.3d 388 (6th Cir. 1998) .................................................................... 14

**STATUTES**

Cal. Labor Code § 515(a). ......................................................................... 15

Cal. Labor Code § 515(e). ...................................................................... 15, 17

**REGULATIONS**

8 Cal. C. Regs. § 11010 ........................................................................... 15

29 C.F.R. 207(a) (2000, 2001) ................................................................. 20

29 C.F.R. 207(c)(1) (2000, 2001) ............................................................ 19

29 C.F.R. 541.202(a) (2005) ................................................................... 20

29 C.F.R. 541.202(c) (2005) ................................................................... 19

29 C.F.R. 541.202(e) (2005) ................................................................... 19

29 C.F.R. 541.203(b) (2005) ................................................................... 23

29 C.F.R. 541.207(e) (2000, 2001) ......................................................... 19

29 C.F.R. 541.704 (2005) ....................................................................... 18

**OTHER AUTHORITIES**

DLSE Manual § 52.3.11 (June 2002) ...................................................... 19

Heller
Ehrman LLP

WASHINGTON MUTUAL'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. BC323376

# I.    INTRODUCTION

Class actions may only be certified after the plaintiff identifies a predominating number of issues which can be proved by common evidence, *and* the named class representative's case presents those common issues. Here, Plaintiffs Kimblyn Creese and Phyllis Parker have completely failed to identify common issues or explain how they propose to prove their case at trial. Therefore, their motion must be denied.

The class Plaintiffs seek to certify would include more than 600 home loan underwriters working in 40 different facilities in California over a five and one half year time period. The common evidence would have to show that all 600 failed to exercise discretion while making credit decisions on the most complicated loans, which failed to pass Defendant Washington Mutual Bank's computerized loan approval system. At first blush, this is an unlikely claim. Every reported decision to consider the classification for underwriters has found them to be exempt because they exercise discretion and judgment in the process of deciding whether credit should be granted.

Washington Mutual's underwriters are no different. Between forty and sixty percent of the loans made during the class period were handled exclusively by nonexempt loan processors because the underwriting decisions for those loans were made by automated underwriting computer programs. Only those loans which were exceptional were referred for human underwriting. These loans, by definition, required the discretionary analysis, judgment and decision making that characterize the duties of an exempt administrative employee.

Plaintiffs' brief fails to come to grips with the issues that would have to be litigated or the evidence relevant to those issues. Instead, it relies on nine individual declarations, all obviously written by the same lawyer. Under the circumstances of this case, individual declarations cannot supply common proof. Many of those who were deposed renounced the declarations in material part. The evidence submitted by Washington Mutual shows profound factual differences and disputes concerning how individual underwriters perform their duties. In fact, Plaintiffs themselves illustrate how individual issues will overwhelm any commonality. Parker and Creese say they did not exercise sufficient discretion, and the way they did their jobs is the same as other underwriters. But both Parker and Creese were disciplined, while still employed and a year before they filed this

Heller
Ehrman LLP

1

1  suit, for *failing* to exercise the degree of discretion expected of them as Washington Mutual

2  underwriters!  Their atypical behavior is no pattern for the other 598 underwriters in the purported

3  class.

4      There is an obvious alternative to class treatment. All 600 possible class members have

5  already been notified and asked to consent to their identities being given to Plaintiffs' counsel. Not

6  counting Plaintiffs, about 60 did, eight submitted declarations, and a few of those actually stuck to

7  their stories when deposed. They can bring individual claims. A class should not be certified.

8  **II.    RELEVANT FACTUAL BACKGROUND**

9      **A.    Washington Mutual Bank's Home Loans Group**

10      This suit involves Washington Mutual's Home Loans business line, formerly known as

11  Home Loans and Insurance Services ("HLIS"). The Home Loans group focuses on residential

12  mortgages and, during the relevant period, operated in California primarily through six "channels,"

13  each with separate line management:  (1) Retail – loans originating through retail branches such as

14  Home Loan Centers ("HLC") and Financial Centers; (2)  Wholesale – loans originating through

15  independent mortgage brokers; (3) Consumer direct – loans coming through the Internet, 1-800

16  telephone numbers, and customer referrals; (4) Custom construction  – loans for new construction

17  or remodels; (5) Emerging Markets – loans targeted at low-to-moderate income ("LMI") customers;

18  and (6) Government – primarily FHA/VA loans. Since October 2000, the Home Loans segment has

19  employed approximately 600 underwriters spread over the various channels and more than forty

20  facilities throughout California.[1]

21      **B.    Issuing a Home Loan at Washington Mutual Bank**

22      The loan process varies depending on a number of factors, including the channel, time

23  

24  [1] (Randall Dep., 23:13-26:4; 77:9-78:22, 81:17-19; 82:13-83:17; Randall Dec., ¶¶ 3-4, 12.) Relevant excerpts
of the depositions cited in this Opposition may be found as exhibits to the Livingston Declaration. Not all of

25  these channels operated in California continuously throughout the class period. Government and Consumer
Direct have not operated for several years, and Emerging Markets was established only a few years ago.

26  (Witherington Dep., 17:7-18:7; Randall Dep., 98:21-99:14; Provencio Dep. 33:4-34:3; Randall Dec., ¶ 3.)
Nor have the lines always been clear between channels; for example, certain aspects of Emerging Markets

27  have fallen under Retail, but it was a separate channel. (Dekow Dep., 21:23-22:9; Witherington Dep., 15:5-
16:5; Provencio Dep., 18:14-19:4.) Generally speaking, 45% of the underwriting population has been Retail,

28  with Wholesale at a slightly lower percentage. Emerging Markets makes up the third largest grouping of
underwriters, followed by the smaller groups of Consumer Direct, Customer Construction, and Government.
(Randall Dep., 67:14-69:21.)

Heller
Ehrman LLP

2

1  period, location, employees, and loan product. However, it may be generalized as follows. First, a
2  customer completes a loan application which is entered into a computer system (the "origination
3  system"). The system first generates a credit report and then runs the application and credit
4  information through one or more automated underwriting systems ("AUS"). The AUS are computer
5  programs that evaluate a borrower against a set of established risk factors and then determine if the
6  loan is approved. Currently, approximately 60% of all loans are approved by the AUS. The loan file
7  is then sent to non-exempt loan processors ("boarders") who take the information from the file and
8  input the data by hand into a different computer (the "delivery system"). After boarding, a different
9  group of non-exempt loan processors creates a physical file for the loan, typically putting the
10  application and other relevant documents about the borrower in the file.[2]

11      AUS-approved files skip the manual underwriting process altogether. Instead, they are sent
12  for "validation" to non-exempt processors who fact-check the information put into the AUS against
13  the employment, income and other information available about the borrower. Assuming the file is
14  validated, the loan is handed over to another group of non-exempt loan processors to handle other
15  processing issues, such as clearing loan conditions and ensuring documentation is complete. Other
16  non-exempt loan processors ("closers") then coordinate the closing of the loan, and another group
17  of non-exempt processors arrange for funding. If the loan is denied, the borrower is informed of the
18  decision. A minority of loans – the ones *not* auto-approved by the AUS – are "referred" to the
19  Bank's underwriting function where manual underwriting takes place.[3]

20  **C.    Underwriters at Washington Mutual**
   **1.    The Underwriting Function**

21      Underwriters act as risk managers for the Bank, charged with ensuring that its assets are
22  safeguarded. They do this by analyzing the creditworthiness of potential borrowers and deciding if
23  the Bank should extend its credit through a loan. Underwriters perform this function only on the
24  more complex loan transactions that have been "referred" by the AUS.[4]

25  ────────────────────────

[2] (Randall Dep., 115:5-116:10; Fletcher Dep., 12:23-14:22, 24:6-32:21, 33:23-36:22, 45:22-49:4, 52:1-
26  55:24, 79:4-85:18; Randall Dec., ¶ 10.)
[3] (Randall Dep., 109:23-110:7, 171:6-17; Fletcher Dep. 33:15-36:22, 45:22-49:4, 52:1-55:24, 79:4-85:18,
27  86:25-88:25; Dekow Dep., 40:7-42:8; *see also* Hills Dec., ¶ 7; Randall Dec., ¶ 10.)
[4] (Fletcher Dep., 78:7-25, 91:2-11; Randall Dep., 91:3-16; 95:14-96:5; Dekow Dep., 41:19-42:8; Riley Dep.,
28  36:21-39:5; *see also* Hartwell Dec., ¶ 4; Fernando Dec., ¶ 6.)  The loans routinely involve the extension of
credit ranging from the hundreds of thousands of dollars to more than $1 million. Given that most

Heller
Ehrman LLP

3

1    According to the official job description, an underwriter's job is to be "[r]esponsible for
2  underwriting the exception loans." Among their "essential functions" are performing credit
3  analysis; negotiating acceptable levels of risk; reviewing credit and risk factors, including
4  identifying mitigating factors; evaluating borrowers' profiles; approving or recommending loan
5  action; and mentoring and developing staff.[5]

6    ## 2.    Performing the Underwriter's Job

7    Underwriters must analyze the information in the loan file and reach a judgment whether the
8  risk presented is acceptable. Underwriters make this determination by analyzing various factors,
9  including employment and income, credit history, assets and cash reserves, debt ratios, collateral
10 and loan-to-value ratios. Through this process, the underwriter must identify risk factors, or
11 multiple risk factors layered on each other. The underwriter must thoroughly understand the
12 identified risk and consider any compensating factors that could mitigate that risk. Ultimately, the
13 underwriter must decide if the risk level presented is acceptable.[6]

14    The underwriter has several options with a loan. For instance, he or she might decide to
15 approve the loan, or approve it if specific conditions are satisfied before funding, such as the payoff
16 of debt. Alternatively, the underwriter might conclude the loan poses too great a risk as written and
17 decide to "counteroffer" by offering the borrower different loan terms or even a different loan
18 product. Finally, the underwriter may decline the loan if he or she decides the loan is too risky and
19 cannot be countered or conditioned to reduce that risk.[7] No matter the decision, the underwriter

20
underwriters "decision" at least five or six loans a day, underwriters are responsible for committing the Bank
21 to well in excess of $1 million in credit each and every day. (*See, e.g.*, Randall Dep., 154:7-17; LaShon Dep.,
90:9-12; Fletcher Dep., 105:2-107:2.)
22 [5] (*See* Kumar Dep., 90:17-92:13; Solis Dep., 132:6-20; Gullo Dep., 66:11-15; Randall Dec., ¶ 5, Exhs. 1-2.)
[6] (Randall Dep., 91:3-16, 96:6-97:4; Dekow Dep., 93:11-21; Fletcher Dep., 91:2-92:7, 92:13-96:11; Parker
23 Dep., 354:17-358:18; *see also* Vasquez Dec., ¶ 4; Orton Dec., ¶ 3; Stoor Dec., ¶ 3; Hartwell Dec., ¶ 3;
Fernando Dec., ¶¶ 3,5; Hills Dec., ¶ 4; Ferreira Dec., ¶ 3.)
24 [7] (Randall Dep., 91:17-92:23, 97:5-23, 117:19-118:19, 128:6-130:19, 142:12-143:11, 145:17-146:18; Riley
Dep., 46:19-49:19; Fletcher Dep., 100:22-102:1, 78:7-25; 180:25-183:11; Witherington Dep., 57:16-60:19,
25 22:2-23:12.) If approved without conditions, the loan is sent off to the loan processors, closers and funders.
If approved with conditions, the loan may come back to the underwriter for further review if the conditions
26 are substantial; if merely standard conditions, they are cleared by a loan processor. If the underwriter decides
the loan should be countered or declined, the underwriter often needs to seek approval from either a manager
27 or a specially designated individual with more authority. In those situations, it is the responsibility of the
underwriter to make an effective recommendation and justify it. (Riley Dep., 46:7-49:19, 95:15-96:18;
28 Witherington Dep., 23:1-16, 67:13-68:20; Fletcher Dep., 47:7-48:20, 176:21-178:6; Provencio Dep., 67:24-
70:14; Randall Dep., 96:6-97:4; Kumar Dep., 31:5-10; LaShon Dep., 89:17-90:1.)

Heller
Ehrman LLP

4

1  must thoroughly document the analysis in a Loan Approval Summary ("LAS").[8]

2      In performing the job, underwriters consult various generalized manuals such as the

3  Conventional Underwriting Guidelines ("CUG"), the Conventional Underwriting Procedures

4  ("CUP"), and the Product and Pricing Guide. Underwriters also often consult documentation for the

5  loan program at issue in the loan they are underwriting. All these documents have been updated and

6  changed throughout the 5-1/2 year class period.[9]

7      **3.    Scope of Authority**

8      The underwriter's authority to make credit decisions originates directly from the Bank's

9  Board of Directors. The Board sets the Bank's Credit Policy and delegates the development and

10  implementation of the policy through the Bank's Risk Management organization. That

11  organization, in turn, delegates its risk management authority and responsibility to each underwriter

12  as Risk Level Authority ("RLA").[10]

13      RLA covers a number of areas in which an underwriter requires authority, such as "lending

14  authority," which sets the maximum dollar amount of a loan that an underwriter may approve. Over

15  the past 5 1/2 years, lending authority has ranged from at least $350,000 all the way up to $3

16  million. RLA also sets the degree to which loan guidelines may be waived ("exception authority").

17  Exception authority allows an underwriter to waive guidelines when, in his or her judgment, there

18  are appropriate compensating factors. For example, an underwriter might approve a loan that

19  deviates from credit score ("FICO") guidelines or the amount of cash that may be taken out by the

20  borrower from the transaction. Finally, RLA provides underwriters with the ability to set and clear

21  certain substantive conditions in approving loans.[11]

---

22  [8] (Riley Dep., 90:1-91:4, 98:13-25; Fletcher Dep., 176:21-178:6.)

23  [9] (Randall Dec., ¶ 7; Rojas Dec., Exhs. 1-2.) The Bank trains its underwriters that such resources are simply guidelines and that it is the underwriter's job to analyze the risk presented by a specific loan. Washington

24  Mutual tells underwriters that "[t]here are not exact, hard and fast rules about which elements or factors balance which risks – that's why it's called 'risk analysis.' Rather, WaMu gives you guidelines and it's up to

25  you to apply these while considering each file on its own merits." Explaining it differently, "[e]ach file and borrower is unique. Know your borrower's story, WaMu programs and guidelines, and then apply your

26  sound judgment as you identify, analyze and mitigate risk." (Randall Dec., ¶ 6; Rojas Dec., Exh. 1, pp. 28, 39; *see also* Vasquez Dec., ¶ 6; Ferreira Dec., ¶ 4.)

27  [10] (Randall Dec. ¶ 8; Fletcher Dep., 119:13-121:6.) RLA now stands for Residential Lending Authority. (Randall Dep., 36:12-19, Randall Dec., ¶ 8.)

28  [11] (Fletcher Dep., 100:20-101:17; 102:2-103:12; 105:2-12; 106:3-109:9; 126:3-129:16; Riley Dep., 64:23-65:23; Randall Dep., 105:7-107:4, 124:14-125:8; 129:23-130:21; Parker Dep., 344:12-348:19; Randall Dec.,

Heller
Ehrman LLP

1   An individual's RLA is found in a form document. Although the form has varied slightly
2   over the years, for much of the time period at issue, that form specifically stated "[y]our job is to be
3   a risk analyst . . . you are expected to exercise sound discretion and judgment. Washington Mutual
4   delegated to you the authority to independently approve loans up to your level of authority. . . .
5   [y]ou are expected to exercise good judgment consistent with Washington Mutual credit
6   philosophy, policy and parameters. . . ."[12]

7       **4.    The Organization of Underwriters in California**

8   There have been very significant changes in how underwriters have been organized and
9   managed over the 5 1/2 year class period. In 2000, underwriters worked in "standalone" facilities
10  called District Credit Centers ("DCC"). DCCs typically had between 3 to 8 underwriters, a DCC
11  manager and clerical support. Underwriting files would be delivered to the DCC, where the
12  underwriters would make their underwriting decisions and pass the files on to separate centers for
13  final processing, closing, and funding.[13]

14  In late 2001 and early 2002, Washington Mutual began to migrate away from DCCs and
15  toward a Loan Fulfillment Center ("LFC") model where underwriters were physically housed
16  together with the personnel necessary for loan processing, such as boarders, loan processors, closers
17  and funders. These groups worked together in teams, with each LFC having a number of teams in
18  place. The teams (including underwriters) originally reported to a team manager, who then reported
19  to the LFC manager. In 2005, underwriters were removed from the LFC team management and
20  moved under the management of a separate Underwriting Manager who, in turn, is managed by an
21  Area Underwriting Manager. This model remains in place through the present.[14]

22  There have been several different types of "matrix" relationships important to the

23

24  ¶ 8; Rojas Dec., Exh. 4; *see also* Vasquez Dec., ¶ 5; Stoor Dec., ¶ 4; Orton Dec. ¶¶ 4-6; Hartwell Dec., ¶ 5;
    Fernando Dec., ¶ 4; Hayashi Dec., ¶ 3; Ferreira Dec., ¶ 5.) Underwriters operate within restrictions imposed
25  by their RLA, but whenever they are confronted with an issue outside their RLA, they are supposed to
    conduct an analysis and decide whether the loan should be made. They must then present the analysis and
26  conclusion to an employee with higher RLA for approval. (Parker Dep., 354:10-16; 363:5-21.; Stoor Dec.,
    ¶ 6.)
27  [12] (Parker Dep., 337:8-344:9, Exhs. 26, 27; Stoor Dec., ¶ 5.)
    [13] (Fletcher Dep., 42:1-45:21, 47:7-51:25; Randall Dep., 32:22-33:20, 75:11-25.)
28  [14] (Fletcher Dep., 42:1-45:21, 47:7-51:25, 56:23-60:18, 60:19-63:23; Randall Dep., 15:10-16:3, 29:12-32:14;
    Dekow Dep., 35:24-39:4, 39:11-20, 72:12-74:13.)

WASHINGTON MUTUAL'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. BC323376

Heller
Ehrman LLP

1    underwriting function. After the LFCs were implemented, a position known as the Strategic Risk

2    Partner ("SRP") was involved with the credit decision process. SRPs reported directly to the Bank's

3    Credit Risk Department and carried the authority to grant, review, and revoke an RLA. SRPs also

4    reviewed loans beyond the RLA of an underwriter, provided second signature authority for

5    counteroffers and declinations, and addressed other escalated issues.[15] In 2004, the Bank eliminated

6    SRPs and set up groups of "elite" underwriters outside the LFC structure known as Credit Risk

7    Teams ("CRT"). These groups reported directly to a CRT Manager, and underwrote the largest and

8    most complicated residential loans and acted as second signature reviewers on other loans. As a

9    result of the CRTs, the most complex loans were removed from the other underwriters. The CRT

10   approach lasted only until 2005, when the Bank returned the most complicated loans to the

11   underwriters and established the Credit Quality Team ("CQT"). The CQT audits the quality of

12   underwriting decisions.[16]

13        5.    **Variations in the Underwriting Job at Washington Mutual**

14        **Variations By Channel.** The underwriting job varies substantially by the channel in which

15   an underwriter works. For example, Retail underwriters often tend to counteroffer to different loan

16   programs much more often than Wholesale underwriters. In addition, Wholesale underwriters, who

17   analyze loans prepared by mortgage brokers, tend to have more complete information about a

18   borrower at their disposal, resulting in a different type of risk analysis from that conducted by

19   Retail underwriters.[17]

20        Underwriting a loan in Emerging Markets also differs from other areas. Because of the low-

21   to-moderate income focus, borrowers in Emerging Markets have more credit challenges and less

22   complete credit, income, and asset information. For instance, Emerging Market underwriters often

23   must operate without traditional FICO score and establish "alternative credit" through looking at

24   such things as rent and utility payments. In addition, Emerging Markets applications often have

25

26   [15] (Fletcher Dep., 56:23-60:18; Randall Dep., 29:12-32:15, 34:15-35:13, 36:12-24; Dekow Dep., 69:14-

27   72:14; Randall Dec., ¶ 9; Skjonsby Dec., ¶ 2.)
     [16] (Fletcher Dep., 11:8-12:3, 15:25-16:17, 119:13-122:20, 123:2-24, 135:23-137:3, 146:9-147:21, 157:6-
     158:12; Randall Dep., 17:6-19, 18:8-19:24, 28:23-29:10, 33:21-34:13, 36:12-36:24, 122:24-124:3, 152:25-

28   153:24; Dekow Dep., 38:12-39:10; 43:23-44:5, 57:13-22, 64:7-22.)
     [17] (Lashon Dep., 15:3-17:16; Vasquez Dec., ¶ 7; Stoor Dec., ¶ 7; see also Hayashi Dec., ¶¶ 5-6.)

Heller
Ehrman LLP

7

multiple borrowers (often extended family), requiring the underwriter to perform an analysis for each. Furthermore, borrowers often do not have "traditional" assets reflected by bank accounts or 401k funds, but rather have cash on hand, posing a completely different type of risk. Finally, underwriters in Emerging Markets have to understand and manage alternate funding sources that provide financial aid to borrowers. All of this requires more analysis, more digging for information, more creativity and more conditions on loans in Emerging Markets.[18]

Underwriters in the Custom Construction channel likewise face issues different from their counterparts. These underwriters must evaluate progress on a construction job, review zoning and permit issues, decide when to release funds on a rolling basis, and continually analyze whether the project contains sufficient capital to protect the Bank's interest.[19]

Finally, the job of a Government underwriter also presents unique issues. These underwriters, who must obtain a special federal certificate, must ensure the loans they underwrite meet the guidelines set by the government which are substantially different from the guidelines used, for example, in Retail. Indeed, the guidelines used by Government underwriters are in the CUG but are different from those that apply to other underwriters.[20]

**Variations Depending on AUS.** Variations in the rate of automatic approval directly impacted the types of loans referred to underwriters. The Bank has used at least three AUS programs over the past five years:  Desktop Underwriter ("DU"), Proprietary Model ("PM"), and Enterprise Decision Engine ("EDE"). Each engine is different. Moreover, the AUS have been used together and separately, depending on the time period and channel. The net effect is that there have been differences, sometimes substantial, in which loans are auto approved. Approval rates have ranged from a low of about 40% to the current level of 60%.[21]

**Variations in Validation by Underwriters.** Validation of the AUS-approved loans typically was performed by loan processors, but underwriters sometimes have been called upon to

---

[18] (Skjonsby Dec., ¶ 5-10; Parker Dep., 283:4-284:24; Dekow Dep., 34:24-35:14, 97:15-98:12; 114:17-115:19; Provencio Dep., 26:1-29:12; Solis Dep., 143:8-23; Vasquez Dep., ¶ 10; Orton Dec., ¶ 11.)
[19] (Riley Dep. 31:2-34:19; Provencio Dep., 32:13-33:3.)
[20] (Provencio Dep., 29:15-32:5, 36:19-37:2; Randall Dec., ¶ 11.) As mentioned, all underwriters receive TRAC training. In addition, underwriters receive additional training which differs based on the channel. (Randall Dec., ¶ 11; *see also* Hayashi Dec., ¶ 7.)
[21] (Fletcher Dep., 26:20-30:13, 34:19-36:22; Hills Dec., ¶ 7; Fernando Dec., ¶ 6.)

Heller
Ehrman LLP

8

validate loans. The frequency of this arguably non-exempt activity varied. For instance, when market conditions slowed down the pipeline of complex loans coming to the underwriters, the underwriters occasionally validated. But when the number of loans in the pipeline was high, underwriters were too busy to validate. The time spent validating also differed based on channel. For example, Emerging Markets underwriters rarely validated because very few loans in this area were auto approved, given the significant credit issues faced by LMI borrowers. Also, the amount of validation often depended upon the LFC.[22]

**Variations Based on Geography.** Geography plays a role in how underwriters carry out the job, and there are at least forty different facilities that are involved in the prospective class. Underwriters typically were managed by an on-site manager, and each such manager typically had his or her own approach to the underwriting job. For example, underwriters in Southern California tend to counteroffer and restructure loans substantially more than their counterparts in Northern California.[23] The location of the property also affected the underwriter's job. Underwriters in San Diego, for instance, could take more risk in extending loans, particularly in coastal communities, because the home values there are steady (if not always rising). On the other hand, an underwriter making a decision on a loan for an inland property might not have the same cushion of escalating values. Finally, geography also played a key role in setting RLA lending authority which, of course, directly impacted the size of the loans underwriters could approve. For example, underwriters in certain parts of California received higher lending authority than in other parts of California by virtue of the higher cost of real estate and its impact on the size of home loans.[24]

**Variation Based on Competency.** Not surprisingly, an underwriter's competency also impacted how he or she did a credit analysis and made decisions. Some underwriters are highly capable of making complex credit decisions and do so. Others simply do not have the ability or the

---

[22] The vast majority of the loans in at least one Emerging Markets facility – Montebello – never even went through the auto engine process. As a result, there was little or no need for validation at that facility. This is where both plaintiffs worked. (Provencio, 27:7-29:12; Parker Dep., 274:25-275:18; *see also* Vasquez Dec., ¶ 11; Stoor Dec., ¶ 11; Orton Dec.,¶ 12; Hartwell Dec., ¶ 9; Hills Dec., ¶ 7; Hayashi Dec., ¶ 8; Ferreira Dec., ¶ 9.)

[23] (*See* Vasquez Dec., ¶ 8; Ferreira Dec., ¶ 6.)

[24] (Riley Dep., 34:20-36:5; Fletcher Dep., 106:3-107:2, 126:6-127:4; Stoor Dec., ¶ 8; Hartwell Dec., ¶ 7; Fernando Dec., ¶ 7.)

Heller Ehrman LLP

WASHINGTON MUTUAL'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. BC323376

1  willingness to engage in the complex analysis required. This is illustrated by the atypical

2  experiences of the Plaintiffs, both of whom were disciplined for not using independent discretion.[25]

3      **Variation in Flexibility in Work Hours.** The practice at Washington Mutual regarding

4  hours worked has hardly been uniform. For instance, many underwriting managers allow

5  underwriters substantial flexibility and do not require their employees to come or go at any set time.

6  On the other hand, some managers thought it important that underwriters keep to an established

7  schedule, and they monitored the comings and goings of those underwriters carefully. In fact,

8  Plaintiffs claim this was true for them.[26]

   **D.    Plaintiffs' Employment with Washington Mutual**

10      Plaintiff Phyllis Parker started work for Washington Mutual as a Senior Underwriter in July

11  1999. Parker initially worked in Wholesale, eventually moving to the Bank's Montebello facility

12  working in Emerging Markets and underwriting LMI loans. Parker's lending authority RLA ranged

13  up to $750,000. At Montebello, Parker was counseled by her manager, Phyllis Aguirre, regarding

14  the quality of her underwriting. These concerns – shared by Parker's SRP, Shawn Skjonsby – led

15  her to issue a Performance Improvement Notice on October 30, 2003. Less than a month later,

16  Plaintiff resigned her employment with the Bank.[27]

17      Plaintiff Kimblyn Johnson Creese started work for Washington Mutual in November 2002

18  as an Underwriter. Creese, like Parker, worked in Emerging Markets at the Montebello location.

19  Her lending authority RLA was $350,000 throughout her employment. Creese also was counseled

20  by Aguirre and Skjonsby for her underwriting, with Creese receiving a Performance Improvement

21  Notice on October 28, 2003. A week after receiving it, Creese submitted her resignation.[28]

22  [25] (*See* Skjonsby Dec., ¶¶ 10-13; Orton Dec., ¶¶ 6-7; Ferreira Dec., ¶ 8.)
    [26] (Witherington Dep., 37:6-39:20; Riley Dep., 117:8-119:15; Stoor Dep., ¶ 12; *see, e.g.,* Parker Dec., ¶ 8,
23  Creese Dec., ¶ 8.) Variations also existed in the payment of bonuses to underwriters. (*See* LaShon Dep.,
    118:24-119:8; Creese Dep., 265:18-266:18; Moore Dep., 89:23-90:3; Fletcher Dep., 133:25-134:10; 135:23-
24  137:6; Vasquez Dec., ¶ 12; Orton Dec., ¶ 9.)
    [27] (Parker Dep., 6:1-6, 138:21-139:12, 141:3-8, 160:11-161:2, 190:16-21, 269:7-21, 337:8-344:9, 373:1-
25  374:19, 377:16-378:11, Exhs. 26, 27, and 31 (redacted).) The PIN counseled Parker for (1) unclear language
    used in documenting her loan decisions, (2) putting too many conditions on the loans she underwrote, (3)
26  improperly failing to make decisions with respect to loans, instead sending them to the SRP or Aguirre to
    make the decision, and (4) not reviewing appraisals as part of her analysis. (*See* Skjonsby Dec., ¶¶ 10-13.)
27  [28] (Creese Dep., 11:13-13:5, 76:3-6, 186:11-187:21, Exh. 9.) The PIN primarily criticized Creece for "over
    conditioning" her loan approvals and for consistently asking Aguirre and Skjonsby for second signatures on
28  her loans instead of making her own decision and then supporting it with an appropriate LAS. (*See* Skjonsby
    Dec.,¶¶ 10-13.)

Heller
Ehrman LLP

                                        10

E. **Declarations and Depositions of Former Washington Mutual Employees**

Plaintiffs submitted the declarations of nine former Washington Mutual employees (including Plaintiffs). The declarations[29] – almost all word-for-word identical – make various statements designed to show that all declarants did exactly the same job. However, depositions of the declarants show that many of their statements are not true, incomplete, or reveal the nature of the underwriting job actually varied. Moreover, Washington Mutual is filing with this Opposition the declarations of 10 individuals involved with underwriting, all of which undercut Plaintiffs' assertions. (*See generally* Declarations of Hayashi, Randall, Hartwell, Skjonsby, Vasquez, Stoor, Orton, Fernando, Hills, Ferreira, filed herewith.)

(1) **Each declarant claims underwriters were the ones who "put together loans," working "side by side" or in "close proximity" with boarders, processors, and closers.** (*See, e.g.,* Decs. of Creese, LaShon, Moore, ¶¶ 5 or 6.) But Plaintiff Creese conceded she did not know what a boarder was. LaShon and Moore admitted that boarders, not underwriters, physically put together loan files. Kumar noted that boarders worked in a different department, and he and Jo Ann Gullo both said they did not work with them. Finally, Plaintiff Parker admitted that only *sometimes* did she work "side by side" with boarders and closers, notwithstanding her declaration.[30]

(2) **Each declarant claims a "majority" of his or her time was spent gathering facts, talking with co-workers, reviewing guidelines, and preparing standardized documents such as "commitment letters" and LAS write-up summaries.** (*See, e.g.,* Decs. of Gullo, Moore, LaShon, Kumar, ¶¶ 6 or 7.) Gullo, Moore, and Kumar all testified that this description did not fully describe their jobs because it left out what they spent the most time doing: the actual underwriting of loans. Absent from the description were activities such as evaluating loans, calculating complex tax

---

[29] At least two declarants testified that they were told by Plaintiffs lawyer that they *had* to sign their declarations if they wanted to stay in the lawsuit. (Gullo Dep., 163:2-22; Wick Dep., 62:14-22.) Washington Mutual did not take the deposition of Adrienne Wallen because she lives in Missouri. Plaintiffs also submitted a tenth declaration, of Nancy Minassian, but they have agreed to withdraw it. (Livingston Dec., ¶ 23.)

[30] (Creese Dep., 202:8-17; Kumar Dep., 125:11-126:14; Gullo Dep., 171:3-12; Parker Dep., 391:13-392:20; LaShon Dep., 190:6-191:14; 247:21-248:16; Moore Dep., 144:18-145:24.) Moore also noted that the underwriter's job was different from the job of a processor, closer or boarder. (Moore Dep., 146:1-17; *see* Stoor Dec., ¶ 10; Orton Dec.,¶ 10; Ferreira Dec., ¶ 7.) Having worked as a loan processor before her promotion to underwriter, Moore testified that underwriters have more authority to act for the Bank, more autonomy, and more opportunity to use independent discretion and judgment. (Moore Dep., 28:18-29:20.)

11

Heller
Ehrman LLP

returns, analyzing appraisals, analyzing and identifying risk, determining creditworthiness of borrowers, and making complex decisions with respect to credit quality.[31] Moreover, LaShon stated she did not, as alleged in her declaration, communicate with "loan officers" or prepare "standardized commitment letters," and she stated that the LAS "write-up summaries" were not "standardized." Moore agreed, saying that although the write-ups had some standardized components, they included her written analysis which was unique to each loan.[32]

(3) **The declarants indicated they had little discretion in making decisions because they worked within "corporate guidelines and policies and procedures" and had only "specific and narrow parameters within which [they] could make exceptions from these guidelines."** (See, e.g., Decs. Of LaShon, Gullo, Wick, Moore, Kumar, ¶¶ 7 or 8.) However, LaShon, Gullo, Wick, Moore and Kumar all testified that in doing their jobs they needed to use such things as their critical thinking, sound judgment, analytical skills *and* discretion. Kumar also stated that there were many loans he underwrote where he did not refer to guidelines; he considered them more as a reference guide, not as a "starting point."[33]

(4) **The declarants stated that in underwriting loans they "relied on industry standards as well as the accepted conventions within Washington Mutual."** (See, e.g., Decs. Of Creece, LaShon, ¶¶ 7 or 8.) But LaShon said she really did not know what "industry standards" meant, that she did not "govern" herself by them, and that the reference to "accepted conventions" had nothing to do with how she made a decision about a loan (but rather which broker's business she worked on first). During her testimony, Creese could not identify any industry standards not covered by Washington Mutual guidelines, and she could not describe a single accepted convention.[34]

(5) **The declarants noted that they would speak with their managers when they saw a**

---

[31] (Gullo Dep., 102:12-104:11; 173:16-174:13; Moore Dep., 146:18-148:1; Kumar Dep., 126:15-130:24.) Indeed, each of them stated that the job description for the underwriting positions accurately set forth their job duties. (Gullo Dep., 66:11-20, Exh. 2; Moore Dep., 140:11-142:11, Exh. 3; Kumar Dep., 90:17-92:7, 130:25-131:21, Exh. 3.)

[32] (LaShon Dep., 248:17-250:14.) Moore Dep., 148:16-150:9.)

[33] (LaShon Dep., 77:5-25, 83:15-84:14, 103:19-104:15. 145:5-16, 252:4-25; Gullo Dep., 96:25-97:3, 104:12-105:6, 114:14-18, 117:23-118:20, 136:5-137:5, 175:11-176:2; Moore Dep., 148:5-15; 41:21-24, 54:24-55:11; Wick Dep. 20:21-21:25; Kumar Dep., 84:10-89:6-90:16, 132:9-133:6; Stoor Dec., ¶ 9; Orton Dec., ¶¶ 4-5; Hartwell Dec., ¶ 6; Hills Dec., ¶ 5; Hayashi Dec., ¶ 4.)

[34] (LaShon Dep., 253:19-254:22; Creese Dep., 275:11-277:23.)

12

Heller Ehrman LLP

WASHINGTON MUTUAL'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. BC323376

1    **"grey area."** (*See, e.g.,* Dec. of Parker, ¶ 7.) Parker stated, however, that this varied, happening

2    "sometimes more; sometimes less." When pressed to give an estimate, she said she would face a

3    grey area only about three or four times a week (even though she underwrote at least 5 loans per

4    day).[35] Indeed, both Parker and Creese were disciplined for *excessive* reference to supervisors,

5    rather than making independent judgments.[36]

6          **(6) The declarants uniformly stated that "for *most* loans it would be obvious whether it**

7    **was appropriate to approve, decline, or counter."** (*See, e.g.,* Decs. of LaShon, Creese, ¶¶ 8 or

8    7.) LaShon contradicted her declaration by saying a loan that she considered "obvious" would come

9    across her desk *"[m]aybe* once or twice a week." On the other hand, Creese stated that by

10    "obvious" she meant that Washington Mutual wanted underwriters to approve "almost all of the

11    loans that came through."[37]

12    **III.    PLAINTIFFS HAVE THE BURDEN OF PROOF FOR CLASS CERTIFICATION**

13          Class actions are appropriate only "when the question is one of common or general interest,

14    of many persons, or when the parties are numerous, and it is impracticable to bring them all before

15    the court." Code of Civil Procedure section 382. The party seeking class certification bears the

16    burden of establishing that each of the requirements of a class action is satisfied. *Sav-On Drug*

17    *Stores, Inc., v. Superior Court,* 34 Cal. 4th 319, 326 (2004). The California Supreme Court recently

18    confirmed the standards for class certification as follows:

19         The party seeking certification has the burden to establish the existence of both an
      ascertainable class and a well-defined community of interest among class members.

20    The "community of interest" requirement embodies three factors: (1) predominant
      common questions of law or fact; (2) class representatives with claims or defenses

21    typical of the class; and (3) class representatives who can adequately represent the
      class.

22    *Id.* (citations omitted). The certification question is "'essentially a procedural one that does not ask

23    whether an action is legally or factually meritorious.'" *Id.* at 326 (citation omitted). Instead, the

24    inquiry must be "what type of questions – *common or individual* – are likely to arise in the action."

25    *Id.* at 327 (emphasis added). Because class treatment must provide substantial benefits both to the

26

---

27    [35] (Parker Dep., 403:23-404:17.)
      [36] (Creese Dep., 186:11-187:21, Exh. 9; Parker Dep., 337:8-344:9, 373:1-374:19, Exh. 31 (redacted);
28    Skjonsby Dec.,¶¶ 10-13.)
      [37] (LaShon Dep., 257:21-259:4; Creese Dep., 279:7-280:13.)

Heller
Ehrman LLP

WASHINGTON MUTUAL'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. BC323376

1   courts and the litigants, Plaintiff musts establish by a preponderance of the evidence that common

2   issues *predominate* and that a class action is *superior* to alternate means for a fair and efficient

3   adjudication of the litigation. *Id.* at 326. Moreover, the trial court is afforded great discretion in

4   determining whether class certification is appropriate. Its ruling will not be disturbed so long as it

5   has identified the proper legal issues governing the underlying action and substantial evidence

6   supports the court's decision on the class issues. *Lockheed Martin Corp. v. Superior Court*, 29 Cal.

7   4th 1096, 1106 (2003).

8         The purpose of requiring a showing of "commonality," *i.e.*, that common questions of fact

9   predominate, before class certification can go forward is to insure that a class action will not

10   devolve into series of complicated mini-trials needed to address several significant issues in the

11   case. The requisite degree of commonality exists only when:

12       [e]ach member must not be required to individually litigate numerous and substantial

13       questions to determine his right to recover following the class judgment; and the
    issues which may be jointly tried, when compared to those requiring separate

14       adjudication, must be sufficiently numerous and substantial to make the class action
    advantageous to the judicial process and to the litigants.

15   *City of San Jose v. Superior Court*, 12 Cal. 3d 447, 458 (1974). "Thus, if a class action will splinter

16   into individual trials, common questions do not predominate and litigation of the action in the class

17   format is inappropriate. *Hamwi v. CitiNational-Buckeye Inv. Co.*, 72 Cal. App. 3d 462, 471 (1977)

18   (internal quotes omitted). Indeed, "[c]lass actions will not be permitted … where there are diverse

19   *factual* issues to be resolved, even though there may be many common questions of law." *Brown v.*

20   *Regents of the Univ. of California*, 151 Cal. App. 3d 982, 988-89 (1984) (emphasis added).

21         The typicality requirement guarantees that the claims of the named plaintiffs and the class

22   "are so inter-related that the interests of the class members will be fairly and adequately protected

23   in their absence." *General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982). "The

24   premise of the typicality requirement is simply stated: as goes the claim for the named plaintiff, so

25   goes the claims of the class." *Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331, 340 (4th

26   Cir. 1998) (quoting *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998). If the named

27   plaintiff cannot demonstrate that resolution of her own claims will resolve, at least with respect to

28   some issues, all of the class members' claims as well, the typicality requirement has not been met

Heller
Ehrman LLP

14

1  and class certification must be denied. *Broussard*, 155 F.3d at 340; *see also Brooks v. Southern Bell*
2  *Tel. & Tel. Co.*, 133 F.R.D. 54, 58 (S.D. Fla. 1990).

3  **IV.  PLAINTIFFS FAIL TO MEET THEIR BURDEN TO PROVE A**
4  **COMMUNITY OF INTEREST EXISTS AMONG THE PROPOSED CLASS.**

5      Plaintiffs cannot meet their burden to prove that a community of interest exists such that a

6  class action is a superior means of adjudicating this lawsuit. That is because Plaintiffs can neither

7  show that common questions of fact predominate nor that their claims are typical of the class.

8      **A.      Plaintiffs' Theory of Recovery**

9      Plaintiffs claim that the underwriters' job function and duties do not support the Bank's

10  classification of them as exempt. Their theory is governed by IWC Wage Order No. 4-2001

11  (codified at 8 Cal. C. Regs. § 11010).[38] To prevail on this theory, Plaintiffs propose it must be

12  proved that underwriters 1) were not employed in an administrative capacity and 2) did not

13  customarily and regularly exercise discretion and independent judgment in carrying out their duties.

14  (*See* Pl. Brief, 6:17-23, 7:8-8:2.)[39] Whether an employee meets the exemption is a factual question.

15  *Nordquist v. McGraw Hill Broadcasting Co.*, 32 Cal.App.4th 555, 564 (1995) (citing *Dalheim v.*

16  *KDFW-TV*, 706 F.Supp. 493 (N.D. Tex. 1988). The Code of Federal Regulations (sections of which

17  Wage Order 4 incorporates by reference) and their construction by courts, both state and federal,

18  guide this factual determination.[40]

19      To meet their burden of proof for class certification, Plaintiffs must articulate how they

20  intend to prove their theory of the underlying action, and also demonstrate that the evidence with

21  which they will prove their case is *common* to each member of the class. They must also show

22  Plaintiffs' claims are *typical*, *i.e.*, that by proving Plaintiffs' claims with this common evidence,

---

23  [38] From October 2000 to the present, the class period, two applicable IWC wage orders successively
24  governed: 4-2000 and 4-2001. Both offer substantially similar administrative exemptions. Also, though the
    exemption has other elements, they are not at issue in this case. The administrative exemption set out by the
25  IWC applies provided "the employee is primarily engaged in duties that meet the test of the exemption,
    customarily and regularly exercises discretion and independent judgment in performing those duties, and
26  earns a monthly salary equivalent to no less than two times the state minimum wage for full-time
    employment. Labor Code section 515(a). To be "primarily engaged in" exempt duties means more than half
27  of the employee's time must be devoted to such duties. Labor Code § 515(e).
    [39] Washington Mutual assumes *arguendo* that the applicable test for the administrative exemption Plaintiffs
28  recite in their opening brief is the actual state of the law on this issue.
    [40] Since Wage Order 4 was enacted, the C.F.R. has since been renumbered. For convenience, we refer here
    to both the *former* C.F.R. sections, as well as the current sections where applicable.

Heller
Ehrman LLP

15

they will prove the claims of the class as a whole. *Sav-On*, 17 Cal.4th at 327 (courts "consider whether theory of recovery advanced by proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.") Plaintiffs do not even purport to meet this burden; nor can they. Thus, Plaintiffs' lawsuit is not suitable for class treatment as a matter of law.

**B.      Plaintiffs Cannot Show Common Issues of Fact Predominate.**

"Plaintiff's burden on moving for class certification … is not merely to show that some common issues exist, but, rather to place substantial evidence in the record that common issues *predominate*." *Lockheed Martin*, 29 Cal.4th at 1108 (emphasis in original). Plaintiffs' principal evidence supporting their motion consists of two manuals and virtually identical declarations by nine underwriters. They do not contend that the formal job description describes a nonexempt job, but rather that the manner in which individuals actually performed the job did not satisfy the exemption. The evidence before the Court establishes that this issue cannot be proven with common evidence.

**1.      Underwriters' Exercise of Discretion And Independent Judgment Is Not Susceptible To Common Proof.**

Central to Plaintiffs' brief is their assertion that underwriters were not exempt because they did not exercise the necessary discretion and independent judgment to make them administrative employees. At the heart of the discretion and independent judgment inquiry is the actual day-to-day work the underwriters have performed for Washington Mutual from October 2000 to the present. *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1128 (9th Cir. 2002) (impossible to determine exemption until nature of employee's daily activities resolved by fact-finder). Apparently misunderstanding the nature of their burden on a motion for class certification, Plaintiffs never state what facts they will use to prove this issue at trial, let alone show – as they must – that a "common thread of evidence" runs through the proposed class members' claims. *See B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*, 191 Cal. App. 3d 1341, 1349 (1987).

Plaintiffs presume, incorrectly, that the exercise of the underwriters' duties is and has been the same for each and every purported class member. (Pl. Brief, 6:21-25.) Ignoring Washington Mutual's complex business reality, Plaintiffs have crafted the nearly identical – and markedly

Heller
Ehrman LLP

16

cursory – declarations of nine former underwriters (including Plaintiffs) ostensibly describing their work. These accounts fell apart under cross examination and are further refuted by the documentary evidence and the declarations of other underwriters and managers. There are myriad variations in how the job was done across the class. All the evidence necessary to litigate the issue of whether the underwriters exercised discretion and independent judgment will necessarily splinter the litigation into a series of individualized inquiries.

### a.     The Deposition Testimony of Plaintiffs' Declarants Belies Commonality of The Underwriters' Claims.

The declarations Plaintiffs submit as evidence of the jobs underwriters performed demonstrate that individualized issues would dominate any trial of their claim. Upon cross-examination, *nearly all* of the non-party declarants –LaShon, Gullo, Kumar, Moore, and Wick – essentially disavowed the incomplete and overly simplistic job description outlined in their declarations, many of them admitting that the Washington Mutual job descriptions were far more accurate than their declarations. (*See* fn 5, 31, *supra*). Far from characterizing their jobs as perfunctory, they admit they were charged with *analyzing* the credit worthiness of loan applicants, and that in so doing they exercised *discretion and independent judgment*. (*See* fn 31, 33, *supra*.) Though they sometimes needed approval from a higher authority, each underwriter made a *decision* whether to extend credit on the loans they underwrote. (*See* fn 7, 31, *supra*.) Far from calling into question the exempt status of these five underwriters, their testimony actually supports it.

Most importantly for the class certification inquiry, this testimony highlights *key differences* in how the underwriter job was performed. For example, Gullo testified she never validated loans, an arguably non-exempt task. (Gullo Dep., 79:1-81:12.) By contrast, Moore testified that about half her loans required only validation of automatically approved files. (Moore Dep., 50:17-51:19.) Because at least 50% of underwriters' time must be spent on exempt work to qualify for the exemption, the breakdown between exempt versus non-exempt tasks is critical. Labor Code § 515(e). These two underwriters alone demonstrate that this will be an individualized inquiry.

Similarly, declarants' testimony stands in stark contrast to Plaintiffs' testimony on these same issues. Plaintiffs claim *they* did not exercise any discretion or independent judgment as

Heller
Ehrman LLP

17

underwriters, but rather merely matched up data from the loan application to guidelines that dictated whether to approve the loan. This is certainly not true for the *class* as the declarants' testimony makes clear. (*See* fn 5-7, 31-33, *supra*). These key differences in testimony serve only to demonstrate further the need for an individualized inquiry regarding the exercise of discretion and independent judgment.

### b.    The "Common" Evidence Proffered By Plaintiffs Is Not Determinative of Underwriters' Claims.

Though Plaintiffs proffer evidence that *some* common facts exist – but certainly do not *predominate* – the facts they focus on are not determinative of the exemption issue. Plaintiffs' evidence does not speak to *how* day-to-day duties were carried out – the critical inquiry here.

For example, Plaintiffs focus on the fact that guidelines and manuals were available to underwriters in the discharge of their duties. (Pl. Brief, 15:2-9.) But this is just the start, not the end, of the inquiry. It is *the manner* in which the manuals have been used – not the fact of their existence – that matters.[41] Here, interpretation and application of manual guidelines differed by underwriter. As a result, so too varied the level of discretion and independent judgment used. To illustrate, Kumar often underwrote loans without consulting any manual; applying discretion and independent judgment instead. Similarly, Moore approved a loan outside the guidelines because it made sense to her. (Moore Dep., 67:23-68:21.) By contrast, Plaintiffs claim strict adherence to guidelines, which in their view left no room for discretion or independent judgment.[42]

As further "common proof" of non-exemption, Plaintiffs refer to "standardized training" given to underwriters. Again, Plaintiffs miss the point. Even if underwriters received similar training, that does not necessarily translate into the uniform exercise of job duties across the class. Indeed, the very testimony Plaintiffs cite makes clear underwriters were trained to *analyze risk*, which by definition is done *uniquely* by each underwriter. (Pl. Brief, p. 16, n. 31). And the TRAC

---

[41] The C.F.R. is instructive on this point: the mere "use of manuals, guidelines or other established procedures ... does not preclude exemption." 29 C.F.R. 541.704 (2005). *See also*, *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (2003); *Haywood v. North Amer. Van Lines, Inc.*, 121 F.3d 1066, 1073 (1997) (issue not whether employee had discretion to disregard manuals).

[42] Hardly supporting Plaintiffs' position that strict adherence to guidelines was required, Steven Riley (whose testimony Plaintiffs cite on the use of manuals) testified that the CUG was used as "just a general reference tool." (Riley Dep., 40:15-41:4.)

Heller
Ehrman LLP

28

18

1  training reinforces this. (*See* TRAC Workbook, telling underwriters "[t]here are not exact, hard and

2  fast rules about which elements or factors balance which risks – that's why it's called risk analysis.

3  Rather, WaMu gives you guidelines and it's up to you to apply these while considering each file on

4  its own merits" and "apply your sound judgment as you identify, analyze and mitigate risk."

5  (Randall Dec., ¶ 6; Rojas Dec., Exh. 1, pp. 28, 39.)) To what extent each underwriter actually

6  scrutinized and evaluated the loan file, relied on tools, and arrived at a decision in undertaking this

7  risk analysis is the true measure of discretion and independent judgment. Thus, though seemingly a

8  common fact, to focus simply on the training received by underwriters does not begin to scratch the

9  surface of what underwriters actually did in their day-to-day jobs.

10        Plaintiffs also overplay the fact that a second signature is required on counter-offers and

11  denials of loans. As a matter of law, "[t]he term 'discretion and independent judgment' … does not

12  necessarily imply that the decisions made by the employee have a finality that goes with unlimited

13  authority and a complete absence of review." 29 C.F.R. 541.207(e) (2000, 2001), now 29 C.F.R.

14  541.202(c) (2005). Thus, the review of counter-offers and denials does not decide the exemption

15  issue, as "recommendations for action" are equally valid expressions of discretion and independent

16  judgment. *Id.* Given the fact that the Bank clearly requires an independent decision before seeking

17  approval, and that both Plaintiffs were disciplined for not doing this very thing, it is evident that no

18  common proof on this issue has been identified.

19        Perhaps the most flawed aspect of Plaintiffs' analysis is their oft-repeated mantra that

20  because underwriters used skill and knowledge in their work, they cannot possibly be exempt

21  employees. The actual standard is whether an underwriter "*merely* applies his knowledge in

22  following prescribed procedures." 29 C.F.R. 207(c)(1) (2000, 2001), now 29 C.F.R. 541.202(e)

23  (2005) (emphasis added). Obviously, the use of skill and knowledge on the one hand, and the use of

24  discretion and independent judgment on the other, are not mutually exclusive; they are just different

25  concepts that are not to be confused in the exemption analysis.[43] Plaintiffs make no showing, as

26  they must, that whether each underwriter was employing *more than* just skill and knowledge can be

27

---

28  [43] *See* DLSE Manual § 52.3.11 (June 2002) (Use of skill "does not necessarily mean … that all employees who are exercising skill are not also exercising discretion and independent judgment.")

Heller
Ehrman LLP

19

1    determined at the class level.[44]

2       **c.**  **The Key Evidence Is *Not* Common to the Class.**

3      While Plaintiffs are correct to focus the exemption inquiry on the use of discretion and

4    independent judgment, the rest of their analysis is off the mark. Though key to the class

5    certification determination, entirely absent from Plaintiffs' brief is any showing that the evidence

6    upon which this inquiry *actually depends* is common to the proposed class. Their omission is not

7    surprising considering that such an examination reveals substantial differences in underwriters'

8    duties across time, business channel, and geography that defeat any chance of proving their claims

9    as a class. At the end of the day, it must be decided whether the underwriters' jobs involve the

10   comparison and evaluation of possible courses of conduct, and require them to act or make a

11   decision after the various possibilities have been considered. 29 C.F.R. 207(a) (2000, 2001), now

12   29 C.F.R. 541.202(a) (2005). Two recent cases that have undertaken this analysis of *underwriters*

13   are instructive here.[45]

14     In *Edwards v. Audubon Ins. Group*, the court held that an insurance underwriter was exempt

15   because he "clearly" exercised discretion and independent judgment.[46] 2004 U.S. Dist. Lexis

16   27562, *22 (S.D. Miss.). In doing so, the court made a fact-intensive inquiry about the plaintiff's

17   day-to-day duties and found that he: was granted underwriting authority; negotiated over coverage,

18   price and exclusions to the insurance policy (within prescribed ranges); evaluated risk; used

19   discretion to make independent decisions; and could commit the insurer in substantial respects

20   financially.[47] *Id.* at *21-23.

21     Similarly, in *Havey v. Homebound Mortgage, Inc*, the court rejected two mortgage

22

23   [44] Plaintiffs also point out there is no specific education or professional license required for the job. This is legally irrelevant to the administrative exemption. *Nordquist* – Plaintiffs' "authority" on this issue – was discussing the *artistic professional* exemption, not the *administrative* exemption. 32 Cal.App.4th 555, 571 (1995).

24   [45] There is a dearth of case law examining the degree of discretion and independent judgment exercised by underwriters. Defendants have discovered only two. Though not binding on this Court, they are certainly illustrative of the fact-intensive inquiry required here.

25   [46] In the case, an insurance underwriter sued his employer for overtime compensation under the Fair Labor Standards Act ("FLSA"), the federal counterpart to California's wage and hour laws. Like Plaintiffs do here, the plaintiff argued that he was not exempt from the overtime rules because he followed detailed manuals and simply used skill in underwriting policies.

26

27   [47] The *Edwards* court, as well as the *Havey* court, *infra*, applied parallel C.F.R. provisions applicable to the state law administrative exemption outlined in Wage Order 4.

28                  20

Heller
Ehrman LLP

1  underwriters' characterization of their jobs as mechanical.[48] 2005 U.S. Dist. Lexis 27036 *18-23

2  (D.Vt.). The court looked more deeply at their responsibilities and found that the underwriters

3  actually analyzed the loan application, determined which guidelines the loan fit, sought additional

4  information as necessary, selected the proper program, made a decision whether to approve the

5  loan, and made counter offers when the loan did not meet certain criteria. *Id.* at 17-22. As a result,

6  the court granted summary judgment to the employer on the exemption issue. *Id.* at 23.

7       The kinds of issues these cases show must be analyzed will turn on facts and circumstances

8  that were richly varied. The critical analysis will have to focus on each individual's process in

9  evaluating, analyzing, and reaching decisions as she underwrote loans. Moreover, factors external

10  to each individual's analytical process varied significantly, both within the organization and over

11  time. For example, key changes over time have substantially affected the nature of the loans

12  underwritten by various segments of the underwriter population. The use of no less than three

13  different underwriting engines since 2003 has significantly altered the character of the loans

14  referred to underwriters as have changes in how they were managed and whether specialized

15  underwriting units siphoned off more difficult loans. As a result, the underwriter job did not remain

16  static over time and neither did all the factors that must be considered to find the exemption, *e.g.*,

17  authority, risk analysis, use of guidelines, conditioning and counter-offering. This difference alone

18  splinters the class.

19       Still other variables – like differences across business channels – further fragment the proof

20  required here. The types of loans and how well they were prepared varied between Retail and

21  Wholesale. Emerging Markets underwriters usually had the most challenging loans due to the

22  unique customer base. Custom construction and Government underwriters faced very different loan

23  products and underwriting issues. These material differences cannot be captured by evidence

24  common to all underwriters.

25       In addition, variations based on location also prevent common analysis. Market conditions

26

27  [48] In remarkably similar fashion to Plaintiffs here, the two *Havey* plaintiffs maintained they were not exempt

28  because they did not need college degrees, merely reviewed criteria and checked off boxes on a form, were required to apply various standards and adhere to guidelines, could not exercise any discretion, and needed to have their denials reviewed by a supervisor.

Heller
Ehrman LLP

21

WASHINGTON MUTUAL'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. BC323376

1  in different regions influence RLA and underwriters' appetite for risk. With steady property values,

2  underwriters are able to extend riskier and bigger loans. Because underwriters' level of authority

3  and their analysis of risk are central to the exemption analysis, these differences and their varied

4  effects on underwriting will require individual scrutiny of each underwriter. Again, frustrating the

5  possibility of inquiry based on common proof.

6      Plainly, Plaintiffs have not met their burden to show that common issues of fact

7  predominate. Quite contrary to Plaintiffs' oversimplified and superficial depiction, the work of the

8  proposed class was not uniform and standardized. With all these variations based on time, business

9  channel, and geography, come differences in evidence needed to examine underwriters' day-to-day

10  duties and decide whether they qualify for the administrative exemption. Because this will

11  necessarily be an individualized inquiry, class certification should be denied.

12  **2.  Washington Mutual Bank's Underwriters Were Employed in an Administrative Capacity.**

13

14      There are two parts to the analysis of the exemption. Plaintiffs' theory of proof will

15  necessarily require extensive analysis of the degree of discretion employed by underwriters because

16  underwriters were employed in an "administrative" capacity.

17      Plaintiffs cite no direct authority supporting their proposition that underwriters are

18  production employees. In fact, *Havey* and *Edwards*, the only two courts deciding this issue for

19  underwriters disagree with Plaintiffs on this point. In *Havey*, the court held that mortgage

20  underwriting was "plainly nonmanual work related to [the company's] business" because the

21  underwriters were "responsible for underwriting loans by reviewing the applications and

22  recommending whether loans should be accepted or rejected." 2005 U.S. Dist. Lexis 27036 at 16-

23  17. Similarly, in *Edwards*, the court rejected an insurance underwriter's claim that he was a

24  production worker because the company's "products" were insurance policies. Instead, the court

25  found that the underwriter's function was negotiating for, representing, and promoting the

26  employer, which is precisely administrative work. 2004 U.S. dist. Lexis 27562 at 18.[49] Rejecting

27  ────────────
[49] The Eleventh Circuit performed a similar analysis when insurance agents claimed they were production

28  employees. *Hogan v. Allstate Ins.*, 361 F.3d 621, 627 (11th Cir. 2004). The court held the agents worked in
an administrative capacity because their duties included adapting policies to customers' needs and delegating
routine matters to staff. Such tasks are just like the functions performed by the underwriters here.

Heller
Ehrman LLP

22

1   the production argument, both courts determined the exemption issue must be decided based on

2   discretion and independent judgment. Both courts then held, as discussed above, that underwriters'

3   duties meet the exemption on that basis also.

4          To be sure, the case Plaintiffs cling to most, *Bell v. Farmers Ins. Exch.* 87 Cal.App.4th 805,

5   823 (2001), distinguished claims adjusting from the company's *administrative* functions, including

6   *underwriting*. Likewise, the C.F.R. strongly counsels that underwriters are administrative

7   employees:

8          Employees in the financial services industry generally meet the duties requirements
           for the administrative exemption if their duties include work such as collecting and
9          analyzing information regarding the customer's income, assets, investments or debts;
           determining which financial products best meet the customer's needs and financial
10         circumstances; advising the customer regarding the advantages and disadvantages of
           different financial products; marketing, servicing or promoting the employer's
11         financial products.

12  29 C.F.R. 541.203(b) (2005). This is precisely the job of the underwriter at Washington Mutual:

13  analyzing a borrower's income, assets, and debt; determining which loan is most suited to the

14  borrower's profile; and, when appropriate, promoting alternative loan products through counter-

15  offers.

16         Returning to Plaintiffs' task here, how do they propose that common proof will establish the

17  "job functions" prong of the exemption? All they have identified is skewed facts and offhand

18  comments by Washington Mutual's witnesses. For instance, there is ample evidence to counter

19  Plaintiffs' unwarranted assertions that underwriters worked "assembly line" style and were subject

20  to "production quotas." As explained above, by definition underwriters only underwrite loans that

21  fall *outside* the boarder-auto engine-processor "production" flow. (*See* fn 3-4, *supra*.) Moreover, if

22  working in cubicles "side by side" with non-exempt employees were the standard, Plaintiffs clearly

23  fall short of their burden of proof. This is because the evidence shows that contrary to Plaintiffs'

24  claims, there were at least three organizational structures in place during the class period:

25  underwriters first worked in stand-alone underwriting groups within DCCs, then moved to LFCs

26  where they worked on teams, and then were separated out from LFC teams into stand-alone groups

27  again. (*See* fn 13-44, *supra*.) For two of these three structures, underwriters were physically and

28  functionally separated *completely* from boarders and other loan processors. (*Id.*) And, while

Heller
Ehrman LLP

23

1  underwriters have performance expectations tethered in part to the number of *decisions* they make,

2  these hardly constitute production quotas because they are not judged based on the number of loans

3  they approve. (Randall Dep. 188:17-189:1; Provencio Dep. 60:17-61:4; Moore Dep. 65:1-66:15;

4  *see also* fn. 26, *supra*.) Finally, Fletcher's isolated comment about the company's "administrative"

5  functions proves nothing. Plaintiffs never even asked him to define administrative.( Pl. Brief,

6  10:16-11:2, p. 11, fn 9.) Obviously, he did not attribute the legal meaning to it that Plaintiffs do

7  here. Yet, this is the type of inconsequential "evidence" Plaintiffs build their case around.

8       Ultimately, underwriters cannot be reduced to mere producers of loans. In assessing credit,

9  they are managing risk and optimizing Washington Mutual's ability to make a return on its

10  investment. These duties are directly related to the company's general business operations.

11      In the end, Plaintiffs cannot escape the fact that deciding whether underwriters were exempt

12  will turn on the issue of discretion and independent judgment, a necessarily individualized inquiry.

13  **C.     Plaintiffs' Claims Are Not Typical of the Purported Class.**

14      To prevail on their motion, Plaintiffs must also show that their claims are typical of the

15  class. This they cannot do. These two Plaintiffs were counseled, shortly before they quit, for *failing*

16  to exercise the discretion expected of them in their role as underwriters! (*See* fn 27-28, *supra*.) In

17  other words, maybe they did have a problem with exercising discretion, but that problem was

18  identified, and corrective action was implemented, long *before* their suit was filed. They are not

19  typical of the vast majority of underwriters, who did their jobs like they were supposed to.

20      Even if Plaintiffs had done their jobs as expected, typicality also fails for the same reasons

21  there can be no commonality. Because the job was so varied across time, business channel and

22  geography, no one underwriter (or even two) can represent the work experience of every other class

23  member. Here, Plaintiffs' work in Emerging Markets (a sliver of the underwriter population) sets

24  them apart from the majority of class members, who worked in other channels. Similarly, their

25  work in Montebello, sets them apart from underwriters in Northern California, or even other parts

26  of Los Angeles County.[50] Thus, the typicality of their claims fails on this ground too, and their

27

28  [50] Plaintiffs' claims are not even typical of their declarants. The differences between the way Plaintiffs testify they did their jobs – mechanically and without discretion – with how the declarants did theirs is conclusive

Heller
Ehrman LLP

24

1   lawsuit does not meet does not meet the criteria for class certification.

2   **D.    Class Treatment Is Not the "Superior" Means of Resolving This Dispute.**

3      In the final analysis, Plaintiffs must establish that class treatment of their claims is

4   "superior" to other methods of dealing with those claims. *See Blue Chip Stamps v. Superior Court*,

5   18 Cal. 3d 381, 386 (1976); *Reese v. Wal-Mart Stores*, Inc., 73 Cal. App. 4th 1225, 1234 (1999).

6   Plaintiffs purport to meet this burden by reciting to the Court the policy aims behind the class action

7   mechanism, *e.g.*, the avoidance of "repetitive litigation" and "inconsistent judgments." However, in

8   light of Plaintiffs' failure to establish that the proof of their case would require anything but an

9   individualized inquiry for each proposed class member, they cannot demonstrate how this policy is

10  served here.

11     Moreover, though Plaintiffs claim that a class action will allow "hundreds of current or

12  former underwriters to resolve their claims," there is no prospect of a glut of lawsuits here. At the

13  inception of this action, notice of Plaintiffs' lawsuit was given to each proposed class member. Of

14  the approximately 600 underwriters notified, only 56 – less than 10% – consented to Plaintiffs'

15  counsel contacting them. Livingston Dec., ¶ 24. Additionally, only seven underwriters, apart from

16  Plaintiffs, provided declarations in support of Plaintiffs' motion, and a good number of them have

17  basically recanted. Anyone left can bring an individual action. Any argument that a class action

18  would substantially benefit the Court by avoiding a flood of lawsuits, therefore, is unfounded.

19  **V.    CONCLUSION**

20     For the foregoing reasons, Washington Mutual respectfully requests that the Court deny

21  with prejudice Plaintiffs' motion for class certification.

22  DATED:  May 19, 2006           HELLER EHRMAN LLP

23

24                                By _____
                                  JONATHAN P. HAYDEN
25                                ANDREW R. LIVINGSTON
                                  TRACY S. TODD
26                                MICHELLE A. ROJAS
                                  Attorneys for Defendant
27                                WASHINGTON MUTUAL BANK

28  of this point. Thus, applying the exemption analysis to Plaintiffs cannot, by any stretch, have any bearing on
    the exempt status of the declarants.

**EXHIBIT D**

  

1  Mark Yablonovich, Esq. (SBN 186670)
   Marc Primo, Esq. (SBN 216796)
2  Shawn Westrick, Esq. (SBN 235313)
   Initiative Legal Group LLP
3  1875 Century Park East, Suite 1800
   Los Angeles, California 90067
4  Telephone: (310) 556-5637
   Facsimile: (310) 861-9051
5
6  Attorneys for Plaintiffs and Class Members

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                  **FOR THE COUNTY OF LOS ANGELES**

10

11  KIMBLYN JOHNSON CREESE, an          | **Case Number: BC323376**
    individual, PHYLLIS PARKER, an individual,
12  and on behalf of other members of the general   CLASS ACTION
    public similarly situated,
13                                        [Assigned to the Honorable Terry A. Green]
              Plaintiffs,
14                                        **PLAINTIFFS' REPLY BRIEF IN**
         vs.                              **SUPPORT OF PLAINTIFFS' MOTION**
15                                        **TO CERTIFY A CLASS ACTION**
    WASHINGTON MUTUAL BANK, a
15  Washington corporation; WASHINGTON
16  MUTUAL MORTGAGE SECURITIES, INC.,
    a Delaware corporation; WASHINGTON
17  MUTUAL BROKERAGE HOLDINGS, INC.,
    a California corporation, WASHINGTON
18  MUTUAL COMMUNITY DEVELOPMENT,          Date:     June 26, 2006
    INC., a California Corporation, and DOES 1   Time:     9:00 a.m.
19  through 10, inclusive,                Place:    Department 14

20            Defendants.                 Action Filed:  October 21, 2004

21

22

23

24

25

26

27

28

 

# TABLE OF CONTENTS

                                                                                                          PAGE

I.   INTRODUCTION AND SUMMARY OF ARGUMENT.................................................. 1

II.  PLAINTIFFS HAVE SATISFIED THE LEGAL STANDARD FOR

     CERTIFYING A CLASS ACTION.................................................................. 3

     A.   Both Defendant and Plaintiffs Identify Essentially the Same List of Job

          Tasks Performed By Underwriters, Which Implies Common Issues of Law

          and Fact ............................................................................................ 5

          1.   How Underwriters Used The Standard Washington Mutual

               Manuals Constitutes A Common Issue Of Law And Fact ............................ 5

          2.   How Underwriters Followed The Standardized Washington Mutual

               Training Program Constitutes A Common Issue Of Law And Fact .............. 6

          3.   Washington Mutual's Standardized "Two-Signature" Policy Is An

               Issue Of Fact Common To All Underwriters, And, Following

               Certification, A Determination Of How It Was Implemented May

               Be A Part Of Determining Class-Wide Liability ..................................... 6

     B.   The "Variations" Identified By Defendant Are Merely The

          Inconsequential Differences Common To Any Large Business, And In No

          Way Impair The Ability To Make A Class-Wide Determination As To

          The Propriety Of The Administrative Exemption Being Applied To

          Underwriters................................................................................................ 7

     C.   Despite Devoting Nearly The Entire Opposition To Claiming That

          Underwriters Exercise Discretion And Independent Judgment, A Closer

          Look At The Evidence Suggests They Do Not ....................................... 10

Case 3:07-cv-02410-WQH-JMA    Document 9-3    Filed 05/05/2008    Page 86 of 108

 

## TABLE OF CONTENTS

PAGE

D.  The Opposition Emphasis On The Merits Does Far More To Establish Common Issues Of Fact And Law Than To Establish That Underwriters Either Exercised Discretion And Independent Judgment Or Performed Administrative Work ................................................................. 12

III.  BECAUSE UNDERWRITERS PERFORM THE FINAL STATE IN WASHINGTON MUTUAL'S PRODUCTION OF LOANS FOR ITS CUSTOMERS THE ADMINISTRATIVE EXEMPTION IS NOT PROPERLY APPLIED TO UNDERWRITERS ................................................................. 12

A.  The Opposition Repeatedly Mischaracterizes What The Underwriters Do ............ 12

B.  The Opposition Repeatedly Fails To Apply The Relevant *California* Law .......... 13

1.  Under California Law, The Threshold Common Question of Law Is Whether The Underwriter Job Consisted Of "Administrative" Or "Production" Tasks ................................................................. 14

2.  By Working As The Final Link Of the Chain Of Production That Assembles Washington Mutual Loans, Underwriters Are Not Eligible For The Administrative Exemption ................................................................. 16

IV.  THE OPPOSITION IS SILENT ABOUT DEFENDANT'S WAGE STATEMENT AND MEAL AND REST BREAK VIOLATIONS, REQUIRING CERTIFICATION DUE TO NON-OPPOSITION ................................................................. 17

A.  Defendant's Failure To Provide Accurate And Complete Wage Statements Provide Separate And Independent Grounds For Certification ................................................................. 17

B.  Defendant's Denial of Meal And Rest Breaks Is Also A Class-Wide Issue, Unopposed In The Opposition ................................................................. 18

C.  Defendant's Violations of California's Wage Laws Is A Violation Of California's Unfair Competition Law ................................................................. 18

ii

TABLE OF CONTENTS

 

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

V.    CONCLUSION ................................................................................ 18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

 

# TABLE OF AUTHORITIES

PAGE

## STATE CASES

Bell v. Famers Ins. Exch., 87 Cal. App. 4th 805 (2001) ................................................................. 14

Bell v. Famers Ins. Exch., 115 Cal. App. 4th 715 (2004) ................................................ 4, 11, 13, 14

Collins v. Rocha, 7 Cal. 3d 232 (1972) ........................................................................................ 8

Daar v. Yellow Cab Company (1967) 67 Cal.2d 695 ................................................................. 3, 8

L.A. Fire & Police Protective League v. City of Los Angeles, 23 Cal. App. 3d 67 (1972)......... 2, 10

Lockheed Martin Corp. v. Supervisors, 196 Cal. App. 3d 1263 (1987) .......................................... 8

Nordquist v. McGraw-Hill Broadcasting Company, Inc., 32 Cal. App. 4th 555 (1995) .......... 13, 14

Reyes v. Board of Supervisors of San Diego (1987) 196 Cal.App.3d 1263 ..................................... 8

Sav-On Drug Stores, Inc. v. Superior Court, 34 Cal. 4th 319 (2004) ........ 2, 3, 4, 8, 9, 10, 14, 16, 17

Vasquez v. Superior Court (1971) 4 Cal.3d 800 ........................................................................... 3

## SUPREME COURT CASES

Arnold v. Ben Kanowsky, Inc., 361 U.S. 388 (1960) ................................................................. 13

Corning Glass Works v. Brennan, 417 U.S. 188 (1974) ............................................................ 13

## FEDERAL CASES

Cooke v. General Dynamics Corp., 993 F. Supp. 56 (D. Conn. 1997) ................................ 13, 16, 17

Havey v. Homebound Mortgage, Inc., 2005 U.S. Dist. LEXIS 27036 (D. Vt. 2005) ................... 14

Hogan v. Allstate Ins. Co., 361 F.3d 621 (11th Cir. 2004) ......................................................... 14

Reich v. American International Adjustment Co, Inc., 901 F. Supp. 321 (D. Conn. 1994) .......... 14

Reich v. Chicago Title Insurance Co., 853 F. Supp. 1325 (D. Kan. 1994) ................................. 14

## FEDERAL REGULATIONS

29 C.F.R. 541.207(e) (2000) ........................................................................................................ 6

29 C.F.R. 541.202(c) (2005) ........................................................................................................ 6

## CALIFORNIA LABOR CODE

California Labor Code § 226 ......................................................................................................... 18

California Labor Code § 226.7 ...................................................................................................... 18




1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### <u>TABLE OF AUTHORITIES</u>

<u>PAGE</u>

### CALIFORNIA BUSINESS AND PROFESSIONS CODE

<u>California Business and Professions Code</u> § 17200 ..................................................................... 18

### CALIFORNIA CODE OF REGULATIONS

8 <u>California Code of Regulations</u> 11070(12)(A) ..................................................................... 14



## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs have established the necessary elements for class certification. There is no dispute that the putative class is ascertainable. Nor does Defendant's opposition brief[1] contest that the proposed class is sufficiently numerous. Plaintiffs' claims are typical of the class and Plaintiffs' counsel would adequately represent the class. A class action is the superior vehicle for determining whether Defendant's underwriters were misclassified.

Plaintiffs have identified the common questions of law and fact that predominate, and thereby justify certification. Liability can be determined on a class-wide basis. All underwriters produce exactly the same product – the loans that Defendant is in business to produce for its customers – and they do so following uniform procedures and guidelines. Those guidelines are established by Defendant, which claims the guidelines are not followed uniformly, and yet *all* underwriters are designated by Defendant under the "administrative exemption."

Accordingly, there are thus two common issues of fact and law that will determine whether or not Defendant misclassified its underwriters as exempt from overtime and related <u>California Labor Code</u> protections:

(1)    Do underwriters exercise the required level of discretion and independent judgment for the administrative exemption to be applicable to them, given that underwriters must follow uniform and detailed procedures and guidelines?

(2)    Regardless of the amount of discretion and independent judgment exercised by underwriters, do they primarily perform "production" as opposed to "administrative" work, and are they thereby not properly designated as exempt?

There is scarcely any dispute about what it is that the underwriters do. Both Defendant and Plaintiffs describe the same tasks. *These are the common issue of fact required for class certification.* Plaintiffs and Defendant differ only over whether those tasks are exempt "administrative" work, or non-exempt "production" work, and whether they entail significant discretion and independent judgment. *This is the common issue of law required for class*

---

[1]    Washington Mutual's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Class Certification, hereinafter referenced as the "Opposition."

REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

 

1  *certification.*

2      Yet Defendant contends that this is not a proper class action because there is no

3  community of interest among all members of the class as to questions of law and fact.  For

4  instance, Defendant claims that there is no community of interest because a loan may be different

5  for a residential property in San Diego, a construction job, or a lower-income resident of Oakland;

6  or that some loans might have been referred to underwriters by an earlier version of the software

7  Washington Mutual uses to assign loans.  Leaving aside whether or not differences of this sort in

8  any way materially alter the loan production process, it is a fundamental and long-standing

9  principle of class actions that "minor differences in sub-groups . . . in no way detract from or

10  affect the common issues of fact and law."  <u>Los Angeles Fire & Police Protective League v. City</u>

11  <u>of Los Angeles</u>, 23 Cal. App. 3d 67, 74 (1972).[2]

12      In other words, all underwriters are performing those final tasks before a loan is made, or

13  not made, to a customer who has submitted a loan application.  All underwriters are doing so

14  following the same training, and in reference to the same policies and procedures detailed in the

15  underwriter manual.  Further, Defendant has deemed its underwriters to share sufficient

16  commonality that every single one of them has been designated as exempt, pursuant to

17  California's administrative exemption.  Just as Defendant determined that the exemption was

18  proper as to all of its underwriters, so, too, can a court reasonably make the determination that a

19  claim for misclassification should also be resolved as to all underwriters.

20      Therefore, class certification is proper here.  One need only look to the content of

21  Defendant's Opposition brief.  Implicit in the defense of having designated every underwriter as

22  exempt is the modest claim made in Plaintiffs' Moving Papers,[3] and indeed any motion for class

23  certification: that the putative class can be identified, and is sufficiently numerous such that the

24  single adjudication of a common question of law creates considerable judicial efficiency.

25

26  [2]  <u>See also Sav-On v. Superior Court</u>, 34 Cal. 4th 319, 335 (2004) ("neither variation in the mix of actual work
        activities undertaken during the class period by individual [plaintiffs], nor differences in the total unpaid

27      overtime compensation owed each class member, bar class certification as a matter of law").
    [3]  Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Certify a Class Action,

28      the Declaration of Shawn Westrick, and Declaration of Marc Primo are, collectively, hereinafter referred to
        as "Platintiffs' Moving Papers."

 

1  Additionally, class treatment provides relief to far more underwriters who have been subjected to

2  an improper exemption than if each had to bring his or her own action.

3  **II.    PLAINTIFFS HAVE SATISFIED THE LEGAL STANDARD FOR CERTIFYING A**

4  **CLASS ACTION**

5  The primary requirements necessary to maintain a California class action are: (1) an

6  ascertainable an numerous class; (2) a well-defined community of interest in the questions of law

7  and fact; (3) representative plaintiffs who are adequate representatives, with claims typical of the

8  class; (4) adequacy of representation by counsel; and (5) the superiority of class treatment over

9  individual lawsuits.  See Vasquez v. Superior Court, supra, 4 Cal. 3d 800, 820 (1971); and see

10  Daar v. Yellow Cab Company, 67 Cal. 2d 695, 704 (1967).

11  The Opposition does not dispute that Plaintiffs' Moving Papers identify an ascertainable

12  and numerous class.  Moreover, Defendant has admitted the size of the class.[4]  Nor is there any

13  contention that Plaintiffs' counsel will not serve more than adequately as class counsel.

14  The Sav-On case is the most recent and comprehensive statement about class certification

15  in the context of a contested exemption from overtime pay, and Sav-On sets out the certification

16  inquiry as follows:

17  The certification question is "essentially a procedural one that does not ask whether an
   action is legally or factually meritorious." [Citation omitted.]  A trial court ruling on

18  certification determines "whether . . . the issues may be jointly tried, when compared with
   those requiring separate adjudication, [and] are so numerous or substantial that the

19  maintenance of a class action would be advantageous to the judicial process and to the
   litigants." [Citation omitted.]

20
   Sav-On, 34 Cal. 4th at 326.

21

22  In Sav-On, as here, "defendant's own evidence" confirms that underwriters "perform[ed] a

23  finite number of tasks on a regular basis."  Id. at 343.  Naturally enough, "plaintiffs and defendant

24  disagree over the classification of many tasks performed by" underwriters.  Id. at 343-44.

25  Defendant makes much of that disagreement, which will almost certainly be a central inquiry

26  should this action be certified and a turn to the merits ensues.  However, it has no bearing on the

27  _____

28  [4]    Response of Defendant Washington Bank FKA Washington Mutual Bank, FA to Plaintiffs Kimblyn Johnson
   Creese and Phyllis Parker's Special Interrogatories (Set Three), attached as Exhibit A to the Declaration of
   Shawn Westrick, dated April 14, 2006, filed concurrently with Plaintiffs' Moving Papers.

 

1  central certification question:  whether "the classification of tasks as exempt or nonexempt may be

2  susceptible to common proof."  Id. at 343.

3      As demonstrated below, both Defendant and Plaintiffs present essentially the same list of

4  tasks performed by underwriters.  Defendant has tended to append to the various tasks modifiers

5  that seemingly elevate them to the realm of the administrative exemption ("analyze" appears

6  frequently, for example), and Plaintiffs give emphasis to the tasks being set out in procedures and

7  guidelines largely contained in an underwriters' manuals and accompanying software.  However,

8  this obscures the existence of a list of tasks that the parties basically agree on, which is essentially

9  the end of the inquiry, for certification.  See Bell v. Farmers Ins. Exch., 115 Cal. App. 4th 715,

10  730 (2004).

11      Determining whether Defendant or Plaintiff is right about the *characterization* of the those

12  tasks – whether they are in fact primarily administrative or production, under California exemption

13  law, or whether they involve a sufficient level of discretion and independent judgment – is taken

14  up *after* certification, when the merits are at issue.  Otherwise, judgment would be entered upon

15  class certification, or the denial of it.

16      Defendant also avers that purported "variations" in the circumstances surrounding

17  underwriters' role in Washington Mutual's production of loans militate against certification.

18  However, Defendant has done little more than identify the variations typical to any sizeable

19  business – new software, different offices, employees of diverse abilities.  None of the purported

20  "variations" rises to the level of making the class of underwriters any less amenable to

21  certification.[5]

22      Thus, perhaps unwittingly, the Opposition has affirmed essentially the same list of

23  underwriters' job tasks as Plaintiff initially identified in its Moving Papers.  That Defendant

24  regards the tasks as being properly exempt merely confirms that, at the merits stage, Plaintiff will

25

26  [5]  Once again, however, Sav-On speaks directly to this familiar tactic for attempting to avoid certification:
27  [M]any of the variables that, according to defendant, render the OM's inappropriate for class treatment – like
   store type, store size, and the number of store employees – may form the basis for appropriate subclasses.
   The trial court could reasonably have concluded that the creation of these subclasses would sufficiently
28  reduce the need for individual litigation as to each member of the class. Sav-On, 34 Cal. 4th at 344 (Brown,
   J., concurring).

- 4 -

1    contend the very same list of tasks includes overwhelmingly *non-exempt* work. In other words,

2    this case will play out exactly as a class action is intended to.

3    A.    **Both Defendant and Plaintiffs Identify Essentially The Same List Of Job Tasks**

4          **Performed By Underwriters, Which Implies Common Issues Of Law and Fact.**

5    One of the Opposition's headings, set in bold, quite rightly proclaims that the facts

6    surrounding the underwriters' performance of their jobs – the bare statement of what they do -- "is

7    not determinative of underwriters' claims."[6] Only an inquiry into the nature of underwriters work,

8    which Plaintiffs contend is "production" work, and *how* the underwriters performed their jobs, will

9    ultimately be determinative of Plaintiffs' claims, on the merits. Accordingly, Plaintiffs at no time

10   contend that any of the evidence presented in its Moving papers *for class certification* is

11   "determinative" on the merits. That would be the work of a summary judgment motion.

12   Here, Plaintiffs are making the more modest claim to have simply identified common

13   issues of law and fact sufficient to certify the class of underwriters. In this, Plaintiffs are

14   substantially aided by Defendant having identified three of the common issues: (1) Defendant's

15   use of the same manuals to circumscribe the underwriters' decision-making; (2) the standardized

16   training that all underwriters received, and, (3) the uniform policy requiring a second signature of

17   all decisions not clearly guided by the training and the manuals.

18   1.    **How Underwriters Used The Standard Washington Mutual Manuals**

19         **Constitutes A Common Issue Of Law And Fact.**

20   Plaintiffs' Moving Papers identified Defendant's underwriter manuals as substantially

21   guiding the determinations that underwriters implement with respect to loan applications. Thus

22   the Opposition states, with a certain accuracy, that "[i]t is *the manner* in which the manuals have

23   been used – not the fact of their existence – that matters."[7] As to the merits, that is completely

24   right. It still remains to be determined *the manner* in which the manuals are used, as one part of

25   the inquiry into the propriety of the administrative exemption here. However, the Opposition

26   attempts to conflate the requirements for prevailing on the merits with the quite different

27

28   [6]    Opposition at 18:6-7.
     [7]    Opposition at 18:12-13.

 

1  requirements for class certification.[8]  As to *certification*, the fact that the parties agree precisely

2  about the manuals existence,[9] and the fact that they are used in *some manner* more than adequately

3  established a common, mixed issue of law and fact.  After certification, the task is to determine

4  whether or not the manuals were used in a manner consistent with the administrative exemption.

### 2.  How Underwriters Followed The Standardized Washington Mutual Training Program Also Constitutes A Common Issue Of Law And Fact.

8  Likewise, there is no dispute that underwriters received "standardized training."[10]  Whether

9  that training in fact translates to "analyz[ing] risk," as Defendant contends, or the underwriters'

10  reliable tendency to operate within the parameters set and enforced by Washington Mutual, is a

11  *post*-certification issue, because it goes entirely to the merits.[11]  Thus the issue has been identified

12  as common to all underwriters – by both parties – and the *manner* in which the standardized

13  training was implemented will be determinative on the merits.  Those common questions of fact

14  and law, appropriately short of an actual determination on the merits, suffice for class certification.

### 3.  Washington Mutual's Standardized "Two-Signature" Policy Is Another Issue Of Fact Common To All Underwriters, And, Following Certification, A Determination Of How It Was Implemented May Be A Part of Determining Class-Wide Liability.

19  So, too, do Defendant and Plaintiffs entirely agree that Washington Mutual maintained a

20  policy by which "a second signature is required on counter-offers and denials of loans."[12]  The

21  common question of law and fact is the legal effect of that policy, and specifically whether or not

22  it weighs against the administrative exemption, in light of authority that employees need not

23  exercise authority in the "complete absence of review"[13] to be properly classified as exempt.

24  Whether Washington Mutual's particular policy for secondary approval of underwriters' decisions

---

[8]  Opposition at 18:10-18.
[9]  Accord id. (Opposition identifies manuals referenced by underwriters) with Plaintiffs' Moving Papers at 15:1-9 (same manuals).
[10]  Opposition at 18:19.
[11]  See Plaintiffs' Moving Papers at 15:1-9.
[12]  Opposition at 19:10-11.  Accord with Plaintiffs' Moving Papers at 15:17-18.
[13]  29 C.F.R. 541.207(e) (2000, 2001), now 29 C.F.R. 541.202(c) (2005), cited in Opposition at 19:11-14.

 

1   is or is not exempt work is an open question for now – identified as a common question of law and

2   fact, but as yet unresolved.  Again, this is precisely the identification of common questions that is

3   the crux of class certification.

4        Plaintiffs need not, as the Opposition implies, conclusively establish, *now*, in their Moving

5   Papers, that they will prevail on each of these common questions.  It would have been a different

6   matter had Defendant identified authority to the effect that its standardized reference manuals and

7   training, or policies requiring a supervisor's approval, could somehow not at all be brought to bear

8   on determining the merits of Defendant's administrative exemption, when the time comes for

9   determining the merits.  Yet the Opposition accomplishes nothing of the sort.  Rather, several of

10  the underwriters' tasks and circumstances are identified.  In each instance, the Opposition actually

11  augments Plaintiffs' Moving Papers, and identifies the various common issues of fact and law that

12  can determine class-wide liability.[14]

13       **B.    The "Variations" Identified By Defendant Are Merely The Inconsequential**

14            **Differences Common To Any Large Business, And In No Way Impair The**

15            **Ability To Make A Class-Wide Determination As To The Propriety Of The**

16            **Administrative Exemption Being Applied To Underwriters.**

17       The Opposition expends considerable space contending that there are at least six well-

18

---

19  [14]   Similarly, the purported "renunciations" of declarations submitted in support of Plaintiffs' Moving Papers

20  serve only to further accentuate the common issues of law and fact that make this action appropriate for class
     treatment.  To the extent that deponents affirming the content of their job descriptions can be taken as a

21  statement of their actual job duties, those descriptions are far from conclusive on the merits, although they
     serve to clearly identify additional common issues of law and fact, including precisely what is involved in the

22  following tasks:
        • "evaluating loans";

23      • "calculating complex tax returns";
        • "analyzing appraisals";

24      • "analyzing and identifying risk";
        • "determining creditworthiness of borrowers"; and

25      • "making complex decisions with respect to credit quality."
     Opposition at 11:22-12:2.  Merely appending "analyzing" or "complex" to a task that is indeterminate as to

26  whether or not it is exempt or non-exempt does not determine conclusively, or at all, whether or not an
     underwriter performing these tasks was properly exempt.  Plaintiff does not dispute that underwriters were

27  called upon during the course of completing a loan, and determining whether it is to be approved or denied,
     to reference tax returns and measures of credit risk, among other things.  But it is far from clear, on the basis

28  of Washington Mutual's own PMK testimony that this work was of an unambiguously exempt character.  *See*
     Section III, *infra*.  What is entirely clear, however, is that the Defendant has once again actually identified
     more of the common issues of law and fact that the Opposition purports do not exist.

REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION



1  defined "Variations in the Underwriting Job at Washington Mutual."[15] While the desired

2  inference is presumably that these purported variations are of sufficient consequence to destroy the

3  integrity of Plaintiff's proposed class definition, the Opposition never explains how the

4  "variations," either individually or collectively, would impair the ability to determine liability to

5  the underwriters on a class-wide basis.

6      The <u>Sav-On</u> defendant attempted an identical tactic in its attempt to avoid certification of a

7  class, also identifying inconsequential differences among class members.[16] The trial court rejected

8  this attempt, as did the California Supreme Court, which drew on the leading class certification

9  authority under state law to set forth a compilation of general certification principles:[17]

> We long ago recognized "that each class member might be required ultimately to justify an individual claim does not necessarily preclude maintenance of a class action." (<u>Collins v. Rocha</u>, [7 Cal. 3d 232, 238 (1972)].) Predominance is a comparative concept, and "the necessity for class members to individually establish eligibility and damages does not mean individual fact questions predominate." (<u>Reyes v. Board of Supervisors</u>, [196 Cal. App. 3d1263, 1278 (1987); see <u>Lockheed [Martin Corp. v. Superior Court</u>, 29 Cal. 4th 1096, 1105; <u>Darr v. Yellow Cab</u> [supra.].) Individual issues do not render class certification inappropriate so long as such issues may effectively be managed.
> . . . .
> Nor is it a bar to certification that individual class members may ultimately need to itemize their damages.

---

[15]  Opposition at 7:13-14.

[16]  "In opposing certification, defendant argued that whether any individual member of the class is exempt or nonexempt from the overtime requirements depends on which tasks that person actually performed and the amount of time he or she actually spent on which tasks. The actual activities performed by its [exempt employees], and the amount of time spent by each [exempt employee] on exempt activities, defendant contended, varied significantly, **from store to store and individual to individual, based on multiple factors, including store location and size, physical layout, sales volume, hours of operation, management structure and style, experience level of managers, and number of hourly employees requiring supervision.** For this reason, defendant argued, no meaningful generalizations about the employment circumstances of its managers could be made." <u>Sav-On</u>, 34 Cal. 4th at 325 (emphasis added).

[17]  There is the persistent implication throughout the Opposition that, for certification to be appropriate, every underwriter must have had identical job duties, abilities, and work hours – producing mortgages for the same kinds of properties with the same regional real estate tendencies, using identical software. (See Opposition at 7:13-10:8.) This is accomplished partly by the suggestion that Plaintiffs' Moving Papers somehow aspired to cast all underwriters' job duties, and consequently any damages arising from being misclassified, as being the same, as if certification would be precluded if they were not. Plaintiffs are well aware that individual proof of eligibility and damages are no bar to class certification, and stated as much in their moving papers. (See Plaintiffs' Moving Papers at 6:21-25.) Yet the Opposition cites to precisely that passage in the Moving Papers in which Plaintiffs expressly acknowledge the likely existence of individual differences to support Defendant's preposterous, and in fact unsupported, claim that "Plaintiffs presume, incorrectly, that the exercise of the underwriters' duties is and has been the same for each and every purported class member. (Pl. Brief, 6:21-25). From there, the opposition goes on to "prove" a fact that is both unremarkable and quite fearlessly acknowledged by Plaintiffs given the case law holding that class actions will accommodate a far greater array of difference than any Defendant contends to exist among underwriters.

 

1  Sav-On, 34 Cal. 4th at 334.

2  But for the conclusory assertion that "myriad variations" among underwriters "will

3  necessarily splinter the litigation into a series of individualized inquiries,"[18] the Opposition offers

4  no explanation as to exactly how these "myriad" differences would render class treatment

5  unmanageable. See Sav-On, 34 Cal. 4th at 323.)

6  Further, none of the variations rise to a level that establishes a counterpoint to the general

7  principle, articulated in Sav-On, that "neither variation in the mix of actual work activities

8  undertaken during the class period by individual [class members], nor the differences in total

9  unpaid overtime compensation owed each class member, bar class certification as a matter of

10  law." Id. at 335.

11  The purported "variations" are nothing more than the ordinary differences within a group

12  whose members are predominantly alike. For instance, "Variations by Channel" is a slightly

13  obscure way of saying that underwriters will be producing loans for different kinds of properties.[19]

14  "Variations Depending on AUS" is a reflection of the fact that Washington Mutual, like all

15  businesses, periodically updated its software.[20] "Variations in Validation by Underwriters" is a

16  concession to the fact that there was some variation in the amount of a particular kind of non-

17  exempt work, which Defendant all but concedes the underwriters performed.[21]

18  Perhaps most revealing of Defendant's impossibly restrictive conception of what sort of

19  variation should be regarded as imposing too much diversity on a class for it to be effectively

20  managed are the final two of the six enumerated "variations." Defendant seriously maintains that

21  "Variations Based on Geography" and "Variations Based on Competency" are impediments to

22  class certification. While many modern businesses maintain multiple locations, virtually all of

23  those that do so endeavor, as Washington Mutual does, to achieve a measure of standardization

24  across all offices.[22] Moreover, few factors are more universal than variations in the competency of

25
26  [18]  Opposition at 17:3-6.
    [19]  See Opposition at 7:13-8:15.
27  [20]  See Opposition at 8:16-22.
    [21]  See Opposition at 8:23-9:7.
28  [22]  Washington Mutual's guidelines direct underwriters to ensure that all documents not written in English *must* be translated into English, and the guidelines direct underwriters that to calculate someone's monthly income if they are paid biweekly means that have to multiply the biweekly income by 26 weeks and then divide by

- 9 -

 

1   workers, even those within the same job title. Most telling, Defendant cites no authority by which

2   certification has been denied for class on the basis of any factor identical or similar to any of the

3   six factors identified in the Opposition.[23]

4   **C.      Despite Devoting Nearly The Entire Opposition To Claiming That**

5   **Underwriters Exercise Discretion and Independent Judgment, A Closer Look**

6   **At The Evidence Suggests They Do Not.**

7   Defendant is understandably on more comfortable ground attempting to bypass the

8   "administrative-production prong" of the exemption test, *which is itself dispositive* -- and will be

9   here. The Opposition proceeds directly to "claiming that underwriters exercise discretion and

10  independent judgment." Yet Defendant only manages to elongate and adorn with euphemism the

11  standardized, production tasks that underwriters perform as they finish off a loan.

12  In two different places, the Opposition describes the underwriters' "essential functions" as

13  follows:[24]

14  Performing credit analysis; negotiating acceptable levels of risk; reviewing credit and risk
       factors, including identifying mitigating factors; evaluating borrowers' profiles; approving

15  or recommending loan action;

16  Yet rather than an elaboration of what exactly is meant by, for example "identifying mitigating

17  factors" or "analyzing loan-to-value," the Opposition cites only to its own management personnel

18  and PMK designees, speaking those same words – as if appending the word "analyze" to terms

19  that sound vaguely like complex finance concepts is the incantation that establishes discretion and

20  independent judgment.

21  However, when the PMK deponents are called upon to elaborate, "evaluating borrowers'

22  [23]   12 months. See Washington Mutual's Conventional Underwriting Guidelines, attached as Exhibit B to the
       Declaration of Shawn Westrick, and submitted with Plaintiffs' Moving Papers, bates stamped WAMU/KC
23         007273 and 007367.

24  To whatever extent any of the purported "variations" did in fact upset the coherence of the class, however,
       the precision with which Defendant is able to define and assign monikers suggests only the "subclasses"
       specifically noted in Sav-On as the preferred alternative when a class is legitimately diverse, but not so

25  disparate in its composition as to completely discard the efficiencies of class treatment. See Sav-On, 34 Cal.
       4th at 334, supra. See, e.g., Los Angeles Fire & Police Protective League v. City of Los Angeles, 23 Cal.

26  App. 3d 67, 74 (1972); Sav-On v. Superior Court, 34 Cal. 4th 319, 344 (Brown, J., concurring). Here,
       though, Defendant has done little more than to identify the differences among a defined class of employees
       common to any business, and, indeed, any certified class. Thus subclasses, an intermediate step that must be

27  considered before certification is denied, are not, in any event, warranted.
       [24]   Opposition at 4:1-5. In the very next paragraph, underwriters are said to be charged with "analyzing" the

28  following: "employment and income, credit history, assets and cash reserves, debt ratios, collateral and loan-
       to-value ratios." Opposition at 4:7-13.

 

profiles" assumes an entirely rote and routine aspect, bereft of the requisite discretion and independent judgment. One PMK testified that underwriters – not a non-exempt employee earlier in the chain of a loan's production, or even a script-recognition computer – do the following:

- Check that the loan applicant's "address [on the loan application] matches the address of the documentation";[25]
- "[Check that the loan applicant's] bank accounts with a bank account statement, and the account numbers on the applications is [sic] one and the same, and that, in fact, it's theirs";[26]
- Check ". . . that [the loan application is] signed and dated . . .";[27] and
- Check ". . . that all sections [the of the loan application is] filled out . . ."[28]
- Check that applicants "have placed their social security number on the application."[29]

This same Washington Mutual designee, when questioned about what is entailed when underwriters "analyze facts" (which presumably equates to "analyzing credit and risk factors") responded that the underwriters are, "looking at" the loan applicants' "level of income."[30] This is apparently the detail behind "calculating complex tax return," for which Plaintiffs are assailed for not including among the elements of "the actual underwriting of loans."[31]

Other claimed underwriter functions are borderline comical, when contrasted with the Opposition's steadfast insistence that performance of the job is so permeated with discretion and independent judgment that Plaintiffs have not even identified an issue worth certifying. Mr. Provencio testifies that underwriters check to see that the social security number on a loan application matches the number given on the applicant's tax return;[32] that the applicants' tax returns were signed and dated;[33] and checks that the property is "not a vacant lot,"[34] -- i.e., that it exists.

**D.    The Opposition Emphasis On The Merits Does Far More To Establish Common Issues Of Fact And Law Than To Establish That Underwriters**

---

[25]    Deposition Transcript of Mike J. Provencio ("Provencio Depo.") at 74:7-9.
[26]    Provencio Depo. at 74:11-14.
[27]    Provencio Depo. at 74:25-75:1.
[28]    Provencio Depo. at 75:1.
[29]    Provencio Depo. at 74:4-5
[30]    Provencio Depo. at 75:11.
[31]    Opposition at 11:22.
[32]    Provencio Depo. at 76:20-24; 77:1-3 ("If they give you tax returns, validating that the social security number matches – on the application matches the tax return.")
[33]    Provencio Depo. at 77:3-4 ("That, in fact, the tax returns were signed and dated.")
[34]    Provencio Depo. at 77:3-11.

REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

 

**Either Exercised Discretion And Independent Judgment Or Performed Administrative Work.**

Plaintiffs need not prevail on the merits here, either with respect to establishing that underwriters were engaged in the production of loans, or that the tasks attendant to producing loans entailed less than the required level of discretion and independent judgment. To certify the class of underwriters on the issue of whether or not the administrative exemption is supported by evidence, Plaintiffs need only identify what that evidence is (what underwriters did in their job) – the common questions of fact – and whether what they did in their job qualifies as exempt work – the common question of law.

These common questions predominate over any entirely individual facts that Defendant has identified. Accordingly, even though summary judgment may well be warranted in Plaintiffs' favor, the issue before the Court is class certification, and Plaintiffs have entirely carried their burden. The class should be certified according to the definition proposed by Plaintiffs, and Plaintiffs' counsel should be appointed as class counsel.[35]

**III.  BECAUSE UNDERWRITERS PERFORM THE FINAL STAGE IN WASHINGTON MUTUAL'S PRODUCTION OF LOANS FOR ITS CUSTOMERS, THE ADMINISTRATIVE EXEMPTION IS NOT PROPERLY APPLIED TO UNDERWRITERS**

Upon being certified, this case would present an entirely straightforward mixed question of law and fact by which class-wide liability could be determined: *did underwriters perform the final stage in Washington Mutual's production of loans for its customers?*

**A.  The Opposition Repeatedly Mischaracterizes What The Underwriters Do.**

Yet Defendant attempts various forms of misdirection to confuse a case plainly suited for certification with one that is not. First, the Opposition repeatedly implies that the so-called "administrative-production dichotomy" is to be equated with the familiar distinction between "white collar" and "blue collar" workers. It is not. But for the Opposition's citation to two federal

---

[35] The Opposition nowhere contests the adequacy of Plaintiffs' counsel, and on that basis alone Initiative Legal Group, LLP should be appointed as class counsel concurrent with the class' certification.

 

1   cases that are neither binding nor even on-point, the Opposition entirely neglects describing the

2   inquiry that would take place were the case certified: first, whether underwriters performed

3   "administrative" work or "production" work, and, then -- only if they are first found to have

4   performed administrative work -- whether the underwriters also exercised sufficient discretion and

5   independent judgment to qualify for the administrative exemption.

6           But for vague implications throughout the Opposition that underwriters are somehow "risk

7   management advisors" to the company, there is little attempt to meet the threshold administrative

8   exemption question, which concerns whether the underwriters performed "administrative" or

9   "production" work. In fact, underwriters perform the final steps in the production of loans for

10  Defendant's customers, and in no way did they perform "administrative" work.

11      **B.      The Opposition Repeatedly Fails To Apply The Relevant *California* Law.**

12          Administrative work includes "advising the management, planning, negotiating,

13  representing the company, purchasing, and business research and control." <u>Cooke v. General</u>

14  <u>Dynamics Corp.</u>, 993 F. Supp. 56, 59 (D. Conn. 1997). By way of contrast, administrative

15  workers are those "whose primary duty is administering the business affairs of the enterprise,"

16  whereas production workers are "those whose primary duty is producing the commodity or

17  commodities, whether goods or services, that the enterprise exists to produce and market." <u>Bell v.</u>

18  <u>Farmers Ins. Exch.</u>, 115 Cal. App. 4th 715, 730 (2004).

19          Rather than venturing the patently unsustainable claim that these underwriters were

20  somehow administering Washington Mutual's business affairs, as opposed to being instrumental

21  in the chain of putting together the loans that are the essence of Washington Mutual's business, the

22  Opposition deploys two inapposite federal cases to do Defendant's work for it.[36] However,

23  Defendant's attempt to suggest that two different courts had considered the exemption status of

---

[36]   Defendant, with little subtlety, argues that Plaintiffs cannot succeed at certifying the class because
underwriters exhibited too much independent discretion and judgment. This is a sly maneuver, because as
Defendant and this Court well know, it is Defendant who *ultimately must prove* the exemption was properly
applied to the underwriters. The employer bears the burden of proving an employee is exempt. See <u>Corning</u>
<u>Glass Works v. Brennan</u>, 417 U.S. 188, 196-197 (1974). "Exemptions are narrowly construed against the
employer and their application is limited to those employees plainly and unmistakably within their terms."
<u>Nordquist v. McGraw-Hill Broadcasting Company, Inc.</u>, 32 Cal. App. 4th 555 (1995) (internal citations
omitted). See, also, <u>Arnold v. Ben Kanowsky, Inc.</u>, 361 U.S. 388, 397 (1960). And a Court would still have
to find that the putative class was not producing a product for the company.

 

1    "underwriters," and thereby created the basis by which *all underwriters*[37] are properly subject to

2    the administrative exemption, comes up short.

3        In fact, only one of the out-of-state, federal courts did in fact consider an exemption

4    concerning a job title of "underwriter," but with evidence presented as to only half of the

5    administrative exemption test under California law.  Indeed, neither case was decided under, or

6    with the merest reference to, California law.  Thus there is nothing like the budding consensus

7    about *all* underwriters, who handle *all* products, for *all* companies that the Opposition suggests.

8        California law still requires that each case be considered on its individual merits – and

9    when the time has arrived to consider the merits, not on a motion to certify a class.

10       **1.**    **Under California Law, The Threshold Common Question of Law Is**

11           **Whether The Underwriter Job Consisted Of "Administrative" Or**

12           **"Production" Tasks.**

13       Under California law, a properly exempt "administrative" employee is one who:

14       Customarily and regularly exercises discretion and independent judgment in the
     performance of 'intellectual' work which, in the context of an administrative

15       function, is office or non-manual work directly related to management policies or
     the general business operations of the employer or the employer's customers.

16   Nordquist v. McGraw-Hill Broadcasting Company, Inc., 32 Cal. App. 4th 555, 563 (1995) quoting

17   2 Division of Labor Standards Enforcement, Operations and Procedures Manual ("DLSE

18   Manual") § 10.62.

19       Courts apply a two-part test to determine whether employees are properly subject to the

20   administrative exemption.  First, there is an inquiry as to whether the employees classified as

21   exempt administrators are primarily engaged in the "'performance of office or non-manual work

22   *directly related to management policies or general business operations*'" of the employer.  Bell v.

23   Farmers Insurance Exchange, 87 Cal. App. 4th 805, 821 (2001) ("Bell I"), quoting 29 C.F.R. part

24   541.2 (italics added by court).  This is the foundation of the so-called "administrative/production

25   worker dichotomy."  Bell v. Farmers Insurance Exchange, 115 Cal. App. 4th 715, 737-38 (2004)

26

27   [37]  Read literally, the Opposition is urging adoption of the principle whereby the mere title "underwriter" would
     be decisive on the exemption question.  Yet it is black-letter exemption law – state and federal – that actual

28   job duties, not titles or job descriptions determine the propriety of an exemption.  See Sav-On, 34 Cal. 4th at
     336.

1   ("Bell II"[38]).  If it is determined that a worker classified as "administrative" is in fact "in the

2   sphere of rank and file production workers," then the inquiry ends.  Bell I, 87 Cal. App. 4th 828-

3   29.  The exemption is improper.  Production employees – "those whose primary duty is

4   producing" the employer's basic product – are categorically not eligible for the administrative

5   exemption.  Id. at 821.

6       If, however, employees classified by the administrative exemption have as their primary

7   duty "administering the business affairs of the enterprise," id., then a second-level inquiry is still

8   required to validate the administrative exemption.  This second-level inquiry asks whether or not

9   the employees are engaged in work that primarily "requires exercise of discretion and independent

10  judgment." Id. at 828.

11      The Opposition relies on Havey v. Homebound Mortgage, Inc., which devotes only a

12  single, dismissive paragraph to the question of whether plaintiffs performed "administrative" or

13  "production" work, because, in Havey, "Plaintiffs point to no support for this assertion [that they

14  performed production as opposed to administrative work]." 2005 U.S. Dist. LEXIS 27036 at *17.

15  Thus the so-called "administrative-production dichotomy" is not even taken up in Harvey or the

16  Opposition in a serious way as required under California law.

17      By contrast, Plaintiffs' Moving Papers amply demonstrate that Washington Mutual's

18  underwriters performed absolutely no administrative work, and were entirely engaged in

19  producing the loans that were Defendant's product.[39]  Relying on Havey's complete lack of any

20  examination of the administrative-production dichotomy, the Opposition stands in stark contrast to

21

22  [38] The various Bell courts use different designations of Bell I, Bell II, and so forth, as they take up the matter's
    entire appellate history.  Thus the designations used herein do not comport with those courts' references: the

23  "Bell II" referenced at 115 Cal. App. 4th at 728 is "Bell I" herein.  Each is internally consistent, however,
    and no citations rely on the inconsistent definitions.

24  [39] See Plaintiffs' Moving Papers at 7:8-12:15.  The second federal case to which the Opposition gives much
    prominence, Hogan v. Allstate Ins. Co., 361 F.3d 621 (11th Cir. 2004), did not even concern underwriters,

25  and the fact that a Florida court happened to uphold a particular administrative exemption is entirely
    unremarkable.  Any number of federal cases can be cited in which some administrative exemption has been

26  found to be proper.  Likewise, there are innumerable federal cases that conclude administrative exemptions
    are not proper, and for reasons similar to the exemption at issue here.  See, e.g Reich v. American

27  International Adjustment Co., Inc., 902 F. Supp. 321, 325 (D. Conn 1994) (in the automobile damage
    appraisal business, those who did the actual appraisals "did not administer the business."); Reich v. Chicago

28  Title Insurance Co., 853 F. Supp. 1325 (D. Kan. 1994) (escrow agents who performed the escrow closings
    that were Chicago Title's "day-to-day business" were thus engaged in production, not administration).  And
    see Plaintiffs' Moving Papers at 9:4-22 (extended discussion of American International and Chicago Title).

 

1  Plaintiffs' Moving Papers, which properly track the requirements for class certification under

2  *California* law, articulated in both <u>Sav-On</u> and <u>Bell</u>.

3      Far from having "failed to identify common issues or explain how they propose to prove

4  their case at trial,"[40]  Plaintiffs have amply set forth the theory on which they will prove liability, a

5  theory that is articulated at length in the Moving Papers.[41]  The theory by which Plaintiffs will

6  prove liability is even succinctly stated in the Opposition, despite the claim that Plaintiffs have no

7  such theory.  As a primary matter, Plaintiffs will seek to prove, as the Opposition implicitly

8  acknowledges, the *"proposition that underwriters are production employees."*[42]

9  **2.    By Working As The Final Link Of The Chain Of Production**

10  **That Assembles Washington Mutual Loans, Underwriters Are**

11  **Not Eligible For The Administrative Exemption.**

12      As against Plaintiff's extensive evidence that underwriters were production workers, and

13  thus per se not eligible for the administrative exemption,[43] the Opposition proposes only the

14  following, thinly supported claim that underwriters performed any work that could plausibly be

15  called "administrative": the contention that underwriters were "mentoring and developing staff"[44]

16      However, despite a seemingly weighty footnote citing to a deposition, a declaration, and

17  two different exhibits, there is no evidence whatsoever of underwriters *actually mentoring and*

18  *developing staff.*  Instead, a putative class member acknowledges that her "job description"

19  included this function; yet that class member offers not a single instance of actually doing

20  anything remotely like mentoring, or in any way supervising, a staff.  Nor does she testify to any

21  other underwriter "mentoring" her.  Similarly, Area Manager Sandie Randall, who would be fully

22  capable of offering personal knowledge of any observed instances of underwriters acting as

23  mentors, directing staff, or in any way actually *administering* the business, merely refers to the

24  same job description, as well as a performance evaluation form that happens to mention the phrase

25

---

26  [40]  Opposition at 1:4-5. The Opposition makes this conclusory assertion at its outset, and repeats it throughout.
        <u>See</u>, e.g., Opposition at 1:20-21; 15:18-19; 23:16-17.

27  [41]  <u>See</u> Plaintiffs' Moving Papers at 6:14-12:15.
    [42]  Opposition at 22:17-18.

28  [43]  <u>See</u> Plaintiffs' Moving Papers at 8:18-12:15.
    [44]  Opposition at 4:5.

 

1  "mentoring and developing staff."

2      It is a staple of misclassification analysis that "[w]hether an employee is exempt is

3  determined by the employee's **actual** work activities, not the employer's characterization of those

4  activities through a job title or job description." <u>Cooke</u>, 993 F. Supp. at 61 (emphasis added); <u>Sav-</u>

5  <u>On</u>, 34 Cal. 4th at 336. Absolutely nowhere – in either the Opposition or the evidence submitted

6  in support of it – is there a single example of any underwriter performing anything but production

7  work.

8  **IV.**    **THE OPPOSITION IS SILENT ABOUT DEFENDANT'S WAGE STATEMENT**

9          **AND MEAL AND REST BREAK VIOLATIONS, REQUIRING CERTIFICATION**

10          **DUE TO NON-OPPOSITION**

11      **A.**    **Defendant's Failure To Provide Accurate And Complete Wage Statements**

12          **Provide Separate And Independent Grounds For Certification.**

13      Plaintiffs' Moving Papers raised two independent grounds for certifying a class based on

14  improper wage statements.[45] First, the putative class was not paid "solely" on salary, but rather a

15  salary plus a bonus. <u>California Labor Code</u> § 226(a)(2) requires then that employees be informed

16  as to the *actual hours* worked. This issue also was not addressed in Defendant's opposition and

17  thus, they must assent to this second independent reason to certify a class action.

18      Plaintiffs' offered a second independent ground for certifying a class based on improper

19  wage statements: that the purported "hourly rate" included on the wage statements was

20  inaccurate[46]. Because Plaintiffs' did not earn an "hourly" rate while misclassified as exempt from

21  overtime, it is a violation of Section 226 to inform class members they earned an hourly rate when

22  in fact they earned a salary. This issue also was not addressed in Defendant's opposition and thus,

23

---

24  [45]   See Plaintiffs' Moving Papers at 17:20-18:15.

   [46]   "Defendant routinely issued wage statements that noted an employee's hourly rate. For

25     example, Plaintiff Phyllis Parker was repeatedly told she earned an hourly rate of

   $28.831519. Defendant thus continuously issued a patently inaccurate hourly rate.

26     Plaintiff Phyllis Parker did not earn $28.831519 per hour. Plaintiffs and the putative class

   were paid a salary. The putative class was never paid an hourly rate. Thus, all wage

27     statements issued by Defendant are in error and in violation § 226(a)(9). This is also

   grounds for certifying this cause of action regardless of the Court's determination on the

28     misclassification issue." (Plaintiffs' Moving Papers at 18:8-18:15.)

 

1  they must assent to this second independent reason to certify a class action.

2      **B.**    **Defendant's Denial Of Meal And Rest Breaks Is Also A Class-Wide Issue,**

3              **Unopposed In The Opposition.**

4      Because Plaintiffs meet their burden for establishing a certified class action based on

5  misclassification, then a cause of action founded on <u>California Labor Code</u> § 226.7 would be

6  certifiable as class members when considered exempt did not receive their statutorily required

7  meal and rest breaks.  Accordingly, this claim is appropriate for certification.

8      **C.**    **Defendant's Violations Of California's Wage Laws Is A Violation Of**

9              **California's Unfair Competition Law.**

10      Because Plaintiffs meet their burden for establishing a certified class action, there is clearly

11  a viable allegation that Defendant violated <u>California Business and Professions Code</u> § 17200 *et*

12  *seq.*, the state's Unfair Competition Law.  Yet the Opposition speaks to neither this issue nor any

13  of the predicate violations.  Accordingly, certification is uncontested.

14  **V.**    **CONCLUSION**

15      Plaintiffs and the putative Class Members have satisfied all the requirements for class

16  certification.  Defendant has not established a valid reason for denying certification.  Plaintiff

17  respectfully request that this Court certify the class described herein, appoint Plaintiffs as the class

18  representatives, and appoint Plaintiffs' attorneys as class counsel.

19

20  Dated: June 12, 2006                    Respectfully submitted,
                                          Initiative Legal Group LLP

21

22                                    By:

23                                    Mark Yablonovich
                                  Marc Primo

24                                    Shawn Westrick

25

26

27

28

REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION




## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles. I declare that I am over the age of eighteen (18) and not a party to this action. My business address is: Initiative Legal Group LLP, 1875 Century Park East, Suite 1800, Los Angeles, California 90067.

On June 12, 2006, I served the within documents described below as:

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO CERTIFY A CLASS ACTION**

on the interested parties in this action by placing true copies thereon enclosed in a sealed envelope addressed as follows:

Matthew M. Yu
Heller, Ehrman, White & McAuliffe LLP
333 S. Hope Street, 39th Floor
Los Angeles, CA 90071

(X)    **PERSONAL:** I caused such envelope to be delivered by hand to the individuals at the addresses listed above via Golden State Attorney Service.

Jonathan Hayden
Heller, Ehrman, White & McAuliffe LLP
333 Bush Street
San Francisco, CA 94104
Facsimile: 415.772.6268

(X)    **OVERNIGHT COURIER:** I caused the above-referenced document(s) to be delivered to an overnight courier service (Federal Express), for delivery to the above addressee(s).

(X)    **FACSIMILE:** I caused the above-referenced document(s) to be transmitted to the above-named person at the telephone numbers above.

(X)    **(STATE)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

( )    **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

**EXECUTED** this document on June 12, 2006, at Los Angeles, California.

ALIDA MEKSAVANH